1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Kevin P.B. Johnson (Bar No. 177129)
2  kevinjohnson@quinnemanuel.com
   555 Twin Dolphin Dr., 5th Floor
3  Redwood Shores, California 94065
   (650) 801-5000 Tel.
4  (650) 801-5100 Fax

5  David Bilsker (Bar No. 152383)
   davidbilsker@quinnemanuel.com
6  Adam B. Wolfson (Bar No. 262125)
   adamwolfson@quinnemanuel.com
7  50 California St., 22nd Floor
   San Francisco, California 94111
8  (415) 875-6600 Tel.
   (415) 875-6700 Fax

9
   Attorneys for Plaintiff Element Biosciences, Inc.
10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12

| | |
|---|---|
| 13 ELEMENT BIOSCIENCES, INC. | Case No. |
| 14      Plaintiff, | **COMPLAINT** |
| 15      vs. | **CLAIMS FOR RELIEF:** |
| 16 ILLUMINA, INC., ILLUMINA CAMBRIDGE LTD., | **1.   RESTRAINT OF TRADE, 15 U.S.C. § 1** |
| 17      Defendants. | **2.   MONOPOLIZATION, 15 U.S.C. § 2** |
| 18 | **3.   ATTEMPTED MONOPOLIZATION, 15 U.S.C. § 2** |
| 19 | |
| 20 | **4.   EXCLUSIVE DEALING AND TYING, 15 U.S.C. § 14** |
| 21 | **5.   UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, *et seq*.** |
| 22 | |
| 23 | **6.   SECRET ALLOWANCES, CAL. BUS. PROF. CODE § 17045** |
| 24 | **7.   DEFAMATION** |
| 25 | **8.   TRADE LIBEL** |
| 26 | **9.   TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS** |
| 27 | |
| 28 | **JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.      DNA sequencing is one of the most important scientific developments of the last several decades. It has revolutionized our understanding of biology, medicine, and evolution by allowing scientists to read the genetic instructions of living organisms with unprecedented precision. This breakthrough has enabled major advances in diagnosing genetic disorders, developing targeted therapies and personalized medicine, tracing ancestry and human migration, improving agriculture through crop and livestock genomics, and accelerating biomedical research. DNA sequencing has become a foundational tool across many scientific disciplines, driving innovation and transforming how we approach health, disease, and the natural world.

2.      First-generation DNA sequencers became commercially available in the late 1970s, with the first automated DNA sequencer released in the mid-1980s. Although a major scientific breakthrough, first-generation machines could only sequence one fragment of DNA at a time and were both extremely costly and constrained in what they could do by the-then state of the art. Nevertheless, their commercial introduction paved the way for major projects like the Human Genome Project, which launched in 1990, officially took 13 years, and reportedly cost more than one billion dollars to complete. Meanwhile, companies continued to develop the next generation of DNA sequencers, which could sequence a much larger number of DNA fragments in parallel.

3.      One of the pioneers in developing these next-generation DNA sequencing ("NGS") instruments was a British company called Solexa, Inc., which was acquired by Defendant Illumina, Inc. in 2007. Since that acquisition, Defendants Illumina, Inc. and Illumina Cambridge Ltd. (collectively, "Illumina") have dominated NGS instruments and certain related markets. According to the Federal Trade Commission ("FTC"), "Illumina is a monopolist. It is the self-proclaimed leader in DNA sequencing markets in the United States and worldwide,"[1] and has "complete dominance" over the worldwide market for NGS systems, where it has had a market share "of over 80% since at least 2013, and over 90% since 2015."[2] Illumina has maintained this dominance—which includes

---

[1]  Administrative Complaint, *In re Illumina, Inc. & Pacific Biosciences of California, Inc.*, FEDERAL TRADE COMMISSION, at ¶ 1 (Dec. 17, 2019).

[2]  *Id.* at ¶¶ 1, 41.

1    not only short-read NGS instruments themselves, but also the Illumina-specific "consumables"
2    needed to sequence DNA on Illumina instruments and the maintenance and repair services many
3    customers find critical to keep these enormously expensive machines running for the entirety of
4    their useful life—through an aggressive strategy over many years aimed at eliminating any and all
5    serious competition at the expense of scientific progress, innovation, and the interests of its
6    customers. Although the details of Illumina's specific tactics changed over time, their unifying
7    theme is a complete unwillingness to permit competition on the merits and instead an extreme
8    commitment to maintaining its monopoly power, no matter what.

9        4.    Nevertheless, many within the scientific community recognize that there are better
10   ways to sequence DNA than what Illumina offers, and many technologies that can do so in a more
11   powerful way, at a fraction of the cost. Plaintiff Element Biosciences, Inc. ("Element") is one such
12   company. Founded in 2017 by a team of scientists, Element recognized an opportunity to innovate
13   in the market for short-read NGS instruments. Using its novel and proprietary avidite base
14   chemistry, Element launched the AVITI family of short-read NGS sequencers in 2022. AVITI
15   instruments can sequence more DNA in a single run and produce higher quality data than Illumina's
16   comparable NextSeq 2000 sequencer, all at a lower cost. AVITI instruments not only have a list
17   price nearly 15% less than the NextSeq 2000, but the "consumables kits" necessary to sequence
18   DNA through the AVITI (*i.e.*, chemical reagents and flow cells used to prepare DNA samples for
19   sequencing) cost less than a third of Illumina's comparable NextSeq 2000 kits. And the maintenance
20   and repair services Element offers for its AVITI products also cost significantly less than
21   comparable services Illumina offers for its own product. For these reasons, Element offers more
22   efficient, more accurate, more cost-effective, and more flexible options than Illumina for research
23   organizations wishing to purchase and use an NGS instrument for their DNA sequencing needs. For
24   these reasons, Element's entry into the NGS market has been met by enthusiasm from customers
25   and investors alike, having raised over $680 million in funding from investors who recognize the
26   importance of challenging Illumina's dominance through higher quality, more efficient NGS
27
28

1    instruments.[3]

2         5.      Yet, Element has encountered significant—and increasingly severe—headwinds
3 since first offering its AVITI instruments for sale in 2022. These challenges are not due to any
4 shortcomings in Element's technology, products, service, manufacturing capacity, or sales
5 infrastructure. Neither are they the result of weak demand for AVITI instruments or insufficient
6 financial resources to scale alongside growing AVITI adoption. Instead, these challenges stem
7 directly from Illumina's refusal to compete on the merits.

8         6.      When Element began selling its AVITI instruments, Illumina correctly recognized
9 Element as a particularly strong new competitor. Consistent with its anticompetitive history,
10 Illumina therefore incorporated Element into its broader campaign to eliminate any would-be
11 competitor at all costs. This wide-ranging scheme includes: (1) coercing customers into the purchase
12 of new Illumina short-read NGS instruments by threatening punitive pricing on NGS consumables
13 and instrument services for preexisting NGS instruments; (2) imposing explicit and *de facto*
14 exclusive dealing on customers for short-read NGS instruments; (3) anticompetitively pricing short-
15 read NGS instruments below an appropriate measure of marginal cost through direct and bundled
16 discounts; and (4) disparaging, libeling, and defaming Element to its existing or prospective
17 customers.

18         7.      Illumina has inflicted substantial harm on Element, resulting in lost sales, diminished
19 market share, and reduced profits. But the damage extends far beyond a single competitor.
20 Illumina's conduct has harmed competition and consumers. By once again attempting to eliminate
21 any meaningful alternatives in the short-read NGS instrument market, Illumina has driven up prices,
22 lowered market wide quality, limited choice, and suppressed innovation. Given the profound
23 benefits DNA sequencing offers to science and society, Illumina's actions enrich itself at the cost
24 of progress. It is time someone stood up and put an end to this anticompetitive campaign.

25

26

27      [3]   *Element Biosciences Raises Over $277 Million to Develop and Commercialize Differentiated Products and Continue Rapid Growth*, ELEMENT BIOSCIENCES (July 11, 2024), https://www.elementbiosciences.com/news/element-biosciences-raises-over-277-million-to-
28 develop-and-commercialize-differentiated-products-and-continue-rapid-growth (last visited Sept. 19, 2025).

Case No.
COMPLAINT

8.      For these reasons, Element seeks redress for the personal and competitive harm it has suffered. As explained below, Illumina has violated Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, the California Unfair Competition Law, the California Secret Allowance Law, and various other California state laws.

## THE PARTIES

9.      Plaintiff Element Biosciences, Inc. is a privately held Delaware corporation with its principal place of business at 10055 Barnes Canyon Road, Suite 100, San Diego, California 92121.

10.     Defendant Illumina, Inc. is a Delaware corporation with its principal place of business at 5200 Illumina Way, San Diego, California 92122.

11.     Defendant Illumina Cambridge, Ltd. is a foreign corporation with its principal place of business at 19 Granta Park, Great Abington Cambridge, Cambridgeshire CB21 6DF, United Kingdom. Illumina Cambridge Ltd. is a wholly owned subsidiary of Illumina, Inc., and joined as co-plaintiff in the suit alleging that Element infringed Illumina's patents.[4] Illumina Cambridge, Ltd. distributes the NGS systems developed by Illumina, Inc. through a global network of distributors.

## JURISDICTION & VENUE

12.     This Court has jurisdiction over the federal claims alleged under 15 U.S.C. § 4, 28 U.S.C. § 1331, and 28 U.S.C. § 1337(a). This Court has jurisdiction over state law claims alleged pursuant to 28 U.S.C. § 1367(a) because Element's state law claims arise out of the same factual nucleus as its federal law claims.

13.     Venue is proper in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 22.

14.     Illumina maintains regular and established places of business in this District at 500 Lincoln Centre Drive, Foster City, CA 94404, and at 25841 Industrial Blvd., Hayward, CA 94545. Further, as discussed within this Complaint, a substantial part of the events giving rise to Element's claims occurred within this District.

## INTERSTATE COMMERCE

15.     Illumina is engaged in, and its activities substantially affect, interstate trade and

[4] *See* Complaint, ECF No. 1, *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602 (D. Del. May 15, 2025).

