UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELEMENT BIOSCIENCES, INC., | Case No. 25-cv-08026-NW |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| ILLUMINA, INC., et al., | |
| Defendants. | Re: ECF No. 31 |

Plaintiff Element Biosciences, Inc. ("Plaintiff" or "Element") asserts various claims against Illumina, Inc. and Illumina Cambridge Ltd. (together, "Defendants" or "Illumina") under federal and state competition laws.  First Amended Complaint ("FAC"), ECF No. 30.  Element alleges that Illumina has engaged in anti-competitive practices for years by unreasonably restraining trade and monopolizing the market for Illumina's next-generation DNA sequencing instruments.

Illumina now moves to dismiss the FAC.  Mot., ECF No. 31.  The motion is fully briefed. Opp'n, ECF No. 32; Reply, ECF No. 33.  The Court GRANTS Defendants' motion with leave to amend.

## I.      BACKGROUND[1]

Element and Illumina both develop, manufacture, and sell DNA sequencing tools.

In 2007, Illumina acquired Solexa, Inc., "[o]ne of the pioneers" in next generation DNA sequencing ("NGS") instruments.  FAC ¶ 3.  "Since that acquisition," Illumina has "dominated NGS instruments and certain related markets."  *Id*.

Element was founded in 2017 by a group of scientists who recognized an opportunity to innovate the NGS instrument market.  Element launched its NGS sequencers in 2022.  Following the debut of their products, Element "has encountered significant—and increasingly severe—

---

[1] The factual allegations are drawn from the FAC.  ECF No. 30.

United States District Court
Northern District of California

headwinds" as it tried to break into the NGS market. *Id*. ¶ 5.

Element contends that, having "recognized Element as a particularly strong new competitor," Illumina has engaged in a "wide-ranging scheme" to exclude Element from the market. *Id*. ¶ 6. Its "scheme" includes coercing customers with punitive pricing, imposing exclusive deals, anticompetitively pricing products below marginal cost with bundled and direct discounts, and disparaging Element to its existing or prospective customers. Element alleges that Illumina's anticompetitive scheme has cost it, and the market, meaningful competition, lost sales, and reduced market share and profits.

### A.    NGS Instruments

DNA sequencing, which became widely available in the 1970s, is the process by which scientists determine the order of nucleotides in DNA molecules from a biological sample. DNA sequencing has broad application, such as in medical diagnostics, biometrics, genomics, pharmacology, and epidemiology.

By the mid-2000s, scientists had developed an improved version of sequencing: next generation sequencing. "NGS instruments use a solid support (known as an array) to sequence DNA fragments in parallel, where first-generation systems relied on gel electrophoresis or similar processes, limiting sequencing to single fragments at a time." FAC ¶ 18.

These changes in methodology resulted in vast reductions in the expense and time required for sequencing. The volume of DNA that an instrument can sequence is called a "throughput." Instruments are typically categorized into three overlapping groups of low, medium, and high throughput. "[T]he time associated with sequencing an equivalent number of DNA segments using first-generation technology versus even the lowest throughput NGS instruments is so much longer than NGS instruments that there is no practical demand to substitute first-generation sequencing instruments for NGS instruments." *Id*. ¶ 19.

### 1.    Short-Read and Long-Read Instruments

Within the NGS field, there are two distinct types of NGS instruments: short-read and long-read. "Short-read NGS instruments are capable of sequencing relatively short DNA fragments in any given run, typically between 50-300 base pairs of DNA," while "[l]ong-read

United States District Court
Northern District of California

NGS instruments, on the other hand, can sequence much longer DNA fragments, between 10,000 to 100,000 base pairs or even more." *Id*. ¶ 24. The tradeoff for being able to sequence more base pairs is that long-read NGS instruments are considered "historically less accurate, provide lower throughput, and are more costly to operate on a per-genome basis than short-read NGS instruments." *Id*.

Given the differences, short-read and long-read NGS instruments have different commercial applications and uses. Long-read NGS instruments are used for analyses that require evaluating more base pairs, such as "*de novo* genome assembly, which is the process of sequencing the entire genome of a particular organism for the first time," or "epigenetic modification detection, a process used to determine how gene expression can differ without changes in the underlying DNA sequence." *Id*. ¶ 25. Short-read NGS instruments on the other hand, are used for focused analyses, such as "detecting a rare variant in a targeted DNA sample, or analyzing a cancer gene panel." *Id*. Customers therefore tend to purchase short-read and long-read instruments as complementary goods, not as interchangeable products.