Case No.
COMPLAINT

commerce. According to its 2024 Annual Report, Illumina's revenues in the United States were approximately $2.3 billion in 2024, $2.4 billion in 2023, and $2.3 billion in 2022.[5]

**RELEVANT PRODUCT MARKET #1:**
**SHORT-READ NEXT GENERATION DNA SEQUENCING INSTRUMENTS**

16.     DNA sequencing is the process used to determine the order of nucleotides (A, T, C, or G) in DNA molecules from a biological sample. As the FTC has explained, "[s]cientists use DNA sequencing to ascertain the sequence of individual genes, larger genetic regions, full chromosomes, or the entire genome of an organism. DNA sequencing is foundational to research spanning the fields of molecular biology, evolutionary biology, genomics, medicine, pharmacology, ecology, and epidemiology. Other uses for DNA sequencing include clinical medical diagnostics, forensics, biometrics, and consumer genetics."[6]

17.     The first generation of DNA sequencing technologies became available in the 1970s. The most common first-generation sequencing method, Sanger sequencing, functioned by using a series of chemical reactions to attach a fluorescent marker to each nucleotide in a DNA fragment, allowing sequencers to identify each nucleotide. However, because Sanger sequencing and other first-generation methods only sequenced one DNA fragment at a time, the process was expensive, time consuming, and inefficient.

18.     In the mid-2000s, next generation sequencing ("NGS") instruments emerged to address the inefficiencies in first-generation sequencing. NGS instruments sometimes rely on different chemical processes to sequence DNA, but all share the same common differences from first-generation sequencing systems. NGS instruments use a solid support (known as an array) to sequence DNA fragments in parallel, where first-generation systems relied on gel electrophoresis or similar processes, limiting sequencing to single fragments at a time. For this reason, unlike their first-generation predecessors, NGS instruments can sequence millions of DNA fragments in a single run, greatly reducing the time and expense of DNA sequencing. This volume of DNA that NGS

---

[5] Illumina 2024 Annual Report, Form 10-K, at 66 (Feb. 12, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited Sept. 19, 2025).

[6] FTC Illumina/PacBio Complaint, *supra* note 1 at ¶ 15.

instruments are capable of sequencing during a run is called "throughput" and today's NGS instruments are generally grouped by throughput into three, overlapping categories: low, medium, and high throughput.

19.     Because even low throughput NGS instruments can sequence a number of DNA segments that is orders of magnitude beyond first-generation sequencers, first-generation sequencing instruments, such as those based on Sanger sequencing, are not commercially reasonable substitutes for NGS instruments. Even if first-generation sequencing instruments could produce a throughput comparable to NGS instruments, the cost of such an instrument would be so much higher than an NGS instrument that it would not be practical for the sort of large scale everyday use that NGS instruments provide. Furthermore, the time associated with sequencing an equivalent number of DNA segments using first-generation technology versus even the lowest throughput NGS instruments is so much longer than NGS instruments that there is no practical demand to substitute first-generation sequencing instruments for NGS instruments.

20.     Government regulators recognize the same. In an administrative complaint seeking to block Illumina's proposed acquisition of a company called PacBio, the FTC noted that a hypothetical monopolist of NGS instruments could profitably impose a small but significant and non-transitory increase in the price ("SSNIP") of NGS instruments.[7] Furthermore, according to the FTC's complaint, Illumina's internal documents "routinely recognize the existence of an NGS market" and "refer to competition across NGS systems."[8] "Sanger sequencing systems . . . are properly excluded from the NGS Market" in part because "the legacy Sanger approach is so much slower that it is impractical for almost all purposes for which scientists employ NGS."[9]

21.     Illumina itself recognizes the distinction between NGS and first-generation sequencing instruments. As Illumina's website explains, "[t]he critical difference between Sanger

---

[7] FTC Illumina/PacBio Complaint, *supra* note 1 at ¶ 23.

[8] *Id.* at ¶ 25.

[9] *Id.* at ¶ 29.

sequencing and NGS is sequencing volume. While the Sanger method only sequences a single DNA fragment at a time, NGS is massively parallel, that is, sequencing millions of fragments simultaneously per run. This process translates into sequencing hundreds to thousands of genes at one time. NGS also offers greater discovery power to detect novel or rare variants with deep sequencing."[10]

22.    According to Illumina's 2024 Annual Report, "Next-generation sequencing (NGS) technologies are being adopted due to their ability to cost-effectively sequence large sample sizes quickly and accurately, generating vast amounts of high-quality data."[11] "The introduction of next-generation sequencing technologies, including ours, has reduced the cost of sequencing by a factor of more than 10,000 and reduced the sequencing time per Gb by a factor of approximately 12,000 over the last 20 years."[12]

23.    Illumina has also acknowledged the difference between first-generation and NGS technologies in court documents. Before the introduction of NGS instruments, "sequencing was so expensive and time-consuming, it could not be practically used in many settings, and the only customers for genetic sequencing were large research institutions."[13] "[U]nlike the type of [first-generation] sequencing that had been used by the researchers in the Human Genome Project, in which nucleotides in a target DNA sample were painstakingly sequenced a handful of strands at a time, Illumina's NGS allows millions of different portions of the same DNA sample to be sequenced simultaneously in a 'massively parallel' fashion."[14]

24.    Beyond the difference between NGS instruments and first-generation sequencing technologies, NGS instrument producers and customers also recognize two distinct types of NGS

---

[10]  NGS vs Sanger Sequencing, available at https://www.illumina.com/science/technology/next-generation-sequencing/beginners/advantages/ngs-vs-sanger.html (last visited Sept. 19, 2025).

[11]  Illumina 2024 10-K, *supra* note 4 at 6.

[12]  *Id.* at 14.

[13]  Complaint, ECF No. 1, *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602, at ¶ 27 (D. Del. May 15, 2025).

[14]  *Id.* at ¶ 28.

instruments, "short-read" and "long-read" instruments. Short-read NGS instruments are capable of sequencing relatively short DNA fragments in any given run, typically between 50-300 base pairs of DNA. Long-read NGS instruments, on the other hand, can sequence much longer DNA fragments, between 10,000 to 100,000 base pairs or even more. The tradeoff is that long-read NGS instruments are historically less accurate, provide lower throughput, and are more costly to operate on a per-genome basis than short-read NGS instruments. Indeed, these differences have led many market participants to call long-read NGS instruments "third generation sequencing."

25.     These differences also mean that short-read and long-read NGS instruments have different commercial applications and uses. For example, long-read sequencers are typically required to perform *de novo* genome assembly, which is the process of sequencing the entire genome of a particular organism for the first time. Long-read sequencers are also generally used to perform epigenetic modification detection, a process used to determine how gene expression can differ without changes in the underlying DNA sequence. These are applications well-suited to the scope of a long-read analysis. For other applications requiring more targeted analysis, however (like detecting a rare variant in a targeted DNA sample, or analyzing a cancer gene panel for short, known DNA regions), short-read NGS instruments are required because of their superior accuracy and sequencing depth (*i.e.*, the number of times a specific DNA nucleotide is read during sequencing).

26.     Due to their differing applications, short-read NGS instruments are not reasonably interchangeable with long-read NGS instruments. For organizations with sequencing needs that can be performed on either short-read or long-read NGS instruments, the better choice is invariably the short-read NGS instrument because of the lower cost to purchase and operate. And organizations with more specific DNA sequencing needs often purchase both short-read and long-read NGS instruments as complementary goods, using long-read NGS instruments to sequence long DNA samples, and short-read NGS instruments to conduct more targeted sequencing. Because short-read

and long-read NGS instruments have fundamentally different uses and demand characteristics, a hypothetical monopolist of just short-read NGS instruments could profitably impose a SSNIP. Indeed, as discussed below, Illumina has done just that.

27.    Customers recognize short-read NGS instruments as a unique type of product for which there are no reasonably interchangeable substitutes. For this reason, short-read NGS instruments have unique pricing and price-demand curves relative to first-generation sequencers, long-read NGS sequencers, and other types of scientific instruments. Short-read NGS instruments also require distinct production processes because they rely on solid support array technologies that are not used by first-generation sequencers and different chemical processes than long-read NGS instruments. Because production processes and demand characteristics differ so markedly between short-read NGS instruments, long-read NGS instruments, first-generation sequencers, and other types of scientific instruments, short-read NGS instrument manufacturers often do not produce long-read NGS instruments or first-generation sequencers and vice versa. If short-read NGS instrument manufacturers do produce other types of scientific instruments (which is rare), they do so under different competitive and cost constraints.

28.    Only two manufacturers produce long-read NGS instruments: PacBio and Oxford Nanopore Technologies ("ONT"). Element and Illumina both only sell short-read NGS instruments. Neither Illumina nor Element produces or sells long-read NGS instruments.

29.    For all of these reasons, short-read NGS instruments are a relevant product market because first-generation DNA sequencing instruments and long-read NGS instruments are not reasonably interchangeable with short-read NGS instruments and because no other type of scientific instrument can reasonably provide the same use.

30.    In the alternative, a relevant product market is no broader than all NGS instruments. As described above, a hypothetical monopolist of all NGS instruments could profitably impose a SSNIP. And both NGS instrument consumers and producers recognize that NGS instruments are

Case No.
COMPLAINT

unique from first-generation DNA sequencers and other types of scientific instruments, meaning there is no reasonably interchangeable substitute for NGS instruments, even if viewed as a market incorporating both short- and long-read instruments.

## RELEVANT PRODUCT MARKET (OR RELEVANT AFTERMARKET) #2: ILLUMINA SHORT-READ NGS CONSUMABLES

31.     All NGS instruments require certain inputs to run. These inputs, often called "consumables," include chemical reagents that prepare DNA samples for sequencing and the flow cells on which DNA samples are loaded into sequencers. NGS providers typically sell consumable kits that contain all inputs necessary to prepare a DNA sample for sequencing. These consumable kits ("NGS consumables") are unique to the specific NGS instruments, meaning, for example, that Illumina consumables can only be used on Illumina sequencers and Element consumables can only be used on Element sequencers. Because NGS consumables are instrument-specific, consumables for short-read NGS instruments cannot be used on long-read NGS instruments and vice versa.

32.     Short-read NGS consumables are a complementary product to short-read NGS instruments, in that the purchase and use of a short-read NGS instrument increases the demand for short-read NGS consumables. Purchasers, however, treat the two as distinct types of products and the reason they are sold separately is because of consumer demand for those separate sales. Most purchasers view (and account for) the purchase of short-read NGS instruments as capital expenditures; *i.e.*, money spent to acquire a long-term, fixed asset. In contrast, most purchasers treat the purchase price of short-read NGS consumable as operating expenditures; *i.e.*, ongoing costs incurred to maintain daily operations. The initial purchase of a short-read NGS instrument is prompted by the desire to conduct certain types of DNA sequencing. However, the subsequent purchase of consumables depends on the quantity and nature of DNA sequencing a short-read NGS instrument owner wants or needs to conduct. These needs may increase or decrease over time, thus necessitating the flexibility to purchase more or less NGS consumables when the owner wants.