The pricing and production for both products differs as well. "Because production processes and demand characteristics differ so markedly between short-read NGS instruments, long-read NGS instruments, first-generation sequencers, and other types of scientific instruments, short-read NGS instrument manufacturers often do not produce long-read NGS instruments or first-generation sequencers and vice versa." *Id*. ¶ 27.

Short-read NGS instruments require chemical reagents to prepare DNA samples, known as "consumables." Consumable kits are often sold along with the short-read NGS instruments. "These consumable kits ('NGS consumables') are unique to the specific NGS instruments, meaning, for example, that Illumina consumables can only be used on Illumina sequencers and Element consumables can only be used on Element sequencers." *Id*. ¶ 31. Similarly, NGS consumables for short-read instruments cannot be substituted with long-read consumables.

To support customers with instrument maintenance, NGS manufacturers often sell repair services after the expiration of a warranty. "These services are specific to short-read NGS instruments and technology, as well as tailored to the specific device(s) sold by the manufacturer

United States District Court
Northern District of California

in question." *Id*. ¶ 37.  General repair services for other types of laboratory equipment cannot reasonably substitute for short-read NGS instrument services "due to the specialized training, tools, and proprietary knowledge required." *Id*. ¶ 39.

### B.      The Parties' Products

Element and Illumina both only sell short-read NGS instruments; they do not sell long-read instruments.  The parties acknowledge that they are direct competitors to one another.

"Illumina's short-read NGS instruments rely on technology it calls 'sequencing-by-synthesis'" chemistry ('SBS')." *Id*. ¶ 43.  Illumina offers a range of low, mid, and high throughput DNA sequencing machines.  The low throughput products are called "MiniSeq" and "MiSeq" systems; mid throughput are the "NextSeq 1000" and "NextSeq 2000" systems; and the high throughput are the "NovaSeq 6000" and "NovaSeq X" systems.

Element's short-read NGS instruments are based on "avidite base chemistry" technology.  Element offers a line of sequencers called the "AVITI line," which contains three instruments all of which operate in the mid throughput range.  Element also offers a low throughput option, the "AVITI LT," and another mid throughput option that has "multi-omic analysis capabilities," called the "AVITI24."

 "Because it is a mid throughput offering, Element's AVITI sequencer most directly competes with Illumina's NextSeq 2000 sequencer." *Id*. ¶ 48.  Element lists the AVITI for $289,000, and Illumina lists the NextSeq 2000 for $335,000.  Element alleges that "the AVITI offers almost double the throughput as the NextSeq 2000 over the same run time," so "the AVITI provides higher throughput and higher quality data than the NextSeq 2000, all at a lower price." *Id*. ¶¶ 48-49.

Both parties offer consumable kits complementary to their respective NGS instruments, as well as services for maintenance and repairs.  Element contends that its consumables and services offerings are offered for less than Illumina's: Element's consumable kit is $1,680, while Illumina's is over $6,000; and Element's services contract is between $20,000 and $30,000, while Illumina typically charges more than $40,000.  Element emphasizes that "the AVITI has a lower

United States District Court
Northern District of California

upfront cost than a NextSeq 2000 and is cheaper to operate and maintain in the long run." *Id*. ¶ 50.

### C.    Alleged Monopolistic Scheme

Despite its competitive pricing, Element has faced "significant headwinds" since entering the short-read NGS instrument market in 2022. Element alleges that Illumina has engaged in an anticompetitive scheme to maintain its dominance in the NGS instrument market. "Illumina's dominance is shown by, among other things, its share of each of the relevant markets identified above and high barriers to entry into each of those markets. Even if the relevant NGS instrument market includes all NGS instruments (*i.e.*, both short-read and long-read), Illumina still has 80-90% share of that market and, according to some sources, has had a share of over 80% of the market since at least 2013." *Id*. ¶ 65. Along with its instruments, Illumina dominates in the markets for consumables and services, because "any end users who want maintenance or repair services for an Illumina short-read NGS instrument must purchase such services from Illumina." *Id*. ¶ 70.