33.     If they wish to conduct DNA sequencing, short-read NGS instrument owners cannot substitute any other type of consumable for short-read NGS consumables. This is because each NGS consumable kit is only compatible with NGS instrument(s) from the same manufacturer. For this

1    reason, other types of consumables are not interchangeable with short-read NGS consumables at

2    all—let alone reasonably interchangeable—and a hypothetical monopolist of short-read NGS

3    consumables could profitably impose a SSNIP.

4          34.    Purchasers recognize short-read NGS consumables as a separate and distinct product

5    for which there is no reasonably interchangeable product. Demand and pricing for short-read NGS

6    consumables is distinct from demand for short-read NGS instruments. For this reason, Illumina itself

7    recognizes its short-read NGS consumables as a unique line of business and identifies consumable

8    revenue as a distinct line item in its financial statements.[15] Because short-read NGS instrument

9    owners must purchase consumables to continue using their instruments, sales of short-read NGS

10   consumables can account for a substantial portion of a short-read NGS manufacturer's revenues.

11   For example, in 2024, short-read NGS consumables accounted for 72% of Illumina's revenue.[16]

12         35.    Although all of these facts indicate that short-read NGS consumables are not

13   reasonably interchangeable with other types of consumables or scientific testing products (and thus,

14   if viewed as a category, are a distinct set of relevant products from other types of consumables), a

15   further facet of this industry is that an Illumina short-read NGS instrument owner can only use

16   Illumina consumables to operate their Illumina instrument. This indicates that Illumina short-read

17   NGS consumables are their own market, because no other type of consumable is interchangeable at

18   all—let alone reasonably interchangeable—with Illumina short-read NGS consumables. Thus, if a

19   hypothetical monopolist of Illumina short-read NGS consumables were to apply a SSNIP of (for

20   example) 5%, it could profitably do so because consumers of Illumina short-read NGS consumables

21   could not switch away at all, let alone switch to other products in sufficient numbers to make the

22   price increase unprofitable. Indeed, Illumina has done exactly this with Illumina short-read NGS

23   consumables in the past, indicating the separateness of the Illumina short-read NGS consumable

24   market and (as discussed further below) Illumina's power in that market.

25         36.    Illumina short-read NGS consumables may also be viewed as a relevant aftermarket

26

27   _____

28        [15]  Illumina 2024 10-K, *supra* note 4 at 34.
          [16]  Illumina 2024 10-K, *supra* note 4 at 7.

over which Illumina has lock-in power. At the time of instrument purchase, Illumina instrument owners generally do not know the volume of consumables they will need over the lifetime of the instrument, or how Illumina's consumable pricing might change during that time. Thus, high information costs make it difficult for Illumina short-read NGS instrument purchasers to estimate the lifetime cost of DNA sequencing they will conduct using short-read NGS consumables in advance. In addition, after purchasing an Illumina short-read NGS instrument, owners cannot easily switch to new short-read NGS instruments because the upfront cost, required training, and regulatory validation requirements are often prohibitive—at least, until the end of the instrument's useful life. And because demand for short-read NGS consumables is driven primarily by the volume of sequencing, demand for short-read NGS consumables is not highly correlated with the price of the instrument and vice versa. Finally, Illumina does not tell short-read NGS instrument purchasers up front that it can, will, and has changed its policies with respect to the pricing, sale, and availability of Illumina NGS consumables, meaning that even sophisticated consumers of short-read NGS instruments have high information costs about Illumina's NGS consumable policies and practices in advance, even in instances where they enter multi-year contracts for consumables and/or instrument services with Illumina in advance—because the actions described herein are *ultra vires* to those contracts and affect buying requirements not covered by those types of contracts. As a result of these information costs, switching costs, and differing demand characteristics, purchasers of Illumina short-read NGS instruments are effectively "locked-in" to purchasing Illumina consumables for the life of the Illumina short-read NGS instrument, and must therefore purchase Illumina short-read NGS consumables in the relevant aftermarket.

### RELEVANT PRODUCT MARKET (OR RELEVANT AFTERMARKET) #3: ILLUMINA SHORT-READ NGS INSTRUMENT SERVICES

37.    Given the specifics of the technology and instruments involved, customers who purchase or operate short-read NGS instruments require highly specialized maintenance and repair services tailored specifically to the complex technology and precision requirements of those instruments. Short-read NGS instrument and consumable manufacturers therefore offer various services to cover maintenance and repair of short-read NGS instruments after expiration of the

included warranty. These services are specific to short-read NGS instruments and technology, as well as tailored to the specific device(s) sold by the manufacturer in question.

38. Although not every short-read NGS instrument purchaser also purchases short-read NGS instrument services, most do. This is because, as noted above, short-read NGS instruments are large purchases and a lab or research organization that has invested in a particular NGS instrument cannot easily justify replacing or otherwise disposing of that machine because of the costs doing so, but also because of considerations around training, data compatibility, and regulatory validation. This means that most short-read NGS instrument users can only maximize the useful life of their instrument by regularly servicing and repairing their instrument. By doing so, short-read NGS instruments typically have an average useful life of 3-5 years.

39. General repair services or maintenance for other types of laboratory equipment are not a substitute—let alone a reasonable substitute—for short-read NGS instrument services due to the specialized training, tools, and proprietary knowledge required. A hypothetical monopolist of short-read NGS instrument services could thus profitably impose a SSNIP.

40. Customers recognize that short-read NGS services constitute a unique type of service for which there are no reasonably interchangeable substitutes. Short-read NGS services are sold and priced separately from short-read NGS instruments, short-read NGS consumables, and other types of scientific instrument services. Because short-read NGS instrument owners typically do not purchase short-read NGS services until expiration of the included warranty, when owners are committed to their purchase of the instrument, demand for short-read NGS services is not highly sensitive to price changes. Furthermore, Illumina itself recognizes that short-read NGS services are a distinct line of business and identifies service revenue as a separate line item in its financial statements from other products and services.[17]

41. Although all of these facts indicate that short-read NGS instrument services are not reasonably interchangeable with other types of scientific instrument services (and thus, if viewed as a category, are a distinct set of relevant products from other types of services), a further facet of this

---

[17] Illumina 2024 10-K, *supra* note 4 at 34.

Case No.
COMPLAINT

industry is that an Illumina short-read NGS instrument owner can only use Illumina to service their machine. This indicates that Illumina short-read NGS instrument services are their own market, because no other provider of any other service (even other NGS instrument services) is interchangeable at all—let alone reasonably interchangeable—with Illumina short-read NGS instrument services. Thus, if Illumina were to apply a SSNIP of (for example) 5% to its Illumina short-read NGS instrument services, it could profitably do so because consumers of those services could not switch away at all, let alone switch to other products or providers in sufficient numbers to make the price increase unprofitable. Indeed, Illumina has done exactly this with Illumina short-read NGS instrument services in the past, indicating the separateness of the Illumina short-read NGS instrument services market and (as discussed further below) Illumina's power in that market.

42.    As with Illumina short-read NGS consumables, Illumina short-read NGS instrument services may also be viewed as a relevant aftermarket over which Illumina has lock-in power. Because short-read NGS instrument services for Illumina short-read NGS instruments are manufacturer-specific, Illumina short-read NGS instrument purchasers have no other option for such services besides Illumina short-read NGS instrument services. This means there is no substitute at all for such services, let alone a reasonable alternative to them. Further, at the time of instrument purchase, Illumina instrument owners generally cannot know the amount of service their instruments will require, nor the price Illumina will charge for that service. Thus, high information costs prevent Illumina short-read NGS instrument owners from estimating the lifetime cost of short-read NGS services at the time of instrument services. In addition, the high upfront, training, and validation costs of switching between short-read NGS instruments makes purchasers less sensitive to changes in the price of NGS services. Because service is typically viewed as necessary for short-read NGS instrument operation and the lifetime cost of service is inherently unknowable at the time of instrument purchase, demand for short-read NGS services is not closely related to the price of the original instrument and vice versa. Finally, Illumina does not tell short-read NGS instrument purchasers up front that it can, will, and has changed its policies with respect to the pricing, sale, and availability of Illumina short-read NGS instrument services, meaning that even sophisticated consumers of NGS instruments can have high information costs about Illumina's short-read NGS

instrument services policies and practices in advance. Purchasers of Illumina short-read NGS instruments are thus effectively "locked-in" to purchasing Illumina services for the life of the instrument and must therefore purchase Illumina short-read NGS instrument services in the relevant aftermarket, or not at all.

## THE PARTIES' SHORT-READ NGS PRODUCTS AND THE AREAS OF COMPETITION BETWEEN THOSE PRODUCTS

43.     Illumina first entered the three short-read NGS relevant markets by acquiring Solexa in 2007. Illumina's short-read NGS instruments rely on technology it calls "sequencing-by-synthesis" chemistry ("SBS").

44.     Illumina currently offers a range of low, mid, and high throughput DNA sequencing machines. Its low throughput sequencers include the "MiniSeq" and "MiSeq" systems. Its mid throughput sequencers include the "NextSeq 1000" and "NextSeq 2000" systems. And its high throughput sequencers include the "NovaSeq 6000" and "NovaSeq X" systems. All of Illumina's NGS instruments are short-read sequencers.

45.     Recognizing an opportunity to innovate, Element was founded in 2017 by three scientists who shared the goal of developing a more accurate and efficient short-read NGS system. Over the first years of its existence, Element developed its proprietary and innovative "avidite base chemistry" ("ABC"), which enables higher quality DNA sequencing results for a lower cost.

46.     Based on its innovative ABC technology, Element launched its AVITI line of short-read NGS instruments in 2022. The AVITI line includes three sequencers, all of which operate in the mid throughput range and all of which are short-read sequencers. The "AVITI" is Element's standard mid throughput offering. The "AVITI LT" is a lower throughput, lower cost sequencer. And the "AVITI24" offers the same sequencing capabilities as the AVITI alongside multi-omic analysis capabilities, enabling study of multiple types of organic materials like DNA, RNA, and various proteins. The AVITI24 is the only NGS instrument that offers both sequencing and multi-omic capabilities in the same machine.

47.     Illumina admits that Element is a direct competitor in short-read NGS sequencing. In recent court filings, Illumina acknowledged that "Element's sequencing instruments and

1    consumables compete directly with Illumina's products."[18]

2    48.    Because it is a mid throughput offering, Element's AVITI sequencer most directly

3    competes with Illumina's NextSeq 2000 sequencer. However, the AVITI offers almost double the

4    throughput as the NextSeq 2000 over the same run time. Third party analyses have also found that

5    the AVITI offers higher quality data, meaning fewer sequencing errors than the NextSeq 2000.[19]

6    49.    Due to cost savings enabled by Element's ABC technology, the AVITI's list price is

7    $289,000, almost 15% lower than the NextSeq 2000's list price of $335,000. Accordingly, the

8    AVITI provides higher throughput and higher quality data than the NextSeq 2000, all at a lower

9    price.