Element alleges interrelated factual allegations and legal theories of antitrust liability to demonstrate that Illumina coerced customers into purchasing its NGS instruments, consumables, and services. First, Element asserts that Illumina threatened to raise Illumina NGS consumable and instrument service prices to coerce customers into purchasing new Illumina NGS instruments. Second, Illumina conditioned its NGS instruments, consumables, and instrument services sales and pricing on the exclusive use of Illumina NGS instruments. Third, Illumina priced its NGS instruments below marginal cost, including by anticompetitively bundling discounts across Illumina NGS instruments, consumables, and instrument services. Fourth and finally, Illumina drummed up baseless fear, uncertainty, and doubt among Element's existing and prospective customers about Element's financial viability. As Element contends, these four related schemes establish that Illumina hampered competition from Element and other short-read NGS instrument manufacturers, which caused Element direct injury and continues to harm the market.

#### 1.    Punitive Pricing

Element avers that Illumina has threatened to raise prices for its NGS consumables and

United States District Court
Northern District of California

United States District Court
Northern District of California

services if customers attempt to purchase a new sequencer from a competitor.  Because customers need to maximize the useful life of their Illumina NGS sequencers because of the significant initial cost, they are "locked-in" to continuing to purchase Illumina consumables and services to maintain their sequencers.  As a result, the threats of increasing a consumer's on-going costs for consumables and services can be effective.

Element states that, "[o]n multiple occasions, customers reported [to Element] that Illumina threatened to increase the cost of its NGS consumables or instrument services if the customer considered purchasing an Element AVITI." *Id*. ¶ 83.  Element shares two examples of instances where a customer "walked away from its previous verbal commitment to purchase an Element AVITI sequencer after Illumina threatened to raise the cost of instrument service on [the customer's] existing Illumina sequencers if it purchased an AVITI." *Id*. ¶ 85.  The nature of the market only exacerbates this issue: large consumers tend to have multiple sequencers (e.g., hospitals, universities, medical labs), therefore, such "customers that already owned multiple Illumina NGS instruments were (and remain) particularly vulnerable to these threats because they must purchase a large amount of consumables and instrument services from Illumina to continue operating their NGS instruments." *Id*. ¶ 83.  This scheme by Illumina has crowded Element and other competitors out of making new sales for short-read NGS instruments.

### 2. Exclusive Dealing

In addition to threatening to raise pricing on consumables and services, Element contends that Illumina has coerced customers by (i) expressly conditioning Illumina NGS consumable and instrument service discounts on exclusivity agreements, and (ii) by conditioning discounts for Illumina products on a customer's agreement to trade in a non-Illumina short-read NGS instrument.  For example, an Element customer reported to Element that "Illumina threatened to raise prices on consumables for its existing Illumina instruments if it did not agree to Illumina's exclusivity proposal." *Id*. ¶ 91.  In a November 2022 email to this customer, "an Illumina representative wrote that in exchange for these current and future discounts, 'we are asking for your commitment to use only Illumina products for your genotyping and production/development. . . . With your continued commitment to Illumina, I will have more leverage with the executive

United States District Court
Northern District of California

leadership team to develop a pricing strategy that better aligns with your projects and expansion goals' (emphasis in original)." *Id*. Along similar lines, Illumina has conditioned discounts on Illumina NGS consumables and instrument services for preexisting Illumina NGS instruments if the customer trades in a newly purchased competitive short-read NGS instrument. Element maintains that these exclusivity deals and conditional discounts have prevented Element and other competitors from reaching new customers.

### 3.    Pricing Below Marginal Cost

Illumina's dominant market position has provided the company with the resources to absorb substantial discounts, including discounts so steep that Illumina is offering products below the marginal cost of production. Element shares two instances where Illumina offered customers a discount of 50% or above, and alleges that "[o]n information and belief, Illumina incurred a loss on both of these sales, and they are indicative of other situations where Illumina predatorily prices to gain a short-read NGS instrument sale." *Id*. ¶ 97. Moreover, Illumina offers customers bundled discounts with, for example, a discount on a sequencer and free consumables and services. Element states that it "has received multiple reports from existing and prospective customers in the past several months that Illumina representatives have promised to 'undercut Element pricing, whatever it is.'" *Id*. ¶ 101. As with its allegations of punitive pricing, Element emphasizes that Illumina's pricing schemes have precluded Element from reaching new customers.

### 4.    Discussions of Element's Financial Stability

Element contends that Illumina employees have expressly raised fears about Element's financial viability to at least three Element customers (a medical school, pharmaceutical manufacturer, and a medical research institution). "Illumina told each of these customers that they should be concerned about Element's long-term ability to sell consumables or services for its short-read NGS instruments because Element 'might not exist in another year or two.'" *Id*. ¶ 104. In another example, "Illumina representatives told Customer J, a large teaching hospital, in late 2024 that 'Element won't be in business for long; if Illumina needs to we can just buy them and shut them down.'" *Id*. ¶ 107. Element vehemently denies these characterizations and describes them as baseless. Illumina has used these comments to underscore its own dominance and

7

stability.  This tactic is at Element's expense; Element alleges that the comments have "[s]tok[ed] baseless fears that Element may not be able sell NGS consumables and instrument services." *Id.* ¶ 108.