10    50.    Element also offers consumable kits and service packages for a lower cost than

11    Illumina. Element's highest capacity (and bestselling) short-read NGS consumables kit has a list

12    price of $1,680. The competing short-read NGS consumable kit from Illumina costs over $6,000,

13    more than three times the cost of the Element kit. And while Illumina typically charges more than

14    $40,000 for an extended short-read NGS instrument service contract, the comparable contract from

15    Element costs between $20,000 and $30,000. As a result, the AVITI has a lower upfront cost than

16    a NextSeq 2000 and is cheaper to operate and maintain in the long run.

17    51.    Element's innovation extends to its newest sequencer, the AVITI24, which combines

18    the AVITI's sequencing capabilities with multi-omics data analysis, a type of biological research

19    that is often performed in parallel with DNA sequencing. Researchers typically use separate multi-

20    omic platforms alongside DNA sequencers, but the AVITI24 is the first and only NGS instrument

21    to combine both functions in a single machine.

22    52.    Although Element's AVITI sequencers all compete in the mid throughput range,

23    their relative price-to-quality ratio versus other short-read NGS instruments creates a unique value

24

25

---

26    [18] *See* Complaint, ECF No. 1, *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602, at ¶ 8 (D. Del. May 15, 2025).

27    [19] *See, e.g.*, "Investigating Element Data with Google DeepVariant," available at

28    https://www.elementbiosciences.com/resources/videos/all/investigating-element-data-with-google-deepvariant-andrew-carroll-phd (Google Health Genomics presentation comparing Element and Illumina data, noting superiority of Element results at lower sequencing depths).

Case No.
COMPLAINT

proposition for customers considering any type of short-read NGS instrument as an alternative. If customers considering a low throughput short-read sequencer (like an Illumina MiSeq) can afford the higher upfront cost of Element's mid throughput AVITI, Element's instrument power, as well as subsequent purchases of its much lower-priced consumables, can make up the difference in a short period of time. For customers considering a high throughput short-read sequencer (like an Illumina NovaSeq), purchasing multiple Element AVITIs can deliver similar throughput for a comparable upfront cost, all while securing Element's much lower consumables and service pricing in those markets over the useful life of the short-read NGS instrument itself.

53.     Further adding to this competitive dynamic are the differences between large and small research organizations, how they approach DNA sequencing, and what this means for the value proposition of different types of short-read NGS instruments, consumables, and instrument services for those organizations. Smaller research organizations typically have one or just a small number of labs, meaning they do not need to purchase many short-read NGS instruments and sequence a relatively small volume of DNA on those they do purchase, making low or mid throughput sequencers the most cost-effective option. Short-read NGS consumables and instrument services also cost less overall for such organizations because they have fewer instruments and lower sequencing needs.

54.     In contrast to smaller organizations, large research organizations typically have many labs—sometimes, dozens—and accordingly sequence a much higher volume of DNA than their smaller counterparts. Historically, the most powerful short-read NGS instruments were higher throughput machines, which means that until recently, large research organizations typically concentrated sequencing in a small number of centralized labs (often called "core labs") with a handful of high throughput machines that run sequencing for the entire organization, and for multiple labs at once. In this model, labs in the organization need to send their DNA samples to the central lab so they can be run as part of a single batch with multiple other labs' DNA samples. This can often take weeks and requires reserving a spot in the sequencing run, which unsurprisingly reduces an individual lab's flexibility and can delay research results. The tradeoff is being part of a large organization that typically has substantial funding and reach, as well as access to other

resources that many smaller organizations do not have. Given the high number of sequencing runs and the regular use of short-read NGS instruments at these organizations, large research organizations are typically more sensitive than small organizations to price changes in short-read NGS consumables and instrument services.

55.     When it comes to large research organizations, one of Element's unique value propositions is that it enables those customers to operate more efficiently by decentralizing DNA sequencing. Large organizations can do so by allowing individual or small groups of labs across the organization to purchase Element's mid throughput NGS instruments. This can lead to increased efficiencies because a decentralized model allows labs to avoid the time and expense of shipping samples to a core sequencing lab, where samples often have to wait in line for processing, all while obtaining sequencing results and analysis that is better than core labs' machines because of the higher quality of Element's NGS instruments. Furthermore, because the cost of Illumina consumables is so high, it is often more cost-effective for large organizations with Illumina instruments to conduct fewer sequencing runs on centralized high throughput instruments that can sequence more DNA in a single run. But with Element's low cost consumables, large organizations can perform more runs on mid throughput AVITI sequencers across multiple labs for a cost comparable to or lower than operating centralized Illumina high throughput sequencers. This allows large organizations to capture the benefits of decentralization for the same (or lower) all-in cost than a centralized model based on Illumina's NGS instruments.

56.     Unsurprisingly, business from large research organizations is incredibly important to Illumina because it drives the majority of Illumina's NGS instrument, consumable, and services revenues, and acts as an anchor for Illumina's monopoly power in each relevant market (discussed further below). Element thus represents a unique competitive threat to Illumina because it offers the largest researchers flexibility that Illumina and its high throughput machines do not, and because Element offers a better quality short-read NGS instrument with better quality short-read NGS consumables, all at a lower all-in cost. Element's competition with Illumina thus benefits purchasers (large and small) through lower prices, higher quality, greater choice, and enhanced innovation, and by demonstrating to other would-be competitors that they can similarly compete with Illumina on

the merits, despite Illumina's anticompetitive history. Customers have already responded positively to Element's entry into the market. For example, the CEO of the New York Genome Center remarked that "[i]t's wonderful to see there's competition" from Element and other NGS startups.[20] This excitement is further evidenced by Element's strong fundraising performance, raising more than $680 million through 2024 from investors that recognize the potential of higher quality, more efficient NGS instruments to bring meaningful choice, competition, and innovation to markets long dominated by Illumina.[21]

57.    Element's competition with Illumina also benefits Element. Despite Illumina's anticompetitive conduct described herein, Element sold 137 AVITI sequencers in 2023 and captured $27 million in revenue, and approximately $60 million in revenue in 2024.

## RELEVANT GEOGRAPHIC MARKET

58.    A relevant geographic market for short-read NGS instruments, consumables, and instrument services is global.

59.    Researchers across the globe rely on short-read NGS instruments, consumables, and instrument services to conduct a wide range of scientific and medical research. To meet this demand, short-read NGS manufacturers produce and sell their instruments, consumables, and services around the world. Illumina and Element, for example, are both companies based in the United States but sell their short-read NGS products and services around the world, either on their own or through networks of global distributors. As another example, BGI Genomics is China-based producer of short-read NGS instruments, consumables, and instrument services that sells its products in the United States through subsidiaries and competes against Illumina and Element globally.

60.    Sellers of short-read NGS instruments, consumables, and instrument services also manufacture their products around the world. U.S.-based Illumina, for example, has manufacturing facilities in the United States, Singapore, and China.

---

[20]  Brian Gormley, *Startups Take On Illumina in Race For Cheaper DNA Sequencing*, WALL STREET JOURNAL (Feb. 16, 2023), Startups Take On Illumina in Race for Cheaper DNA Sequencing - WSJ (last visited Sept. 19, 2025).

[21]  *Element Fundraising*, *supra* note 3.

Case No.
COMPLAINT

61.    There are low barriers to international trade for short-read NGS instruments, consumables, and instrument services. Given the high cost of short-read NGS instruments, the relatively small number of manufacturers, and the importance of short-read NGS technology to global research, any costs associated with the international production or sale of short-read NGS instruments, consumables, and services is easily overcome by global demand.

62.    A hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of short-read NGS instruments, consumables, or services in the world would profitably impose at least a SSNIP.

63.    In the alternative, the relevant geographic market for short-read NGS instruments, consumables, and instrument services is no narrower than the United States. Any barriers that restrict the production or sale of short-read NGS technology globally do not exist in interstate commerce. And for the same reasons a hypothetical profit-maximizing monopolist of short-read NGS instruments, consumables, or instrument services could profitably impose at least a SSNIP globally, they could also do so in the United States.

## ILLUMINA'S MONOPOLY POWER

64.    Illumina describes itself as "a global leader in DNA sequencing and array-based technologies."[22] "Illumina is a monopolist. It is the self-proclaimed leader in DNA sequencing and dominates DNA sequencing markets in the United States and worldwide. Its name is often considered synonymous with 'next-generation sequencing'…. In the United States, Illumina has complete dominance over the market for these products…. Historically, Illumina has faced little competition for its NGS instruments and consumables…. Illumina has possessed since at least 2009, and continues to possess today, monopoly power in the markets in which it sells its DNA sequencing systems, including in the NGS Market."[23]

65.    Illumina's dominance is shown by, among other things, its share of each of the relevant markets identified above and high barriers to entry into each of those markets. Even if the

---

[22] Illumina 2024 10-K, *supra* note 4 at 31.

[23] FTC Illumina/PacBio Complaint, *supra* note 1 at ¶¶ 1, 36.

1    relevant NGS instrument market includes all NGS instruments (*i.e.*, both short-read and long-read),

2    Illumina still has 80-90% share of that market and, according to some sources, has had a share of

3    over 80% of the market since at least 2013.[24] In court filings, Illumina itself has admitted that it "is

4    a recognized industry leader in DNA sequencing, and its technology is used to generate over 90%

5    of the world's sequencing data."[25] Industry trade publications report that through at least August

6    2024, "Illumina has more than 90% market share of clinical genomics testing and its platforms have

7    become deeply embedded in many clinical companies."[26]

8        66.    Because the market for short-read NGS instruments, consumables, and instrument

9    services is necessarily narrower than the market for all NGS-related products, Illumina's share of

10   the global market for short-read NGS instruments, consumables, and instrument services must be at

11   least 80%.

12       67.    As the FTC has also explained, barriers to entry in the NGS instrument market are

13   high because "any new entrant would need to overcome significant scientific, commercial, and

14   intellectual property barriers to develop and commercialize a new NGS system successfully."[27]

15   "DNA sequencing systems are highly complex systems comprising advanced chemistry, sensitive

16   optics, and powerful semiconductors. Integrating these components into a system that delivers value

17   and performance sufficient to compete with existing systems, is scalable, and is cost effective to

18   manufacture and operate is an immense challenge that requires considerable investment of capital

19   and time."[28]

20       68.    Moreover, Illumina is extremely aggressive in patenting its alleged inventions in the

21   DNA sequencing space and then enforcing the patents it obtains (whether through its own

22   applications or through portfolios it acquires from others) against any real NGS instrument

---

24    [24] *Id.* at ¶¶ 41, 51.