Individually and collectively, as alleged in the FAC, these schemes have foreclosed Element and other competitors from the market for short-read NGS instruments and have entrenched Illumina's ability to artificially raise prices for its NGS instruments, consumables, and services.

## II.     LEGAL STANDARD

A complaint that does not state a plausible claim upon which relief can be granted can be dismissed under Federal Rule of Civil Procedure 12(b)(6).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Legal conclusions "can provide the framework of a complaint" but "must be supported by factual allegations." *Id.* at 679.  The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).  "[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) (internal citation omitted)).

## III.     DISCUSSION

Element brings nine claims: (1) restraint of trade in the market for short-read NGS instruments under Sherman Act Section 1(15 U.S.C. § 1); (2) monopolization of the market for short-read NGS instruments under Sherman Act Section 2 (15 U.S.C. § 2); (3) attempted monopolization of the market for NGS instruments (15 U.S.C. § 2); (4) exclusive dealing and tying in violation of the Clayton Act Section 3 (15 U.S.C. § 14); (5) unlawful and unfair competition (Cal. Bus. & Prof. Code §17200, et seq.); (6) secret allowances (Cal. Bus. & Prof. Code § 17045); (7) defamation; (8) trade libel; and (9) tortious interference with prospective

United States District Court
Northern District of California

8

economic relations. Illumina moves to dismiss each of Element's claims.

### A. Federal Antitrust Claims

The Court begins by reviewing Element's Sherman Act Section 1 claim and Clayton Act Section 3 claims together. The Ninth Circuit has stated that "the elements for establishing a violation under each provision are virtually the same." *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 n.2 (9th Cir. 1984). The Court then turns to Element's remaining antitrust claims and theories under Section 2 of the Sherman Act.

### 1. Restraint of Trade in the Market for Short-Read NGS Instruments (15 U.S.C. § 1) (Count 1) and Exclusive Dealing and Tying in Violation of the Clayton Act Section 3 (15 U.S.C. § 14) (Count 4)

Section 1 of the Sherman Act "makes unlawful 'every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States.'" *Parker v. Brown*, 317 U.S. 341, 350 (1943) (quoting 15 U.S.C. § 1); *see also* 15 U.S.C. § 14 (making it unlawful under Section 3 of the Clayton Action "to lease or make a sale or contract for sale of goods . . . where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."). "Despite the breadth of the statutory language, the Supreme Court 'has long recognized that Congress intended to outlaw only unreasonable restraints.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 981 (9th Cir. 2023) ("[A] Section 1 inquiry has both a threshold component (whether there is a contract, combination, or conspiracy) and a merits component (whether it is unreasonable).").

To state a claim under Section 1, Element must allege (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade. Element raises two theories for how Illumina restrained trade under Section 1: first, that Illumina restrained trade by forcing its customers into de facto exclusive dealing arrangements, and second, that Illumina restrained trade by "tying" discounts on Illumina consumables and services to purchases of Illumina NGS instruments.

9

The Court finds that Element has not sufficiently alleged foundational factors of each theory.  For its exclusive dealing theory, Element has not alleged facts to support the existence of an agreement (a contract or combination).[2]  For its tying arrangement theory, Element has not demonstrated that the NGS short-read consumables and services are distinct products from the NGS short-read instruments.

### a.    Exclusive Dealing

An exclusive deal is an "agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor," and forecloses competition.  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 & n.1 (9th Cir. 2010).  The first question is whether Element has alleged an agreement to deal exclusively.  *Aerotec Int'l, Inc.*, 836 F.3d at 1181.