25    [25] Illumina Mot. for Preliminary Injunction at 3, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:19-CV-03770 (N.D. Cal. Feb. 19, 2020), ECF No. 85.

26    [26] Jeffrey Rosenfeld, *Illumina and the State of the Genomics Market*, GENETIC ENGINEERING 27 & BIOTECHNOLOGY NEWS (Aug. 29, 2024), https://www.genengnews.com/topics/omics/illumina-and-the-state-of-the-genomics-market/ (last visited Sept. 19, 2025).

      [27] FTC Illumina/PacBio Complaint, *supra* note 1 at ¶¶ 1, 42.

28    [28] *Id.* at ¶ 53.

competitor. Indeed, "Illumina's patent enforcement efforts have prevented, and likely will continue to prevent, new competitors from emerging in the United States."[29]

69.     Part of Illumina's power also stems from the high switching costs inherent in NGS instrument purchases. As noted above, an NGS instrument typically costs hundreds of thousands of dollars and is not easily replaced once purchased. Further exacerbating these switching costs is the time, energy, and other resources lab personnel would have to undergo by switching to another platform after learning how to use their Illumina NGS instrument. Such switches do in fact happen—which is one of the main reasons Illumina has targeted Element—but the stickiness of an NGS instrument purchase acts as a barrier to new entry.

70.     In addition to short-read NGS instruments, Illumina also dominates and has monopoly power in both the Illumina short-read NGS consumable and Illumina short-read NGS instrument services markets. For end users wishing to use an Illumina sequencing instrument, dedicated consumables (*e.g.*, reagents and flow cells) from Illumina are required. Similarly, any end users who want maintenance or repair services for an Illumina short-read NGS instrument must purchase such services from Illumina. As noted above, these dedicated consumables and instrument services in fact indicate that there are aftermarkets for Illumina short-read NGS consumables and Illumina short-read NGS instrument services, which means that Illumina has 100% share of each aftermarket. However, even viewing short-read NGS consumables and instrument services as markets incorporating all other brands as well, Illumina has a dominant share in each, tied (and equivalent) to the dominant share and power it has over short-read NGS instruments themselves.

71.     There are substantial barriers to entry in each of the short-read Illumina NGS consumables and Illumina short-read NGS instrument services markets. Each require specialized knowledge and (for consumables) manufacturing capabilities. Similarly, each have certain legal restrictions around them, given consumables and instrument services are specific to an NGS instrument and, largely dictated by requirements from the NGS instrument provider, NGS users may have to obtain new regulatory approvals if the user switches between NGS instruments.

---

[29] *Id.* at ¶ 54.

1  Furthermore, Illumina asserts intellectual property ownership over several aspects of the short-read

2  NGS consumables it sells and the short-read NGS instrument technology it services, acting as yet

3  another barrier to would-be entrants into either market.

4    72.    As a result of its power and dominance, Illumina enjoys the ability to control prices

5  and exclude competition in the markets for short-read NGS instruments, Illumina short-read NGS

6  consumables, and Illumina short-read NGS instrument services. For Illumina short-read NGS

7  consumables and instrument services, this includes but is not limited to lock-in power for the reasons

8  previously discussed. As the FTC previously noted, "[c]ustomers recognize that they have few

9  commercially reasonable alternatives and lack bargaining leverage to obtain lower prices or better

10 contract terms from Illumina. When Illumina has implemented price increases, those increases have

11 been profitable" because they have not driven sufficient sales toward other NGS instruments to

12 render the price increases unprofitable. "Illumina is so dominant that it sees limited sales left to

13 compete for."[30]

14  **ILLUMINA HAS LONG DEMONSTRATED IT WILL NOT ALLOW ANY**

15  **MEANINGFUL COMPETITION**

16    73.    Illumina entered the markets for short-read NGS instruments, consumables, and

17 instrument services by acquiring Solexa in 2007. Before its acquisition by Illumina, Solexa

18 developed the SBS technology that all Illumina sequencers continue to use to this day. Based on

19 that original acquisition, Illumina acquired more than 80% share of the market for NGS instruments

20 at least by 2013.[31]

21    74.    It is extremely lucrative to dominate such an important and expanding market.

22 Illumina thus demonstrated from early on that it would brook no competition and began a long-

23 running campaign of patent infringement litigation against any would-be competitors. For example,

24 Illumina began a series of lawsuits against the BGI Group (BGI) and its subsidiary Complete

25 Genomics, Inc. (CGI) in 2010, before BGI or CGI even attempted to commercially launch a short-

[30] FTC Illumina/PacBio Complaint, *supra* note 1 at ¶¶ 38, 40.
[31] *Id.* at ¶ 41.

Case No.
COMPLAINT

1  read NGS instrument in the United States.[32] Although the Northern District of California granted a

2  preliminary injunction against BGI and CGI, the court subsequently invalidated several of

3  Illumina's underlying patents and ruled that others had not been infringed, prompting Illumina to

4  drop all of its claims.[33] CGI eventually launched its own short-read NGS instrument in the United

5  States in 2022, but only after a long, drawn out battle.

6      75.    Another example is Oxford Nanopore Technologies PLC ("ONT"), which launched

7  its long-read NGS instrument in the United States in or around 2015. Shortly thereafter, Illumina

8  filed complaints with the International Trade Commission and the Southern District of California

9  seeking to block the importation or sale of ONT's long-read NGS systems in the United States based

10  on alleged patent infringement.[34] The parties ultimately reached a settlement permanently enjoining

11  ONT from selling certain products in the United States.[35]

12      76.    Another competitor, QIAGEN, launched a short-read NGS instrument in the United

13  States in or around 2016, but was forced to abandon the market after facing a series of lawsuits from

14  Illumina alleging patent infringement.[36] After QIAGEN's exit from the sequencing market, it

15  entered into a sequencing collaboration agreement with Illumina.[37] QIAGEN currently also partners

16

17  _____

18  [32]  *See* Complaint, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. Aug. 3, 2010), ECF No. 1; *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:12-cv-01465-BEN-BGS (S.D. Cal. June 15, 2012), ECF No. 1.

19

20  [33]  *See* Stipulation & Order Dismissing Claims Regarding U.S. Patent Nos. 7,232,656 & 7,598,035, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. May 5, 2011), ECF No. 75; *Illumina Inc. v. Complete Genomics Inc.*, No. 3:10-cv-05542-EDL, 2013 WL 1282977, at *2, *4 (N.D. Cal. Mar. 26, 2013); *Illumina Inc. v. Complete Genomics Inc.*, No. C-10-05542 EDL, 2013 WL 1644829 (N.D. Cal. Mar. 27, 2013); *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. July 19, 2013), ECF No. 256; *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:12-cv-01465-BEN-BGS (S.D. Cal. July 23, 2013), ECF No. 54.

21

22

23  [34]  *See* Complaint, *Certain Nanopores & Prods. Containing Same*, Inv. No. 337-TA-991 (Feb. 23, 2016); Complaint, *Illumina, Inc. v. Oxford Nanopore Techs. Ltd.*, Case No. 3:16-cv-0477-DMS-MDD (S.D. Cal. Feb. 23, 2016), ECF No. 1.

24

25  [35]  *See* Consent Order, Final Judgment, and Permanent Injunction, ECF No. 14, *Illumina, Inc. v. Oxford Nanopore Techs. Ltd.*, Case No. 3:16-cv-0477-DMS-MDD (S.D. Cal. July 12, 2016).

26  [36]  *See, e.g.*, *Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1083 (N.D. Cal. 2016) (granting preliminary injunction).

27

28  [37]  Reuters Staff, *Qiagen CEO Quits Amid Genetic Sequencing U-Turn, Shares Tumble* (Oct. 8, 2019), https://www.reuters.com/article/us-qiagen-restructuring/qiagen-ceo-quits-amid-genetic-sequencing-u-turn-shares-tumble-idUSKBN1WN11Q (last visited Sept. 19, 2025).

Case No.
COMPLAINT

1    with Element to offer workflow solutions for AVITI sequencers.

2         77.    But Illumina's campaign to stifle competition at all costs is not limited to aggressive

3    patent litigation. It has also attempted to buy would-be NGS competitors to eliminate threats of

4    meaningful competition. For example, in November 2018, Illumina signed an agreement to acquire

5    another emerging long-read NGS instrument producer, PacBio. Illumina agreed to purchase PacBio

6    for $1.2 billion, representing "a 71% premium over PacBio's share price at the time" the purchase

7    agreement was signed.[38] Shortly thereafter, the FTC filed a complaint to stop the acquisition, noting

8    that PacBio only had 2-3% share of the total NGS instrument market.[39] Illumina and PacBio

9    announced their intent to abandon the transaction a month after the FTC complaint was filed. In a

10   press release accompanying the abandonment, the FTC's Deputy Director of the Bureau of

11   Competition noted that the "deal threatened to let a monopolist extinguish nascent competition in a

12   growing health care market: next-generation DNA sequencing."[40]

13        78.    In September 2020, Illumina entered into an agreement to acquire Grail, Inc., a

14   company that developed a "multi-cancer early detection test" that required use of NGS instruments

15   to analyze patient DNA.[41] In March 2021, the FTC filed an administrative complaint seeking to

16   block the transaction. While FTC and European Commission regulatory proceedings were ongoing,

17   Illumina consummated its acquisition of Grail. The European Commission fined Illumina and Grail

18   more than € 430 million for completing the transaction while regulatory review was pending and

19   ordered Illumina to divest Grail.[42] Illumina completed its divestiture of Grail in June 2024.[43]

20

21   [38]  FTC Illumina/PacBio Complaint, *supra* note 1 at ¶¶ 8.

22   [39]  *Id.* at ¶ 46.

23   [40]  *Statement of Gail Levine, Deputy Director of FTC Bureau of Competition, Regarding the
     Announcement that Illumina Inc. has Abandoned Its Proposed Acquisition of Pacific Biosciences
24   of California*, FEDERAL TRADE COMMISSION (Jan. 2, 2020), Statement of Gail Levine, Deputy
     Director of FTC Bureau of Competition, Regarding the Announcement that Illumina Inc. has
25   Abandoned Its Proposed Acquisition of Pacific Biosciences of California | Federal Trade
     Commission (last visited Sept. 19, 2025).