The Ninth Circuit has recently recognized that exclusive agreements can be *de facto*.  *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1074 (9th Cir. 2025), *cert. denied Costar Grp., Inc. v. Com. Real Est. Exch.*, No. 25-667, 2026 WL 795193 (U.S. Mar. 23, 2026) ("To dismiss an exclusive dealing claim just because a contract does not expressly require exclusivity would be the type of overly formalistic rule that the Supreme Court has cautioned against in antitrust cases.").  As the Ninth Circuit explained *CoStar*, courts in other circuits have recognized *de facto* exclusive agreements where there were "'specific features' that 'effectively coerced' parties to work exclusively with a dominant firm."  *Id.* at 1073.  The Ninth Circuit looked to *ZF Meritor*, where the Third Circuit found that "a dominant supplier [had entered] into *de facto* exclusive dealing arrangements with every customer in the market," when the supplier offered rebate programs on purchase and volume targets that "induce[d] customers to deal exclusively" with the supplier.  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275; 281 (3d Cir. 2012) (holding that, where there is a *de facto* exclusive dealing arrangement, "other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand.").

---

[2] Element concedes that it does not bring its claims under a "conspiracy" theory of Section 1. Opp'n to Mot. at 1.

United States District Court
Northern District of California

United States District Court
Northern District of California

Applying this logic in *CoStar*, the Ninth Circuit focused its analysis on the "specific provisions of each contract" between defendant and its customers to see whether the arrangements were *de facto* exclusive, despite not using language that was facially exclusive. Key to the analysis was the fact that the plaintiff had alleged the existence of actual contracts between defendant and its customers. The unspoken purchasing requirements that had induced customers to deal exclusively with the defendant were layered on an actual contractual relationship. Additionally, the Ninth Circuit noted that the plaintiff had provided specific examples of customers who had understood the defendant's "contract terms to *actually* foreclose their ability to work with [plaintiff] and other [] rivals." *CoStar Grp., Inc.*, 150 F.4th at 1074 (emphasis in original). The Ninth Circuit has been consistent, even before *CoStar*, that "[t]he 'de facto' exclusive dealing theory does not provide [a plaintiff] an end run around the obligation to first show that express or implied contractual terms in fact substantially foreclosed dealing with a competitor for the same good or service." *Aerotec Int'l*, 836 F.3d at 1182 (stated in dicta).

Here, Element has not sufficiently alleged the existence of an underlying contractual relationship between Illumina and its customers. Element has focused its allegations on the nature of the relationships between Illumina and its customers, and the attendant features of those relationships that effectively coerce a customer to buy exclusively from Illumina. But Element has missed the mark on its foundational obligation to "first show that express or implied *contractual* terms in fact substantially foreclosed dealing with a competitor." *Id*. (emphasis added).

Element relies on reports from three customers to state their claim. For Customer A, a medical school, Element contends that "Illumina threatened to increase the price of instrument services for Customer A's existing Illumina NGS instruments if Customer A purchased" from Element. FAC ¶ 85. Likewise, for Customer B, a healthcare provider and research institution, "Illumina threatened to raise the cost of instrument service on Customer B's existing Illumina sequencers," if it purchased from Element. *Id*. With both examples, Element has not explicitly alleged that there was an ongoing, underlying contractual relationship between Illumina and these customers. Nor has Element provided facts to support the idea that there are "specific provisions"

in Illumina's contracts that, in practice (if not necessarily explicitly) lock customers into purchasing from Illumina.

Finally, Customer C was "an Element customer" who "Illumina attempted to coerce . . . into explicit exclusivity through a combination of discounts and implied threats." FAC ¶ 91. The same deficiencies identified for Customers A and B apply here too. More importantly, in this example, Customer C "ultimately declined Illumina's exclusivity offer." Element has not shown that Customer C was prevented from purchasing from any other competitor. *Allied Orthopedic Appliances Inc.*, 592 F.3d at 996.

Element has failed to allege sufficient facts to support its exclusive dealing theory.

### b.    Tying

"In a tying arrangement, a 'seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product).'" *Aerotec Int'l, Inc.*, 836 F.3d at 1178 (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2007)). To state a tying claim, Element must allege that (1) Illumina tied together the sale of two distinct products or services, (2) that Illumina possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product, and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market. *Id*.

The Court begins by analyzing whether there are two distinct product markets. Here, Element's allegations are internally inconsistent as to whether the short-read NGS instruments are separate products from the consumables and services. On one hand, Element describes three relevant product markets, *see* FAC at ¶¶ 15-42, and argues in its opposition that there is a "robust third-party service industry" that also sells consumables, implying that consumables and services are sold distinctly from instruments. Opp'n at 9. On the other hand, throughout the background section of the FAC, Element describes short-read NGS instruments as "systems" – for both Illumina's products and Element's. Element explains that "consumable kits are unique to the specific NGS instruments, meaning, for example, that Illumina consumables can only be used on Illumina sequencers and Element consumables can only be used on Element sequencers." FAC ¶ 31. Further, NGS "services are specific to short-read NGS instruments and technology, as well

United States District Court
Northern District of California

as tailored to the specific device(s) sold by the manufacturer in question"; "proprietary knowledge [is] required" to service NGS instruments. *Id*. ¶¶ 37, 39. Element makes clear that its consumables and services could not be used with an Illumina NGS instrument. These allegations support the idea that consumables and services are not "reasonably interchangeable by consumers for the same purpose." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021).