26   [41]  Administrative Complaint, *In re Illumina, Inc. & GRAIL, Inc.*, FEDERAL TRADE
     COMMISSION, at ¶ 23 (Mar. 20, 2021)

27   [42]  *Commission Approves Illumina's Plan to Unwind Its Completed Acquisition of GRAIL*,
     EUROPEAN COMMISSION (Apr. 11, 2024), ILLUMINA / GRAIL (last visited Sept. 19, 2025).

28   [43]  Illumina 2024 10-K, *supra* note 4 at 9.

Although the FTC dismissed its proceedings in light of the divestiture, it did so only after the Fifth Circuit issued an opinion holding that the FTC "carried its initial burden of showing that the Illumina-Grail merger is likely to substantially lessen competition."[44]

79.     Element has not escaped Illumina's attempts to stifle new competitors. In May 2025, Illumina sued Element for alleged patent infringement in the District of Delaware.[45] Although litigation is ongoing, Element continues to vigorously contest Illumina's claims. In a press release following the lawsuit, Element stated that "it believe[s] Illumina's claims are unfounded and represent an anticompetitive effort to limit choice and stifle innovation in genomic sequencing. The technology described in the asserted patents well predates Illumina, which fundamentally undermines Illumina's hollow public claim that Element lacks a history of innovation. We are confident that Illumina's claims are meritless."[46]

80.     As Illumina's acquisition and litigation history shows, it will not accept any meaningful competition in the relevant markets and intends to keep its monopoly power, no matter the cost. Although the acts described in this section are not overt acts on which Element bases its claims, they demonstrate Illumina's specific intent to monopolize and maintain its dominance.

## ILLUMINA'S ANTICOMPETITIVE AND TORTIOUS CONDUCT

81.     Ever since Element entered the market for short-read NGS instruments in March 2022, Illumina recognized it as a new competitive threat and acted in accordance with its long history of trying to stamp out any would-be competitor. Rather than compete with Element by offering better products, reducing its prices, or otherwise trying to convince customers that Illumina was the better choice on the merits, Illumina instead chose to engage in a course of conduct aimed at coercing customers into purchasing its NGS instruments by, *inter alia*: (1) threatening to raise Illumina NGS consumable and instrument service prices to coerce customers into purchasing new

---

[44] *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1061-62 (5th Cir. 2023).

[45] *See* Complaint, ECF No. 1, *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602 (D. Del. May 15, 2025).

[46] *Element Biosciences Responds to Illumina Patent Litigation*, ELEMENT BIOSCIENCES, Element Responds to Illumina Patent Litigation | Element Biosciences, available at https://www.elementbiosciences.com/element-biosciences-responds-to-illumina-patent-litigation (last visited Sept. 19, 2025).

Illumina NGS instruments; (2) conditioning Illumina NGS instruments, consumables, and instrument services sales and pricing on the exclusive use of Illumina NGS instruments; (3) pricing its NGS instruments below marginal cost, including by anticompetitively bundling discounts across Illumina NGS instruments, consumables, and instrument services; and (4) creating baseless fear, uncertainty, and doubt among Element's existing and prospective customers about Element's financial viability. That conduct has sped up in recent years, as Element made further inroads into the next generation DNA sequencing industry despite Illumina's anticompetitive efforts, and it has hampered competition not only from Element, but from other short-read NGS instrument sellers as well.

## I.   Illumina Threatens to Raise Illumina Short-Read NGS Consumable and Instrument Service Prices to Coerce Customers to Purchase New Illumina Short-Read NGS Instruments

82.    One way Illumina leverages its dominance to crowd out competition in the market for short-read NGS instruments is by threatening to raise the price of Illumina NGS consumables and instrument services for customers that are considering purchasing anything but an additional Illumina NGS sequencer. These threats are effective due to the need to maximize an NGS instrument's useful life and the lock-in power Illumina exercises over Illumina NGS instrument purchasers after their purchase. Once customers purchase an Illumina NGS instrument, they are effectively locked in to purchasing Illumina consumables and instrument services in order to use that instrument, often at a much higher price than Element charges for comparable consumables and services for its own short-read NGS instruments. Although a research organization could use Illumina and Element (or other) short-read NGS instruments in parallel, Illumina's conduct prevents that result.

83.    Element first learned of this Illumina tactic from its very earliest days selling AVITI sequencers to customers (2022). On multiple occasions, customers reported that Illumina threatened to increase the cost of its NGS consumables or instrument services if the customer considered purchasing an Element AVITI. Large customers that already owned multiple Illumina NGS instruments were (and remain) particularly vulnerable to these threats because they must purchase a large amount of consumables and instrument services from Illumina to continue operating their

NGS instruments and because their ability to continue DNA sequencing is critical to their research efforts.

84.     By tying the price of its NGS consumables and instrument services to the continued purchase of its NGS instruments, Illumina effectively coerces its customers into purchasing Illumina NGS instruments when the customer otherwise would have purchased a short-read NGS instrument from Element or another seller.

85.     This anticompetitive result is not just theoretical. On at least two occasions of which Element is specifically aware, these threats have directly caused Element to lose committed sales. In or around September 2024, Element was close to finalizing the sale of an AVITI sequencer to Customer A, a prominent medical school,[47] which had verbally committed to the purchase. But Customer A backed away from the deal at the last minute after Illumina threatened to increase the price of instrument services for Customer A's existing Illumina NGS instruments if Customer A purchased an AVITI. Similarly, in or around January 2025, Customer B, a large healthcare provider and research institution, walked away from its previous verbal commitment to purchase an Element AVITI sequencer after Illumina threatened to raise the cost of instrument service on Customer B's existing Illumina sequencers if it purchased an AVITI. Because Customers A and B are large research organizations that sequence substantial amounts of DNA each year, they are particularly sensitive to Illumina's threats because NGS instrument service costs represent a material portion of their operating budgets. And, on information and belief, these are not the only instances where Illumina has engaged in this sort of conduct, both with Element and other short-read NGS instrument sellers. Element has lost sales to Illumina in several other instances with large organizations where Element was the better-priced option, yet nevertheless lost the sale to Illumina under circumstances highly similar to the Customer A and B examples.

86.     The anticompetitive impact of Illumina's threats to raise consumable and instrument service prices for customers considering the purchase of an Element NGS instrument is heightened by competitive dynamics in the market for short-read NGS systems. As noted above, because large

---

[47]  Element uses pseudonyms to refer to existing and prospective customers to protect Element's competitively sensitive business information and to protect the privacy of nonparties.

Case No.
COMPLAINT

customers like Customers A and B purchase high quantities of consumables and instrument services each year, they account for a disproportionate share of any short-read NGS provider's revenue and are uniquely sensitive to threats, like Illumina's, to raise prices on critical NGS consumable and instruments services. These large organizations are thus more likely to choose Illumina over Element or any other short-read NGS competitor in the face of Illumina's threats, and to have an outsize impact on Illumina's competitors' bottom line as a result. Indeed, for Element, the inability to obtain such customers dramatically reduces its competitive options, as well as its long-term viability.

87.     These threats also harm Illumina's customers and stifle competition. Element, for example, competes by offering AVITI sequencers with higher throughput, better quality, and lower cost relative to Illumina sequencers. It separately offers NGS consumables at a fraction of the price Illumina offers, and similarly prices its NGS instrument services far below where Illumina prices its Illumina NGS instrument services. For large research organizations, the AVITI's individual advantages are magnified by the ability to decentralize DNA sequencing workflows, which can save the time and expense of shipping samples to centralized sequencing labs that rely on high throughput sequencers. But through its threats to raise aftermarket consumable and instrument service prices, Illumina prevents its customers from considering these benefits when purchasing a new short-read NGS instrument.

88.     On information and belief, Illumina has similarly conditioned the price of its NGS consumables and instrument services on the purchase of additional Illumina NGS instruments for numerous other customers. Though the specifics may vary between customers, Illumina's threats all leverage its monopoly power in Illumina short-read NGS consumables and instrument services for the same anticompetitive goal: coercing customers into purchasing additional Illumina instruments, and thereby crowding Element and other competitors out of the market for short-read NGS instruments.

## II.    Illumina Forces Customers Into Exclusivity for Short-Read NGS Instruments

89.     Illumina also leverages its market power to effectively force customers to exclusively purchase short-read NGS instruments from Illumina. Illumina achieves this exclusivity in at least

three ways. First, and as discussed above, its threats to raise Illumina NGS consumable and instrument service prices on customers that consider purchasing a competing short-read NGS instrument when making an additional short-read NGS instrument purchase *de facto* require those customers to exclusively purchase Illumina NGS instruments. Second, Illumina expressly conditions Illumina NGS consumable and instrument service discounts on exclusivity agreements, which it has obtained and which foreclose access to a substantial portion of the short-read NGS instrument market. Third, Illumina conditions discounts on its NGS instruments, consumables, and instrument services on a customer's agreement to trade in a non-Illumina short-read NGS instrument.

90.    As alleged above, Illumina's threats to raise Illumina NGS consumable and instrument services have resulted in *de facto* exclusivity for short-read NGS instruments. Element identifies two such examples (Customers A and B) above, as well as its information and belief based on other lost competitive sales opportunities that this is a widespread practice for Illumina.

91.    But in at least one case, Illumina attempted to coerce an Element customer into explicit exclusivity through a combination of discounts and implied threats. Specifically, Illumina offered Customer C, an agricultural genetic sequencing provider, substantial discounts on Illumina NGS instruments and consumables conditioned on exclusivity to Illumina. Moreover, Customer C reported to Element that Illumina threatened to raise prices on consumables for its existing Illumina instruments if it did not agree to Illumina's exclusivity proposal. In a November 2022 email to Customer C, an Illumina representative wrote that in exchange for these current and future discounts, "we are asking for your commitment to use only Illumina products for your genotyping and production/development. . . . With your continued commitment to Illumina, I will have more leverage with the executive leadership team to develop a pricing strategy that better aligns with your projects and expansion goals" (emphasis in original). In a subsequent conversation with Element, a Customer C representative expressed frustration with Illumina's "anti-competitive BS." Although Customer C ultimately declined Illumina's exclusivity offer, Illumina's communications with Customer C offer a clear example of how it exercises this practice across the industry.

92.    In Customer C's case, it was able to resist largely because Customer C is a smaller

1    research organization with less DNA sequencing needs than larger organizations, meaning

2    Illumina's tactics did not have as much relative effect on Customer C's bottom line. Larger

3    organizations, however, do not have similar flexibility or ability to withstand Illumina's tactics, and,

4    on information and belief, have succumbed to these tactics despite the desire to use competitive

5    offerings like Element's. Element bases this allegation on competitive sales offerings at large

6    research organizations where it was the lowest-priced offer, but nevertheless lost to Illumina.