Simply, Element has not yet squared these allegations. Element must amend its allegations to support this foundational factor – the distinction between the products – before the Court can reach the remainder of its claim.

The Court grants Illumina's motion to dismiss Counts 1 and 4, with leave to amend.

### 2. Monopolization and Attempted Monopolization of the Market for Short-Read NGS Instruments (15 U.S.C. § 2) (Counts 2 and 3)

Section 2 of the Sherman Act makes it illegal to "monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. A plaintiff must show that the defendant (1) possesses monopoly power in the relevant market and (2) uses that power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992); *Epic Games*, 67 F.4th at 998. For an attempted monopolization claim, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993).

Element bases its Section 2 claim on four theories: exclusive dealing, tying arrangements, predatory pricing, and disparagement. The Court addressed the first two theories above. Element has not adequately pled their exclusive dealing and tying theories under Section 2 for the same reason as under Section 1. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). The Court turns to the final theories – predatory pricing and disparagement.

#### a. Predatory Pricing

"[T]o prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) 'the prices

13

complained of are below an appropriate measure of its rival's costs'; and (2) there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438, 451 (2009) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222 (1993)).  "Because low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, the Supreme Court has cautioned against recognizing antitrust discounting claims except where the prices complained of are below an appropriate measure of a rival's costs and where there is a dangerous probability that the pricing firm will be able to recoup its investment after it has successfully extinguished its competitors through artificially low prices." *Aerotec Int'l, Inc.*, 836 F.3d at 1185–86 (internal citations and quotes omitted).

Element alleges that Illumina prices its short-read NGS instruments below the marginal cost of producing them, often for discounts greater than 50%.  Element explains that "[b]ecause Illumina has enjoyed a dominant position in the short-read NGS relevant markets for nearly two decades, it has the financial resources necessary to absorb short term losses from unprofitable sales of short-read NGS instruments that Element and other sellers simply cannot compete with due to their shorter financial runways and relative lack of assets." FAC ¶ 95.  Despite the common practice of bundling instruments, consumables, and services – a practice for both Element and Illumina – Element alleges that, because Illumina holds market power, other short-read NGS manufacturers cannot compete with Illumina's steep discounts.

Element offers no facts to support its theory that Illumina prices below its costs.  To state a claim for predatory pricing, at this stage, it is sufficient to allege facts showing that defendants priced below their cost.  *Solyndra Residual Tr. by & through Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1043 (N.D. Cal. 2014) (holding that "at the pleading stage, an allegation of predatory pricing" does not require "factual allegations showing that the defendants engaged in below-marginal cost pricing. . . . Plaintiff's allegation that Defendants priced their product below cost is sufficient to avoid dismissal.").  Here, Element does not provide any support for the estimate of Illumina's costs and does not provide the Court with even a sense of scale.  A high percentage discount is not dispositive; the Court needs factual support for Illumina's costs to

14

evaluate whether "the prices complained of are below an appropriate measure of [Illumina's] costs." *Pac. Bell Tel. Co.*, 555 U.S. at 451.

### b.    Disparagement

To rise to the level of an antitrust violation under Section 2, a plaintiff "must overcome a presumption that the effect on competition" of a competitor's disparaging statement "was de minimis." *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,* 108 F.3d 1147, 1152 (9th Cir.1997). To overcome this presumption, a plaintiff must allege that the representations were "(1) clearly false; (2) clearly material; (3) clearly likely to induce reasonable reliance; (4) made to buyers without knowledge of the subject matter; (5) continued for prolonged periods; and (6) not readily susceptible of neutralization or other offset by rivals." *Id.*

As discussed further below in its evaluation of Element's defamation and trade libel claims, the Court finds that Element has not sufficiently alleged that the representations made by Illumina were "clearly false." Additionally, Element's allegations indicate that Illumina's statements to various customers were one-off instances that were not "continued for prolonged periods." *Id*. Element has not overcome the de minimis presumption at this stage.

The Court grants Illumina's motion to dismiss Counts 2 and 3, with leave to amend.