7         93.    And in still other cases, Illumina has attempted to achieve exclusivity through trade

8    in offers, whereby it will only offer discounts on Illumina NGS consumables and instrument services

9    for preexisting Illumina NGS instruments if the customer in question trades in a newly purchased

10    competitive short-read NGS instrument (like the AVITI). If accepted, this quite literally forces the

11    customers to only—*i.e.*, exclusively—use Illumina short-read NGS instruments.

12         94.    Whether explicit or implied, these exclusivity requirements are intended to (and do)

13    foreclose Element and other competitors from a substantial portion of the market for short-read NGS

14    instruments. This exclusive dealing also harms Illumina's customers. By foreclosing Element and

15    other competitors from the market, Illumina deprives research organizations of choice and

16    entrenches its own power to artificially raise prices for all of Illumina NGS instruments,

17    consumables, and instrument services.

18    **III.    Illumina Prices Its NGS Instruments Below Marginal Cost**

19         95.    In addition to coercing customers directly, Illumina also harms competition for short-

20    read NGS instruments by pricing its own short-read NGS instruments below the marginal cost of

21    producing them, both in individual and bundled discount situations. Because Illumina has enjoyed

22    a dominant position in the short-read NGS relevant markets for nearly two decades, it has the

23    financial resources necessary to absorb short term losses from unprofitable sales of short-read NGS

24    instruments that Element and other sellers simply cannot compete with due to their shorter financial

25    runways and relative lack of assets. Worse, Illumina's history shows that, once it eliminates its most

26    pressing competitors, it then raises prices for its NGS instruments. Thus, in this specific scenario, if

27    Illumina succeeds at driving Element out of the marketplace, Illumina can recoup any lost profits

28    from its NGS instrument sales by raising prices on those instruments above the competitive level.

96.    Illumina frequently offers substantial discounts off the list prices of its NGS instrument, sometimes in excess of 50%. On information and belief, these steep discounts mean that Illumina is selling its NGS instruments for a price that is below the marginal cost of production. In other words, Illumina incurs a loss on every instrument it sells with these discounts.

97.    In one case, Illumina offered Customer D, a large regional healthcare provider, a 55% discount off the list price of a NextSeq 2000 sequencer, meaning the instrument cost only $150,000. In another, Illumina offered Customer E, a nonprofit genetic research institution, more than 50% off the list price of a NextSeq 2000 sequencer. On information and belief, Illumina incurred a loss on both of these sales, and they are indicative of other situations where Illumina predatorily prices to gain a short-read NGS instrument sale.

98.    But Illumina's anticompetitive pricing is not limited to direct discounts on short-read NGS instruments. Illumina also bundles discounts across its NGS instrument, consumable, and instrument services in a way that prevents meaningful competition for short-read NGS instruments and thus harms competition (and Element) as a result. When all discounts are attributed to the short-read NGS instrument, the only product that Illumina and other short-read NGS instrument manufacturers compete directly to sell, the result is that Illumina effectively offers customers short-read NGS instruments below cost.

99.    For example, Illumina offered Customer F, a prominent research university, a nearly 40% discount on a NextSeq 2000 sequencer in addition to between $50,000 and $70,000 in free consumables. Because Customer F would have purchased those consumables from Illumina anyway, the consumables discount functioned as an added discount to the sequencer itself. Illumina thus offered Customer F as much as a 64% discount off the price of its sequencer. On information and belief, this bundled discount had the effect of pricing Illumina's NGS instrument below cost.

100.    Although spread across multiple products, these bundled discounts have the same anticompetitive effect as sales of individual short-read NGS instruments below cost. Because Element cannot sell NGS consumables or instrument services that work on Illumina NGS instruments, it does not have an opportunity to compete against Illumina on the price of consumables. Nor can Element competitively offer its own bundled discount across NGS

instruments and consumables/instrument services without incurring unsustainable losses, because such a strategy would prevent Element from recognizing profits on NGS instruments until years after the initial sale (when consumable and instrument service revenues would allow Element to finally generate enough revenue to make the overall set of sales profitable). Unlike Illumina, Element and other short-read NGS instrument competitors do not have virtually unlimited resources to withstand such widespread, short-term losses on NGS instrument sales and thus would go out of business long before reaching the theoretical point where their combined NGS instrument, consumable, and instrument service revenues turn profitable for the company.

101.   Indeed, Element has received multiple reports from existing and prospective customers in the past several months that Illumina representatives have promised to "undercut Element pricing, whatever it is." These statements directly illustrate that Illumina's pricing strategy is driven by a desire to put Element out of business rather than compete on the merits.

102.   On information and belief, Illumina has made similar below-cost instrument sales to numerous Element customers or prospective customers, in the form of both direct and bundled NGS instrument discounts that place the NGS instrument price below its marginal cost.

## V.   Illumina Creates Market Wide Fear, Uncertainty, and Doubt About Element's Financial Sustainability

103.   If there were any doubt that the conduct described above is specifically intended to be anticompetitive, Illumina put such questions to rest with its widespread, pernicious, defamatory, and libelous efforts to make Element's current and prospective customers believe that Element would go out of business within a few months or years.

104.   Illumina representatives have expressly raised fears about Element's near term viability to at least Customer G, a prominent medical school; Customer H, a pharmaceutical manufacturer; and Customer I, a nonprofit medical research institution. Illumina told each of these customers that they should be concerned about Element's long-term ability to sell consumables or services for its short-read NGS instruments because Element "might not exist in another year or two."

105.   At the time Illumina made these disparaging comments, it had no basis to make

claims about the sustainability of Element's business. Element is a privately held company and does not report performance metrics publicly. Any comments Illumina made about Element's business prospects to prospective customers were necessarily baseless and intended to harm Element's business prospects with these entities.

106.    Lacking any basis to speculate on Element's financial sustainability, Illumina's clear intent in making these disparaging statements (as well as their effect) was to stoke fear in the minds of Element's existing or prospective customers. In light of the substantial upfront cost of purchasing a short-read NGS instrument, customers need assurance that sellers will be able to produce consumables and provide instrument maintenance and repair services for years to come. Illumina's rumormongering was intended to and did suggest that Element would not be able to sell necessary consumables or instrument services in the near future, thereby attempting to induce customers to purchase from Illumina instead.

107.    In a particularly stark example, Illumina representatives told Customer J, a large teaching hospital, in late 2024 that "Element won't be in business for long; if Illumina needs to we can just buy them and shut them down." This disparaging statement goes a step beyond fostering doubt about Element's ability to service its NGS instruments: it belies Illumina's anticompetitive and tortious intent. Illumina essentially informed the Hospital that if other anticompetitive tactics fail to put Element out of business, Illumina will simply acquire its competitor to maintain monopoly power. As noted above, it tried a similar tactic with PacBio and Grail, but was forced to either abandon or divest those acquisitions due to their anticompetitive nature and effects. Here, the clear suggestion behind Illumina's comments is that customers like Customer J should buy short-read NGS instruments from Illumina now because either Element will go out of business due to Illumina's conduct and stop selling consumables and instrument services, or will simply disappear because Illumina will not allow a competitive offering like Element's to exist, and Illumina will therefore charge whatever it wants for short-read NGS instruments anyway.

108.    The effects of Illumina's disparaging statements are directly tied to Illumina's market power. Stoking baseless fears that Element may not be able sell NGS consumables and instrument services is only an effective strategy because of Illumina's nearly two-decade long dominance of

1   the market for short-read NGS instruments, implying that customers can have confidence in

2   Illumina. And by telling customers that it can acquire Element if all else fails, Illumina underscores

3   that it is willing to use its monopoly power to stomp out new competitors.

4       109.    On information and belief, Illumina has made similar disparaging statements to

5   numerous other Element customers or prospective customers, with the intent of inducing those

6   customers to purchase Illumina NGS instruments out of fear that Element might not be able to

7   service its cheaper, higher quality short-read instruments in the near term.

8   **VI.   Illumina's Conduct Lacks Any Legitimate Business or Otherwise Procompetitive Justification**

9
10      110.    As the facts alleged herein show, Illumina's specific intent is to obtain and/or

11  maintain monopoly power in short-read NGS instruments by driving out Element and all other

12  competitors from that relevant market. That goal is blatantly anticompetitive, tortious, and, if

13  successful, would result in higher prices, less choice, and less innovation for short-read NGS

14  instrument consumers.

15      111.    Illumina's conduct cannot be justified as a mere attempt to compete against Element

16  on price or the merits. Indeed, much of Illumina's conduct would be economically irrational but for

17  its anticompetitive effects. By selling its short-read NGS instruments below marginal cost, for

18  example, Illumina diminishes its own profits in a way that would be irrational but-for their effects

19  on long-term competition. This behavior only makes sense if Illumina believes it can drive Element

20  and other competitors out of the market through its predatory pricing. Once competitors are

21  eliminated from the market, Illumina can charge supracompetitive prices and recoup any lost profits.

22      112.    Similarly, there are no legitimate justifications to forcing research organizations to

23  only purchase short-read NGS instruments from Illumina and to suffer price increases on Illumina

24  short-read NGS consumables and/or Illumina NGS instrument services just because they want to or

25  do buy a short-read NGS instrument from a different manufacturer.

26      113.    Furthermore, and in any event, there are substantially less restrictive alternatives that

27  Illumina could use to compete against Element on the merits. These include offering standalone,

28  above-marginal cost discounts on short-read NGS instruments, consumables, and instrument

services that are not conditioned on exclusivity or the purchase of any other product or service. Moreover, Illumina could invest more of its substantial financial resources into developing new and better short-read NGS instruments and consumables that offer the same cost, quality, and efficiency advantages as Element's and other competitors' products.

114.    To the extent Illumina can provide any procompetitive explanations for its conduct, such explanations are far outweighed by anticompetitive effects.

### ACTUAL AND ANTITRUST INJURY

115.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

116.    Illumina's anticompetitive conduct directly harms competition. Through the acts alleged herein, Illumina has substantially hindered competition from Element and any other potentially significant entrant in the relevant markets for short-read NGS instruments, consumables, and instrument services. In doing so, Illumina has raised market wide prices, lowered market wide quality, limited market wide choice, and stifled market wide innovation for short-read next generation DNA sequencing.

117.    Illumina's anticompetitive conduct also directly harms Element. That harm includes both past and future lost profits due to the loss of current and prospective customers, as well as the diminution in Element's business value due to the same.

118.    Element's lost market share and profits are directly caused by Illumina's unfair and unlawful conduct, as described herein.