### B.    State Law Claims

#### 1.    Defamation and Trade Libel (Counts 7 and 8)

Illumina challenges Element's two claims – defamation and trade libel – that stem from Element's allegations that Illumina employees made comments to Element's customers about Element's viability as a business. Element alleges that Illumina representatives told Element customers that Element "might not exist in another year or two," and that "Element won't be in business for long; if Illumina needs to we can just buy them and shut them down." FAC ¶¶ 104, 107.

"Defamation is an invasion of the interest in reputation." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999). A defamatory statement may be either written or oral. Cal. Civ. Code §§ 44, 45, 46. To succeed on a claim for defamation *per se*, the plaintiff must prove that "[1] a defendant published a false statement to another person or persons, [2] that those persons

United States District Court
Northern District of California

15

reasonably understood the statements to be about the plaintiff, [3] that the statements were defamatory on their face . . ., and [4] that the defendant failed to use reasonable care to determine the truth or falsity of the statement." *Ellis v. Starbucks Corp.*, 2015 WL 5240042, at *4 (N.D. Cal. Sept. 5, 2015). "A cause of action for trade libel includes the following elements: (1) the defendant published a statement that tended to disparage the plaintiff's product or property; (2) the statement was provably false; (3) the defendant either knew the statement was false or acted with reckless disregard for its falsity; and (4) the statement caused actual pecuniary damage." *ZF Micro Sols., Inc. v. TAT Cap. Partners, Ltd.*, 82 Cal. App. 5th 992, 1002 n. 5 (2022). Defamation and trade libel each require a showing that the statements in question were provably false.

Illumina focuses its challenge on this overlapping prong, specifically arguing that the statements Illumina employees made were "opinions" and not verifiably false statements. "[S]tatements that cannot reasonably be interpreted as stating actual facts[ ] are protected by the First Amendment and, as a result, cannot be the basis of a state-law defamation claim." *Weiner v. San Diego Cty.*, 210 F.3d 1025, 1031 (9th Cir. 2000). To succeed on a defamation claim, plaintiffs must allege that the statements in question are "verifiable statements of fact" as opposed to "nonactionable statements of opinion." *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1052 (2008) (defamation claim failed because it was based on subjective opinions that did not include provable facts); *Webb v. Olive Garden Italian Restaurants/Darden Restaurants*, 424 F. App'x 660, 661 (9th Cir. 2011) (affirming dismissal of a defamation claim "because the complained-of statements are nonactionable opinions."). "Under this standard, 'rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt, and language used in a loose, figurative sense have all been accorded protection.'" *Ugorji v. Cnty. of Lake*, No. 4:20-CV-01448-YGR, 2020 WL 3639647, at *10 (N.D. Cal. July 6, 2020) (citing *Nygard, Inc.*, 159 Cal. App. 4th at 1048). District courts consider the totality of the circumstances to distinguish facts from opinion. *Weiner*, 210 F.3d at 1031.

Here, the totality of the circumstances indicates that the challenged statements are opinion. As alleged, the statements could not reasonably have been proven false because they are statements predicting Element's future. The statements were made by Illumina employees who

16

could not reasonably have had any legitimate information about Element's financial well-being. As Element points out in the FAC, "Element is a privately held company and does not report performance metrics publicly." FAC ¶ 105. Given the context, the statements are akin to "rhetorical hyperbole," puffery, or subjective views because they did not include provable facts. The cases Element relies on concern statements made with a sufficient level of detail that it would be plausible to prove the falsity of the statements, for example, indications of defaulting on debt or comments about the likelihood of not delivering terms of a contract – a level of specificity that has not been alleged here. *See e.g.*, *Creatively Disruptive, LLC v. Nat'l Inc. Network, Inc.*, 2018 WL 4897212, at *5 (S.D. Cal. Oct. 5, 2018) (evaluating statements such as "at this time they are in breach of our contract," "produced nothing on contract," "delivered nothing but excuses and garbage," and noting that "Defendants' statements include specific dollar amounts, dates, and details regarding the nature of the agreement."). The high-level nature of the challenged statements here (i.e, Element "might not exist in another year or two," and "Element won't be in business for long; if Illumina needs to we can just buy them and shut them down") frustrates any effort to show that the statements could have been proven false.

The Court finds that Element has not sufficiently alleged these two claims, and grants Illumina's motion to dismiss Counts 7 and 8, with leave to amend.