### CAUSES OF ACTION

**COUNT 1: RESTRAINT OF TRADE IN THE MARKET FOR SHORT-READ NGS INSTRUMENTS (15 U.S.C. § 1)**

119.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

120.    Illumina's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits contracts, combinations, and conspiracies in restraint of interstate trade or commerce.

121.    Sale of short-read NGS instruments around the world is a relevant antitrust market.

Sale of consumables and instrument services for Illumina short-read NGS instruments globally are relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and instrument services globally are relevant antitrust markets, regardless of seller.

122.    Illumina has monopoly power in all relevant markets and aftermarkets.

123.    As alleged herein, Illumina entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, exclude competition, and to willfully acquire and maintain monopoly power in the relevant market for short-read NGS instruments.

124.    These contracts, combinations, or conspiracies include but are not limited to tying arrangements and exclusive dealing arrangements.

125.    These contracts, combinations, or conspiracies are harmful to competition and foreclose a substantial share of competition in the market for short-read NGS instruments from Element and other competitors.

126.    Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

127.    Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

128.    Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

**COUNT 2: MONOPOLIZATION OF THE MARKET FOR SHORT-READ NGS INSTRUMENTS (15 U.S.C. § 2)**

129.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

130.    Illumina's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of interstate trade or commerce.

131.    Sale of short-read NGS instruments around the world is a relevant antitrust market. Sale of consumables and instrument services for Illumina short-read NGS instruments globally are relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and instrument services globally are relevant antitrust markets, regardless of seller.

132.    Illumina has monopoly power in all relevant markets and aftermarkets.

133.    Illumina has maintained or acquired monopoly power in the market for short-read NGS instruments by means of the predatory, exclusionary, and anticompetitive conduct alleged herein. This conduct includes, but is not limited to, tying arrangements, exclusive dealing arrangements, predatory pricing, and disparagement.

134.    Illumina's conduct as alleged herein is harmful to competition and forecloses a substantial portion of the market for short-read NGS instruments from Element and other competitors.

135.    Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

136.    Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

137.    Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

**COUNT 3: ATTEMPTED MONOPOLIZATION OF THE MARKET FOR NGS INSTRUMENTS (15 U.S.C. § 2)**

138.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

139.    Illumina's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits attempted monopolization of interstate trade or commerce.

140.    Sale of short-read NGS instruments around the world is a relevant antitrust market. Sale of consumables and instrument services for Illumina short-read NGS instruments globally are relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and short-read NGS instrument services globally are relevant antitrust markets, regardless of seller.

141.    Illumina specifically intended to monopolize the market for short-read NGS instruments globally by means of the predatory, exclusionary, and anticompetitive conduct alleged herein. This conduct includes, but is not limited to, tying arrangements, exclusive dealing arrangements, predatory pricing, and disparagement.

142.    Illumina attempted to monopolize the market for short-read NGS instruments in the United States by means of the predatory, exclusionary, and anticompetitive conduct alleged herein.

143.    There is a dangerous probability that Illumina will achieve monopoly power in the market for short-read NGS instruments as a result of its anticompetitive conduct.

144.    Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

145.    Illumina's attempts to monopolize the market for NGS instruments in the United States are harmful to competition and, if successful, will foreclose a substantial portion of the relevant markets from Element and other competitors.

146.    Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

147.    Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

**COUNT 4: EXCLUSIVE DEALING AND TYING IN VIOLATION OF THE CLAYTON ACT SECTION 3 (15 U.S.C. § 14)**

148.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

149.    Illumina's conduct violates Section 3 of the Clayton Act, 15 U.S.C. § 14, which prohibits exclusive dealing and tying agreements that may substantially lessen competition or tend to create a monopoly.

150.    Sale of short-read NGS instruments around the world is a relevant antitrust market. Sale of consumables and instrument services for Illumina short-read NGS instruments globally are relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and instrument services globally are relevant antitrust markets, regardless of seller.

151.    Illumina has monopoly power in all relevant markets and aftermarkets.

152.    As alleged herein, Illumina has entered into one or more contracts or agreements that may substantially lessen competition by conditioning the sale or price of Illumina short-read NGS instruments, consumables, and instrument services on the exclusive purchase of short-read NGS

products from Illumina.

153.    As alleged herein, Illumina has entered into one or more contracts or agreements that may substantially lessen competition by conditioning the sale or price of Illumina short-read NGS instruments, consumables, or instrument services on the purchase of other short-read NGS products from Illumina.

154.    These contracts or agreements, as alleged herein, have and will continue to substantially lessen competition in the market for short-read NGS instruments in the United States.

155.    Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

156.    Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

157.    Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

**COUNT 5: UNLAWFUL AND UNFAIR COMPETITION (CAL. BUS. & PROF. CODE §17200,** *et seq.***)**

158.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

159.    Illumina's conduct violates California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits unlawful, unfair, or fraudulent business acts or practices.

160.    Illumina's conduct is unlawful under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the California Secret Rebate Law, Cal. Bus. & Prof. Code § 17045, and constitutes defamation, trade libel, and tortious interference with prospective economic relations under California common law.

161.    For these reasons, Illumina's conduct is also unfair under the UCL. Illumina's conduct is additionally unfair because it is designed to harm Element's ability to compete, thereby restraining competition.

162.    As a direct result of Illumina's unlawful and unfair conduct, Element has suffered

1    significant harm, including lost market share, lost profits, reputational harm, and litigation costs.

2    **COUNT 6: SECRET ALLOWANCES (CAL. BUS. & PROF. CODE § 17045)**

3    163.    Element hereby re-alleges and incorporates by reference the allegations contained in

4    the preceding paragraphs as if fully set forth herein.

5    164.    Illumina's conduct violates California's Secret Payments or Allowances law, Cal.

6    Bus. & Prof. Code § 17045, which prohibits secret rebates, refunds, commissions, or unearned

7    discounts that are "not extended to all purchasers purchasing upon like terms and conditions."

8    165.    As alleged herein, Illumina has offered non-public rebates, refunds, or unearned

9    discounts to some purchasers of short-read NGS instruments, consumables, or instrument services

10   that it has not offered to other purchasers on like terms and conditions.

11   166.    Illumina's use of these secret rebates and discounts is designed to put Element out of

12   business, thereby destroying competition. Illumina has specifically targeted Element customers or

13   prospective customers for its secret discounts and rebates.

14   167.    Element has suffered, and will continue to suffer, significant harm as a result of

15   Illumina's conduct, including in the form of past and future lost customers and revenue.

16   **COUNT 7: DEFAMATION**

17   168.    Element hereby re-alleges and incorporates by reference the allegations contained in

18   the preceding paragraphs as if fully set forth herein.

19   169.    As alleged herein, Illumina has intentionally made false and misleading statements

20   to Element's customers and prospective customers.

21   170.    As alleged herein, Element customers and prospective customers reasonably

22   understand Illumina's false and misleading statements to disparage Element's continued ability to

23   sell short-read NGS consumables and provide services for its short-read NGS instruments.

24   171.    Because of the facts and circumstances known to Element's customers and

25   prospective customers about the importance of short-read NGS consumables and instrument

26   services, Illumina's false and misleading statements about Element's financial viability tended to

27   injure Element by discouraging customers and prospective customers from association or dealing

28   with Element.

Case No.
COMPLAINT

172.    Illumina failed to use reasonable care to determine the truth or falsity of its statements, including because it had no basis to believe that Element will go out of business.

173.    Element has and will continue to suffer harm to its property, business, and reputation as a result of Illumina's false and misleading statements. Element's specific economic damages include past and future lost customers and revenue.

## COUNT 8: TRADE LIBEL

174.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

175.    Illumina has intentionally made false and misleading statements to Element's customers and prospective customers disparaging Element's continued ability to sell short-read NGS consumables and service its short-read NGS instruments.

176.    Illumina made these statements with knowledge of their falsity or misleading nature because it had and continues to have no basis to believe that Element will go out of business.

177.    Illumina's disparaging statements were made maliciously because they were designed to create fear, uncertainty, and doubt about Element's ability to sell the consumables and services necessary to operate Element NGS instruments.

178.    Element has sustained, and will continue to sustain, significant economic and reputational harm as a result of Illumina's disparaging statements. Element's specific economic damages include past and future lost customers and revenue.

## COUNT 9: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

179.    Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

180.    Illumina knowingly interfered with Element's prospective business relationships with existing or prospective customers. These customers include, but are not limited to Customers A, B, C, G, H, I, and J.

181.    Element has existing contracts with or was in advanced negotiations with these existing or prospective customers for the sale of AVITI sequencers, creating a strong probability of

1   future economic benefit.

2       182.    Illumina was aware of Element's relationships with these existing and prospective

3   customers at all relevant times.

4       183.    As alleged herein, Illumina's independently wrongful and anticompetitive acts were

5   intended to and actually did disrupt Element's relationship with these existing and prospective

6   customers.

7       184.    The loss or significant deterioration of Element's business relationships with these

8   existing or prospective customers would not have occurred but for Illumina's interference.

9       185.    Illumina's wrongful acts proximately caused substantial economic harm and

10  reputational damage to Element. Element's specific economic damages include past and future lost

11  customers and revenue.

## PRAYER FOR RELIEF

13      186.    WHEREFORE, Element respectfully prays for the following relief:

14          a.    a judgment finding that Illumina violated Section 2 of the Sherman Act and

15                California Business and Professions Codes §§ 17200, 17045;

16          b.    a judgment finding that Illumina committed the torts of defamation, trade

17                libel and tortious interference with prospective economic relations;

18          c.    a permanent injunction prohibiting Illumina from engaging in the

19                anticompetitive, unfair, and tortious conduct alleged herein;

20          d.    equitable relief as may be required to restore competition and to prevent the

21                recurrence of future statutory and state common law violations alleged

22                herein;

23          e.    a judgment and order requiring Illumina to pay Element's actual and treble

24                damages in an amount adequate to compensate it for Illumina's violations for

25                the federal statutes, state statutes, and state common law cited herein;

26          f.    pre-judgment and post-judgment interest on such monetary relief;

27          g.    the costs of bringing this suit, including reasonable attorneys' fees;

28          h.    any further relief the Court deems just and proper.

Case No.
COMPLAINT

## DEMAND FOR JURY TRIAL

187.    Element hereby demands a jury trial on all claims.

DATED: September 22, 2025                    Respectfully submitted,

                                            QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP


                                    By _____/s/ Adam B. Wolfson_____
                                            Adam B. Wolfson (Bar No. 262125)
                                            Attorney for Plaintiff Element Biosciences, Inc.

Case No.
COMPLAINT