### 2. Unlawful and Unfair Competition (Count 5)

As set forth above, Element has failed to adequately allege that Illumina violated federal or state law. Failure to adequately allege an underlying statutory violation is fatal to a UCL claim premised on those statutory violations. *See Das v. WMC Mortg. Corp.*, 831 F. Supp. 2d 1147, 1161 (N.D. Cal. 2011) (holding plaintiff failed to allege cause of action under UCL's "unlawful" prong where the plaintiff failed to sufficiently allege underlying statutory violations). Element additionally raises a claim under the UCL's unfair prong. Element acknowledges that the unfair prong claim turns with the unlawful prong claim. Opp'n at 25. Courts in this District agree with Element and have held "that where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two

prongs of the UCL do not survive." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017).

Accordingly, the Court grants Illumina's motion to dismiss Element's UCL claim (Count 5) on both theories. The Court provides Element leave to amend because it may be able to allege sufficient facts to show that Illumina violated the federal and state law that forms the basis of their UCL claims and thus show that Illumina violated the UCL.

### 3.    Secret Allowances (Count 6)

Illumina also specifically challenges Element's secret allowances claim pursuant to Cal. Bus. & Prof. Code § 17045, "which falls under the UCL's prohibition against unlawful business practices." *Ramsey v. Comcast Cable Commc'ns, LLC*, 99 Cal. App. 5th 197, 202 (2023). "A claim under Section 17045 has three elements: (1) there must be a secret allowance of an unearned discount; (2) there must be injury to a competitor; and (3) the allowance must tend to destroy competition." *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-CV-03587-BLF, 2019 WL 1560460, at *8 (N.D. Cal. Apr. 10, 2019) (internal citations omitted). Section 17045 must be "liberally construed" to "foster and encourage competition[ ] by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices." Cal. Bus. & Prof. Code §§ 17001-02. Element has not sufficiently alleged that Illumina offered "unearned discounts" to customers. Element has not identified that some customers, such as those referenced in the FAC, were receiving discounts, while other customers were not. Nor has Element sufficiently shown that the discounts were not lawful volume discounts, given that Element suggests that each of those customers was large, and that large customers tend to purchase multiple instruments. FAC ¶ 54 ("large research organizations typically have many [sequencing] labs—sometimes, dozens"); *id.* ¶ 97 ("Customer D, a large regional healthcare provider" was offered a 55% discount); *id.* ("Customer E, a nonprofit genetic research institution" was offered a 50% discount); and *id.* ¶ 99 ("Customer F, a prominent research university" was offered a 40% discount). The Court grants Illumina's motion to dismiss Count 6, with leave to amend.

### 4.    Tortious Interference with Prospective Economic Relations (Count 9)

Finally, Illumina challenges Element's tortious interference with prospective economic

18

United States District Court
Northern District of California

relations claim. To state such a claim, a plaintiff must show: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *ZF Micro Sols*, 82 Cal. App. 5th at 1002 (citing *Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal.App.4th 507, 521–522 (1996)). "[T]he defendant's conduct must be 'wrongful by some legal measure other than the fact of interference itself.'" *Id*. (quoting *Della Penna v. Toyota Motor Sales, U.S.A.* 11 Cal. 4th 376, 393 (1995)). Here, Element has not yet sufficiently alleged that Illumina's conduct "was wrongful by some measure beyond the fact of the interference itself." *Della Penna*, 11 Cal. 4th at 393. Element has provided facts to support the remaining factors for Customers A and B, but the key issue turns on whether Element has additionally alleged other wrongful conduct such as its antitrust claims or other state law claims.

The Court notes that Element has not sufficiently alleged the other factors for its allegations related to Customer C, because Customer C "ultimately declined Illumina's exclusivity offer." FAC ¶ 91. Element must show that Illumina's intentional actions to disrupt the customer relationship proximately caused "economic harm to" Element. *ZF Micro Sols.*, 82 Cal. App. 5th at 1002.

Illumina's motion to dismiss Count 9 is granted, with leave to amend.

## IV.    CONCLUSION

Defendants' motion to dismiss is GRANTED. The Court finds that, at this stage, amending the complaint would not be futile. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2007) (holding that "a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts" (internal quotation marks omitted)). The Court has identified specific deficiencies in the FAC that Plaintiff could address by alleging additional facts.

/ / /

/ / /

If Element elects to amend its FAC consistent with this Order, it must do so within 21 days of this Order.  Element may not add any new claims or parties without leave of Court.

**IT IS SO ORDERED.**

Dated: May 28, 2026

_____
Noël Wise
United States District Judge