QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
(650) 801-5000 Tel.
(650) 801-5100 Fax

David Bilsker (Bar No. 152383)
davidbilsker@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
50 California St., 22nd Floor
San Francisco, California 94111
(415) 875-6600 Tel.
(415) 875-6700 Fax

Attorneys for Plaintiff Element Biosciences, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELEMENT BIOSCIENCES, INC.<br><br>Plaintiff,<br><br>vs.<br><br>ILLUMINA, INC.,<br>ILLUMINA CAMBRIDGE LTD.,<br><br>Defendants. | Case No. 5:25-cv-08026-NW<br><br>**SECOND AMENDED COMPLAINT**<br><br>**CLAIMS FOR RELIEF:**<br><br>**1. RESTRAINT OF TRADE, 15 U.S.C. § 1**<br>**2. MONOPOLIZATION, 15 U.S.C. § 2**<br>**3. ATTEMPTED MONOPOLIZATION, 15 U.S.C. § 2**<br>**4. EXCLUSIVE DEALING AND TYING, 15 U.S.C. § 14**<br>**5. UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200, *et seq*.**<br>**6. SECRET ALLOWANCES, CAL. BUS. PROF. CODE § 17045**<br>**7. DEFAMATION**<br>**8. TRADE LIBEL**<br>**9. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1. DNA sequencing is one of the most important scientific developments of the last several decades. It has revolutionized our understanding of biology, medicine, and evolution by allowing scientists to read the genetic instructions of living organisms with unprecedented precision. This breakthrough has enabled major advances in diagnosing genetic disorders, developing targeted therapies and personalized medicine, tracing ancestry and human migration, improving agriculture through crop and livestock genomics, and accelerating biomedical research. DNA sequencing has become a foundational tool across many scientific disciplines, driving innovation and transforming how we approach health, disease, and the natural world.

2. First-generation DNA sequencers became commercially available in the late 1970s, with the first automated DNA sequencer released in the mid-1980s. Although a major scientific breakthrough, first-generation machines could only sequence one fragment of DNA at a time and were both extremely costly and constrained in what they could do by the-then state of the art. Nevertheless, their commercial introduction paved the way for major projects like the Human Genome Project, which launched in 1990, officially took 13 years, and reportedly cost more than one billion dollars to sequence a complete human genome. Meanwhile, companies continued to develop the next-generation of DNA sequencers, which could sequence a much larger number of DNA fragments in parallel.

3. One of the pioneers in developing these next-generation DNA sequencing ("NGS") instruments was a British company called Solexa, Inc., which Defendant Illumina, Inc. acquired in 2007. Since that acquisition, Defendants Illumina, Inc. and Illumina Cambridge Ltd. (collectively, "Illumina") have dominated NGS instruments and certain related markets. According to the Federal Trade Commission ("FTC"), "Illumina is a monopolist. It is the self-proclaimed leader in DNA sequencing markets in the United States and worldwide,"[1] and has "complete dominance" over the worldwide market for NGS systems, where it has had a market share "of over 80% since at least

[1] Administrative Complaint at ¶ 1, *In re Illumina, Inc. & Pacific Biosciences of Cal., Inc.*, FED. TRADE COMM'N (Dec. 17, 2019) ("*PacBio* Complaint").

2013, and over 90% since 2015."[2] Illumina has maintained this dominance—which includes not only short-read NGS instruments themselves, but also the Illumina-specific "consumables" needed to sequence DNA on Illumina instruments and the maintenance and repair services many customers find critical to keep these enormously expensive machines running for the entirety of their useful life—through an aggressive strategy over many years aimed at eliminating any and all serious competition at the expense of scientific progress, innovation, and the interests of its customers. Although the details of Illumina's specific tactics changed over time, their unifying theme is a complete unwillingness to permit competition on the merits and instead an extreme commitment to maintaining its monopoly power, no matter what.

4. Nevertheless, many within the scientific community recognize that there are better ways to sequence DNA than what Illumina offers, and many technologies that can do so in a more powerful way, at a fraction of the cost. Plaintiff Element Biosciences, Inc. ("Element") is one such company. Founded in 2017 by a team of scientists, Element recognized an opportunity to innovate in the market for short-read NGS. Using its novel and proprietary avidite base chemistry, Element launched the AVITI family of short-read NGS sequencers in 2022. AVITI instruments can sequence more DNA in a single run and produce higher quality data than Illumina's comparable NextSeq 2000 sequencer, all at a lower cost. AVITI instruments not only have a list price nearly 15% less than the NextSeq 2000, but the "consumables kits" necessary to sequence DNA through the AVITI (*i.e.*, chemical reagents and flow cells used to prepare DNA samples for sequencing) cost less than a third of Illumina's comparable NextSeq 2000 kits. And the maintenance and repair services Element offers for its AVITI products also cost significantly less than comparable services Illumina offers for its own product. Element offers more efficient, more accurate, more cost-effective, and more flexible options than Illumina for research organizations wishing to purchase and use an NGS instrument for their DNA sequencing needs. For these reasons, Element's entry into the NGS market has been met by enthusiasm from customers and investors alike, having raised over $680 million in funding from investors who recognize the importance of challenging Illumina's dominance through

[2] *Id.* at ¶¶ 1, 41.

higher quality, more efficient NGS instruments.[3]

5. Yet, Element has encountered significant—and increasingly severe—headwinds since first offering its AVITI instruments for sale in 2022. These challenges are not due to any shortcomings in Element's technology, products, service, manufacturing capacity, or sales infrastructure. Neither are they the result of weak demand for AVITI instruments or insufficient financial resources to scale alongside growing AVITI adoption. Instead, these challenges stem directly from Illumina's refusal to compete on the merits.

6. When Element began selling its AVITI instruments, Illumina correctly recognized Element as a particularly strong new competitor. Consistent with its anticompetitive history, Illumina quickly incorporated Element into its broader campaign to eliminate any would-be competitor at all costs. The crux of this strategy is Illumina's use of customer contracts, which Illumina calls Supply Agreements, to blunt competition from Element specifically and from other competitors generally. Although each Supply Agreement is bespoke, these contracts can include express terms that preclude competition on the merits, such as exclusivity provisions, explicit tying arrangements, and volume-based pricing structures intended to penalize customers for using short-read NGS instruments from multiple companies.

7. Beyond the express contractual provisions, Illumina has also engaged in a campaign to threaten and coerce customers into *de facto* exclusivity. This wide-ranging scheme includes: (1) coercing customers into the purchase of new Illumina short-read NGS instruments by threatening punitive pricing on NGS consumables and instrument services for preexisting NGS instruments; (2) imposing *de facto* exclusive dealing provisions on customers for short-read NGS instruments, via implied contractual terms, as well as specific features of the parties' agreements that effectively coerce Illumina's customers into only working with it for all future NGS instrument purchases; and (3) anticompetitively structuring new NGS-related contracts in a way to prevent

---

[3] *Element Biosciences Raises Over $277 Million to Develop and Commercialize Differentiated Products and Continue Rapid Growth*, ELEMENT BIOSCIENCES (July 11, 2024), https://www.elementbiosciences.com/news/element-biosciences-raises-over-277-million-to-develop-and-commercialize-differentiated-products-and-continue-rapid-growth (last visited June 9, 2026).

competition based on efficiency by depriving more cost-effective and higher-quality rivals, such as Element, of opportunities to make contestable sales (e.g., for instruments) by leveraging Illumina's control over non-contestable sales (*e.g.*, consumables and services for Illumina's dominant instruments). To avoid such punishments, customers have no choice other than to simply continue purchasing new Illumina instruments. This deprives rivals, such as Element, of opportunities to make enough money in the short term to survive and represent a longer-term competitive threat to Illumina.

8. Illumina has inflicted substantial harm on Element, resulting in lost sales, diminished market share, and reduced profits. But the damage extends far beyond a single competitor. Illumina's conduct has harmed competition and consumers. In its effort to eliminate any meaningful alternatives in the short-read NGS instrument market, Illumina has driven up prices, lowered market-wide quality, limited consumer choice, and suppressed innovation. Given the profound benefits DNA sequencing offers to science and society, Illumina's actions enrich itself at the cost of progress. It is time someone stood up and put an end to this anticompetitive campaign.

9. For these reasons, Element seeks redress for the personal and competitive harm it has suffered. As explained below, Illumina has violated Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, the California Unfair Competition Law, the California Secret Allowance Law, and various other California state laws.

## THE PARTIES

10. Plaintiff Element Biosciences, Inc. is a privately held Delaware corporation with its principal place of business at 10055 Barnes Canyon Road, Suite 100, San Diego, California 92121.

11. Defendant Illumina, Inc. is a Delaware corporation with its principal place of business at 5200 Illumina Way, San Diego, California 92122.

12. Defendant Illumina Cambridge, Ltd. is a foreign corporation with its principal place of business at 19 Granta Park, Great Abington Cambridge, Cambridgeshire CB21 6DF, United Kingdom. Illumina Cambridge Ltd. is a wholly owned subsidiary of Illumina, Inc., and joined as

co-plaintiff in the suit alleging that Element infringed Illumina's patents.[4] Illumina Cambridge, Ltd. distributes the NGS instruments, consumables, and services developed and provided by Illumina, Inc. through a global network of distributors.

**JURISDICTION & VENUE**

13. This Court has jurisdiction over the federal claims alleged under 15 U.S.C. § 4, 28 U.S.C. § 1331, and 28 U.S.C. § 1337(a). This Court has jurisdiction over state law claims alleged pursuant to 28 U.S.C. § 1367(a) because Element's state law claims arise out of the same factual nucleus as its federal law claims.

14. Venue is proper in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 22.

15. Illumina maintains regular and established places of business in this District at 500 Lincoln Centre Drive, Foster City, CA 94404, and at 25841 Industrial Blvd., Hayward, CA 94545. Further, as discussed within this Complaint, a substantial part of the events giving rise to Element's claims occurred within this District.

**INTERSTATE COMMERCE**

16. Illumina is engaged in, and its activities substantially affect, interstate trade and commerce. According to its 2024 Annual Report, Illumina's revenues in the United States were approximately $2.3 billion in 2024, $2.4 billion in 2023, and $2.3 billion in 2022.[5]

**RELEVANT MARKETS**

17. The purpose of defining a relevant product market is to assist the court and fact finder in identifying the area of effective competition between a foreclosed rival and its dominant rival.[6]

---

[4] *See* Complaint, *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602 (D. Del. May 15, 2025), ECF No. 1.

[5] Illumina, Inc., Annual Report (Form 10-K) at 66 (Feb. 12, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited June 9, 2026).

[6] *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) ("The relevant market for antitrust purposes is the area of effective competition—i.e., the arena within which significant substitution in consumption or production occurs.") (internal citation and quotation omitted); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("The relevant market is the field in which meaningful competition is said to exist.").

Element's primary allegation is that short-read NGS instruments, Illumina-specific consumables, and Illumina-specific services are distinct but complementary relevant product markets—the latter two, aftermarkets. Under this economic framing, Illumina's conduct directly forecloses competition in the relevant market for short-read NGS instruments via its control over Illumina-specific consumables and services. In the alternative, if the Court treats instruments, consumables, and services as a single integrated lifecycle product, the relevant product market is no broader than short-read NGS systems. Regardless, the exclusionary mechanism is actionable under either market definition because Illumina uses locked-in consumables and service demand to prevent customers from purchasing competing short-read NGS instruments. Holding upwards of 80-90% share, Illumina is a monopolist under either market definition approach.

## I. Relevant Product Market #1: Short-Read Next-generation DNA Sequencing Instruments

18. DNA sequencing is the process used to determine the order of nucleotides (A, T, C, or G) in DNA molecules from a biological sample. As the FTC has explained, "[s]cientists use DNA sequencing to ascertain the sequence of individual genes, larger genetic regions, full chromosomes, or the entire genome of an organism. DNA sequencing is foundational to research spanning the fields of molecular biology, evolutionary biology, genomics, medicine, pharmacology, ecology, and epidemiology. Other uses for DNA sequencing include clinical medical diagnostics, forensics, biometrics, and consumer genetics."[7]

19. The first generation of DNA sequencing technologies became available in the 1970s. The most common first-generation sequencing method, Sanger sequencing, functioned by using a series of chemical reactions to attach a fluorescent marker to each nucleotide in a DNA fragment, allowing sequencers to identify each nucleotide. However, because Sanger sequencing and other first-generation methods only sequenced one DNA fragment at a time, the process was expensive, time consuming, and inefficient.

[7] *PacBio* Complaint at ¶ 15.

20. In the mid-2000s, next-generation sequencing ("NGS") instruments emerged to address the inefficiencies in first-generation sequencing. NGS instruments sometimes rely on different chemical processes to sequence DNA, but all share the same differences from first-generation sequencing systems. NGS instruments use a solid support (known as an array) to sequence DNA fragments in parallel, where first-generation systems relied on gel electrophoresis or similar processes, limiting sequencing to single fragments at a time. For this reason, unlike their first-generation predecessors, NGS instruments can sequence millions of DNA fragments in a single run, greatly reducing the time and expense of DNA sequencing. This volume of DNA that NGS instruments are capable of sequencing during a run is called "throughput," and today's NGS instruments are generally grouped by throughput into three overlapping categories: low, mid, and high throughput.

21. Because even low throughput NGS instruments can sequence a number of DNA segments in orders of magnitude beyond first-generation sequencers, first-generation sequencing instruments, such as those based on Sanger sequencing, are not commercially reasonable substitutes for NGS instruments. Even if first-generation sequencing instruments could produce a throughput comparable to NGS instruments, the cost of such an instrument would be so much higher than an NGS instrument that it would not be practical for the sort of large scale everyday use that NGS instruments provide. Furthermore, the time associated with sequencing an equivalent number of DNA segments using first-generation technology versus even the lowest throughput NGS instruments is so much longer than NGS instruments that there is no practical demand to substitute first-generation sequencing instruments for NGS instruments.

22. Government regulators recognize the same. In an administrative complaint seeking to block Illumina's proposed acquisition of a sequencing company called PacBio, the FTC noted that a hypothetical monopolist of NGS instruments could profitably impose a small but significant and non-transitory increase above the competitive price ("SSNIP") of NGS instruments.[8]

---

[8] *Id.* at ¶ 23.

Furthermore, according to the FTC's complaint, Illumina's internal documents "routinely recognize the existence of an NGS market" and "refer to competition across NGS systems."[9] "Sanger sequencing systems . . . are properly excluded from the NGS Market" in part because "the legacy Sanger approach is so much slower that it is impractical for almost all purposes for which scientists employ NGS."[10]

23. Illumina itself recognizes the distinction between NGS and first-generation sequencing instruments. As Illumina's website explains, "[t]he critical difference between Sanger sequencing and NGS is sequencing volume. While the Sanger method only sequences a single DNA fragment at a time, NGS is massively parallel, that is, sequencing millions of fragments simultaneously per run. This process translates into sequencing hundreds to thousands of genes at one time. NGS also offers greater discovery power to detect novel or rare variants with deep sequencing."[11]

24. According to Illumina's 2024 Annual Report, "Next-generation sequencing (NGS) technologies are being adopted due to their ability to cost-effectively sequence large sample sizes quickly and accurately, generating vast amounts of high-quality data."[12] "The introduction of next-generation sequencing technologies, including ours, has reduced the cost of sequencing by a factor of more than 10,000 and reduced the sequencing time per Gb by a factor of approximately 12,000 over the last 20 years."[13]

---

[9] *Id.* at ¶ 25.

[10] *Id.* at ¶ 29.

[11] *NGS vs Sanger Sequencing*, ILLUMINA, https://www.illumina.com/science/technology/next-generation-sequencing/beginners/advantages/ngs-vs-sanger.html (last visited June 9, 2026).

[12] Illumina, Inc., Annual Report (Form 10-K), at 6 (Feb. 12, 2026), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited June 9, 2026).

[13] *Id.* at 14.

25. Illumina has also acknowledged the difference between first-generation and NGS technologies in court documents. Before the introduction of NGS instruments, "sequencing was so expensive and time-consuming, it could not be practically used in many settings, and the only customers for genetic sequencing were large research institutions."[14] "[U]nlike the type of [first-generation] sequencing that had been used by the researchers in the Human Genome Project, in which nucleotides in a target DNA sample were painstakingly sequenced a handful of strands at a time, Illumina's NGS allows millions of different portions of the same DNA sample to be sequenced simultaneously in a 'massively parallel' fashion."[15]

26. Beyond the difference between NGS instruments and first-generation sequencing technologies, NGS instrument producers and customers also recognize two distinct types of NGS instruments, "short-read" and "long-read" instruments. Short-read NGS instruments are capable of sequencing relatively short DNA fragments in any given run, typically between 50-300 base pairs of DNA. Long-read NGS instruments, on the other hand, can sequence much longer DNA fragments, between 10,000 to 100,000 base pairs or even more. The tradeoff is that long-read NGS instruments are historically less accurate, provide lower throughput, and are more costly to operate on a per-genome basis than short-read NGS instruments. Indeed, these differences have led many market participants to call long-read NGS instruments "third generation sequencing."

27. These differences also mean that short-read and long-read NGS instruments have different commercial applications and uses. For example, long-read sequencers are typically required to perform *de novo* genome assembly, which is the process of sequencing the entire genome of a particular organism for the first time. Long-read sequencers are also generally used to perform epigenetic modification detection, a process used to identify chemical modifications to nucleotides, and therefore determine how gene expression can differ without changes in the underlying DNA sequence. These are applications well-suited to the scope of a long-read analysis. For other applications requiring more targeted analysis, however (like detecting a rare variant in a targeted

---

[14] Complaint at ¶ 27, *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602 (D. Del. May 15, 2025), ECF No. 1.

[15] *Id.* at ¶ 28.

DNA sample, or analyzing a cancer gene panel for short, known DNA regions), short-read NGS instruments are preferred because of their superior accuracy and sequencing depth (*i.e.*, the number of times a specific DNA nucleotide is read during sequencing).

28. Due to their different applications, short-read NGS instruments are not reasonably interchangeable with long-read NGS instruments. For organizations with sequencing needs that can be performed on either short-read or long-read NGS instruments, the better choice is invariably the short-read NGS instrument because long-read NGS instruments are notoriously less accurate than short-read. Where *de novo* genome assembly is required, but accuracy less valued, organizations use long-read instruments. For any use-case requiring accuracy, organizations use short-read instruments. Accordingly, long-read and short-read instruments are sold in different markets. Because short-read and long-read NGS instruments have fundamentally different uses and demand characteristics, a hypothetical monopolist of just short-read NGS instruments could profitably impose a SSNIP. Indeed, as discussed below, Illumina has done just that.

29. Customers recognize short-read NGS instruments as a unique type of product for which there are no reasonably interchangeable substitutes. For this reason, short-read NGS instruments have unique pricing and price-demand curves relative to first-generation sequencers, long-read NGS sequencers, and other types of scientific instruments. Short-read NGS instruments also require distinct production processes because they rely on solid support array technologies that are not used by first-generation sequencers and different chemical processes than long-read NGS instruments. Because production processes and demand characteristics differ so markedly between short-read NGS instruments, long-read NGS instruments, first-generation sequencers, and other types of scientific instruments, short-read NGS instrument manufacturers often do not produce long-read NGS instruments or first-generation sequencers and vice versa. If short-read NGS instrument manufacturers do produce other types of scientific instruments (which is rare), they do so under different competitive and cost constraints.

30. Only two manufacturers are established sellers of long-read NGS instruments in the U.S.: PacBio and Oxford Nanopore Technologies ("ONT"). Element and Illumina both only sell short-read NGS instruments. Neither Illumina nor Element produces or sells long-read NGS instruments.

31. For all of these reasons, short-read NGS instruments are a relevant product market because first-generation DNA sequencing instruments and long-read NGS instruments are not reasonably interchangeable with short-read NGS instruments and because no other type of scientific instrument can reasonably provide the same use. From the consumer's perspective, long-read and short-read instruments are not substitutable products.

32. In the alternative, a relevant product market is no broader than all NGS instruments. As described above, a hypothetical monopolist of all NGS instruments could profitably impose a SSNIP. And both NGS instrument consumers and producers recognize that NGS instruments are unique from first-generation DNA sequencers and other types of scientific instruments, meaning there is no reasonably interchangeable substitute for NGS instruments, even if viewed as a market incorporating both short- and long-read instruments.

## II. Relevant Product Market (or Relevant Aftermarket) #2: Illumina Short-Read NGS Consumables

33. All NGS instruments require certain inputs to run. These inputs, often called "consumables," include chemical reagents that prepare DNA samples for sequencing and the flow cells on which DNA samples are loaded into sequencers. NGS providers typically sell consumable kits that contain all inputs necessary to prepare a DNA sample for sequencing. These consumable kits ("NGS consumables") are designed to work with specific NGS instruments, meaning, for example, that Illumina consumables can typically only be used on Illumina sequencers and Element consumables can only be used on Element sequencers. This instrument-specific compatibility locks instrument owners into consumables that work with their short-read NGS instrument. This means that an owner of an Illumina short-read NGS instrument must buy Illumina consumables and instrument services. Once the customer buys an instrument, that customer is technologically (and often contractually) locked in to buying consumables and services from the same instrument

manufacturer for the life of the instrument. Similarly, because NGS consumables are instrument-specific, consumables for short-read NGS instruments cannot be used on long-read NGS instruments and vice versa.

34. Short-read NGS consumables are a complementary product to short-read NGS instruments, in that the purchase and use of a short-read NGS instrument increases the demand for short-read NGS consumables. Because the two are complements, they are, by definition, *not* substitutes and therefore not competitive with one another. By way of example, driving in a car requires gasoline. Both a car and gasoline are necessary to drive, and therefore one cannot replace the purchase of car with a purchase of gasoline.[16] By the same token, a consumer looking to sequence DNA cannot purchase NGS consumables in lieu of an NGS instrument, or vice-versa.

35. Illumina itself recognizes that consumables (and services, discussed *infra*) are a separate product from instruments. On its website, Illumina includes a "Products" menu that lists "Instruments" and "Kits & Reagents" (its branding for consumables) as separate products (and lists "Services" as another product, discussed further below).[17] Illumina's standard Terms and Conditions similarly separately define Hardware (instruments) and Consumables and state that its "Products may be Hardware, Consumables, *or* Software."[18] In the "Sequencing Platforms" portion

---

[16] *See* PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 565a (6th ed. 2026) ("Grouping complementary goods into the same market is not only economic nonsense, it also undermines the rationale for the policy against monopolization or collusion in the first place. One 'monopolizes' a market by reducing output, and once certain output is removed from the market, the remaining output experiences increased demand and a rise in prices. Thus a monopolist might monopolize the market for gasoline by reducing output from the competitive level of, say, 1,000,000 barrels, to a monopoly level of 700,000, with the result that demand intensifies for that which remains and the market clearing price rises. No such result obtains when one aggregates complementary goods into the same market. For example, grouping gasoline and tires into a 'market' suggests that an output decrease in gasoline would permit an increase in tire prices. In fact, it will do just the opposite.").

[17] *See Illumina Genomic Products*, ILLUMINA, https://www.illumina.com/products.html (last visited June 9, 2026). Product pricing is, however, subject to change on Illumina's whim. This makes life-cycle pricing difficult.

[18] *See Illumina Terms and Condition of Sale – Research Use Products*, ILLUMINA, https://www.illumina.com/content/dam/illumina-marketing/documents/terms-conditions/united-states/usa-terms-and-conditions-of-sale-general.pdf (last visited June 9, 2026) (emphasis added).

of the "Instruments" product listings, Illumina advertises the different sequencers it offers, advertising each sequencer's capabilities against other sequencers.[19] A website user can order a sequencer separate and apart from any consumables for that sequencer; ordering the "Sequencing System" involves *only* purchasing the sequencer itself.[20] In contrast, the "Kits & Reagents" product menu lists, *inter alia*, "Library Preparation Kits" and "Sequencing Reagent Kits" (among others) and advertises the various kits in comparison with one another.[21] Website users can directly order *consumables only* directly from the website.[22] Furthermore, there is a range of different consumable options available to Illumina instrument users, depending on which sequencer they selected and their specific sequencing needs.[23]

36. Illumina intentionally incorporates this separate demand in its pricing strategy. Illumina's online purchase advertisements inform customers they can either buy each separately or "bundle . . . instrumentation, reagents, training, warranty for an additional discount."[24] If Illumina instruments, consumables, and services were not distinct products with separate demand, there would be no need to advertise additional discounts for bundled purchases.

---

[19] *See Sequencing Platforms*, ILLUMINA, https://www.illumina.com/systems/sequencing-platforms.html (last visited June 9, 2026).

[20] *See NextSeq 1000 and NextSeq 2000 System Ordering*, Illumina, https://www.illumina.com/systems/sequencing-platforms/nextseq-1000-2000/order.html#tab group-1-tab2 (last visited June 9, 2026). A purchaser can also purchase reagents for that sequencer via the same webpage, but they are listed in a separate "reagents" section and may be ordered a la carte, just like a sequencer. *Id.*

[21] *See Library Preparation Kits*, ILLUMINA, https://www.illumina.com/products/by-type/sequencing-kits/library-prep-kits.html?tags=&pageSize=20&pageNumber=1&sortBy=title (last visited June 9, 2026); *Sequencing Reagent Kits*, ILLUMINA, https://www.illumina.com/ products/by-type/sequencing-kits/cluster-gen-sequencing-reagents.html?tags=&pageSize =20&pageNumber=1&sortBy=title (last visited June 9, 2026).

[22] *See*, *e.g.*, *NextSeq 1000/2000 Reagents*, ILLUMINA, https://www.illumina.com/products/bytype/sequencing-kits/cluster-gen-sequencing-reagents/next seq-1000-2000-reagents.html#tabgroup -1-tab2 (last visited June 9, 2026).

[23] *Id.*

[24] *Instrument Buying Options*, ILLUMINA, https://www.illumina.com/company/doing-business-with-illumina/instrument-buying-options.html (last visited June 9, 2026).

37. Similar to Illumina itself, purchasers treat instruments and consumables as distinct types of products, and they are sold separately due to separate consumer demand for those sales. Most purchasers view (and account for) the purchase of short-read NGS instruments as capital expenditures (*i.e.*, money spent to acquire a long-term, fixed asset); indeed, Illumina positions the purchase of short-read NGS instruments as part of customer's "capital equipment budget."[25] In contrast, most purchasers treat the purchase price of short-read NGS consumable as operating expenditures; *i.e.*, ongoing costs incurred to maintain daily operations. The initial purchase of a short-read NGS instrument is prompted by the desire to conduct certain types of DNA sequencing. However, the subsequent purchase of consumables depends on the quantity and nature of DNA sequencing a short-read NGS instrument owner wants or needs to conduct. These needs may increase or decrease over time, thus necessitating the flexibility to purchase more or less NGS consumables when the owner wants.

38. Further supporting this distinction are the grants that largely power much of the scientific research in this country. Under the Uniform Guidance for federal grants, a short-read NGS instrument qualifies as "equipment" in that it is tangible personal property with a useful life of more than one year and a per-unit acquisition cost of at least $5,000 (or $10,000, depending on the grant date—more recent grants are subject to the higher equipment price threshold).[26] In contrast, consumables are separately qualified as reimbursable "supplies" because they do not meet the very specific definition of "equipment."[27] Depending on the grant in question, recipients may or may not use grant money to reimburse one or both of equipment or supply costs. They therefore view and treat the purchases of each as separate line items because they must by law.

39. If they wish to conduct DNA sequencing, short-read NGS instrument owners cannot substitute any other type of consumable for short-read NGS consumables, and must use the consumables compatible with the instrument they are using. This is because NGS consumable kits

---

[25] *See id.*

[26] 2 C.F.R § 200.1 (2024).

[27] *Id.*

are only compatible with the NGS instrument(s) from the same manufacturer (and, in Illumina's case, only from Illumina based on intellectual property assertions and specific instrument designs). For this reason, other types of consumables are not interchangeable with short-read NGS consumables at all—let alone reasonably interchangeable—and a hypothetical monopolist of short-read NGS consumables could profitably impose a SSNIP.

40. As noted, purchasers recognize short-read NGS consumables as a separate and distinct product for which there is no reasonably interchangeable product. Demand and pricing for short-read NGS consumables is therefore distinct from demand for short-read NGS instruments. For this reason, as noted above, Illumina itself recognizes its short-read NGS consumables as a unique line of business and identifies consumable revenue as a distinct line item in its financial statements.[28] Illumina also offers discounts and pricing independently for each product.[29] Illumina's Supply Agreements similarly have different provisions and definitions for each.[30] Indeed, some Illumina Supply Agreements even acknowledge that purchasers may attempt to use non-Illumina NGS consumables as a work-around to purchasing Illumina NGS consumables, and forbid that behavior.[31] Illumina would not need a contractual provision requiring the use of Illumina consumables with Illumina NGS instruments, if the two were not independent of one another.

41. Because short-read NGS instrument owners must purchase consumables to continue using their instruments, sales of short-read NGS consumables can account for a substantial portion

---

[28] Illumina, Inc., Annual Report (Form 10-K) at 34 (Feb. 12, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited June 9, 2026); *see also* notes 5, 12, *supra*.

[29] *See, e.g.*, *Universal Consumables and Instruments Discount Schedules and List Price Catalogue*, ILLUMINA (Jan. 6, 2022), https://www.illumina.com/content/dam/illumina-marketing/documents/applications/cancer/01_6_2022revision-Appendix1_.pdf (last visited June 9, 2026).

[30] *See e.g.*, Illumina, Inc., Supply Agreement at 21, sec.gov/Archives/edgar/data/2017526/000114036126017428/ny20061080x8_ex10-24.htm (last visited June 9, 2026) (SEC filing exhibit defining "Certain Supplied Product(s)" to include "Illumina's NextSeq, NextSeqDx and NovaSeq instruments, and any future sequencing instruments launched by Illumina or its Affiliates," and "Certain Sequencing Consumables" as "those consumables intended by Illumina to be used to perform a sequencing process on Illumina's NextSeq, NextSeqDx and NovaSeq instruments").

[31] *Id.* at 12 (Section 11.2(d))

of a short-read NGS product manufacturer's revenues over time. For example, in 2024, short-read NGS consumables accounted for 72% of Illumina's global revenue.[32] In 2024, this reflected some $3.169 billion in global revenue from consumables alone.[33] At the same time, Illumina's gross margin on consumables was 67.1%.[34] Revenues and margins of this magnitude *should* induce significant entry by third-party providers of consumables compatible with Illumina products. In practice, however, Illumina's restrictions make entry by a consumable-only manufacturer impossible.

42. Although all of these facts indicate that short-read NGS consumables are not reasonably interchangeable with other types of consumables or scientific testing products (and thus, if viewed as a category, are a distinct set of relevant products from other types of consumables), a further facet of this industry is that an Illumina short-read NGS instrument owner can only use Illumina consumables to operate their Illumina instrument. First, Illumina imposes contractual prohibitions on the use of third party consumables. Illumina also asserts intellectual property rights (both patent and trade secrets) over those products, thereby asserting those rights preemptively to exclude companies from even attempting to develop, manufacture, or sell consumable for Illumina short-read NGS instruments. Furthermore, Illumina imposes design restrictions on its instruments that technologically prevent rivals from selling short-read NGS consumables for its instruments. Illumina reagent cartridges (*i.e.*, the consumable) use Radio-Frequency Identification ("RFID") technology to prevent competitor consumables from working with Illumina NGS equipment. This means Illumina instrument users are locked-in to purchasing consumables from Illumina, regardless of demonstrated demand for a cheaper alternative. For example, users have discussed ways to dilute the reagents using third-party products, or create "homebrew" consumables for DNA library preparation (a necessary step prior to sequencing). But given the volume of consumables many

---

[32] Illumina, Inc., Annual Report (Form 10-K) at 7 (Feb. 12, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited June 9, 2026); *see also* notes 5, 12, *supra*.

[33] *Id.* at 34-35.

[34] *Id.*

customers require for their sequencing needs, these methods are not scalable alternatives to Illumina consumables. Similarly, Illumina prohibits consumers from analyzing or reverse engineering their consumables.[35]

43. Consumer lock-in of this type indicates that Illumina short-read NGS consumables are their own, single-brand market, because no other type of consumable is interchangeable at all—let alone reasonably interchangeable—with Illumina short-read NGS consumables. Thus, if a hypothetical monopolist of Illumina short-read NGS consumables were to apply a SSNIP of (for example) 5% above a competitive price, it could profitably do so because consumers of Illumina short-read NGS consumables could not switch away at all, let alone switch to other products in sufficient numbers to make the price increase unprofitable. Indeed, Illumina has already done this—increasing the price on consumables for locked-in customers—in the past, indicating the separateness of the Illumina short-read NGS consumable market, Illumina's power in that market, and harm to consumers in that market.

44. Illumina short-read NGS consumables may also be viewed as a relevant aftermarket because Illumina possess both *ex ante* and *ex post* lock-in power[36] over Illumina NGS consumable pricing. *Ex ante* lock-in power refers to the inability of Illumina purchasers to accurately life-cycle price the overall cost of using Illumina's NGS instrument, inclusive of the cost of Illumina NGS consumables and instrument services (discussed below). *Ex post* lock-in power refers to the inability of Illumina purchasers to switch away from an Illumina NGS instrument.

45. Illumina has *ex ante* lock-in power over its short-read NGS instrument customers because Illumina does not tell purchasers up front that it can, will, and has changed its policies with respect to the pricing, sale, and availability of Illumina short-read NGS consumables. As a result, even sophisticated consumers of short-read NGS instruments have high information costs about Illumina's short-read NGS consumable policies and practices. Even in instances where purchasers

---

[35] *See Illumina Terms and Conditions of Sale – IVD Products* at 1 (Section 3), ILLUMINA, https://www.illumina.com/content/dam/illumina-marketing/documents/terms-conditions/united-states/usa-terms-and-conditions-of-sale-ivd.pdf (last visited June 9, 2026).

[36] *Ex ante* and *ex post* are temporal designations, referring to the moment that purchasers buy an Illumina NGS instrument.

enter multi-year contracts for consumables and/or instrument services with Illumina in advance, these expected costs may nonetheless increase because of the actions described below. These actions are *ultra vires* to those contracts and affect buying requirements not covered by those types of contracts. Moreover, NGS instruments last for a long time. Many consumers purchased Illumina short-read NGS instruments before Element (or other competitors) entered the market. These consumers had no realistic way of life-cycle pricing their purchase, because they had no alternative benchmarks at the time of their initial instrument purchase.

46. Illumina also has *ex ante* lock-in power over its short-read NGS instrument customers because, at the time of instrument purchase, purchasers generally do not know the volume of consumables they will need over the lifetime of the instrument, or how Illumina's consumable pricing might change during that time. Indeed, for the first one to five years of instrument purchase, Illumina can do whatever it wants with its consumable prices unless the customer wants to write off the price of the instrument and start over with another company's instrument, which is prohibitively costly. In the case of grants and validated research projects, even that high-cost switch may not be available once the purchased instrument is qualified for the project. In effect, one cannot switch mid-study, no matter by how much Illumina increases the consumable price.

47. Thus, high information costs make it difficult for Illumina short-read NGS instrument purchasers to estimate the lifetime cost of DNA sequencing they will conduct using short-read NGS consumables in advance.

48. Illumina also has *ex post* lock-in power over its NGS instrument customers. After purchasing an Illumina short-read NGS instrument, owners cannot easily switch to new short-read NGS instruments because the sunk upfront cost, required training, and regulatory validation requirements are often prohibitive, at least until the end of the instrument's useful life. Because short-read NGS instruments have a useful life of several years, consumers are typically stuck with their instrument choice—and the attendant consumable and instrument services—for a long time. Furthermore, because demand for short-read NGS consumables is driven primarily by the volume of sequencing, demand for short-read NGS consumables is not highly correlated with the price of the instrument, and vice versa.

49. Many customers (whose business Element is attempting to compete for) have existing Illumina short-read NGS instruments that require Illumina consumables and Illumina instrument services. Indeed, some of these instruments were purchased before Element had even entered the market. Customers with an installed base of Illumina instrument need to purchase Illumina consumables and instrument services for those instruments. Because they can only purchase those products from Illumina, they are uncontestable sales, in that Element (and others) cannot compete for those consumable and services sales. This demand, unconstrained by non-Illumina products, can be—and, as discussed below, is—leveraged by Illumina to where it and Element do compete; *i.e.*, short-read NGS instrument sales.

50. Illumina's *ex ante* and *ex post* lock-in power ensures that, once customers have entered the Illumina ecosystem, they have great difficulty in leaving. Crucially, this remains true even if a competitor offers a better short-read NGS instrument or consumable price. Although under normal competitive conditions better pricing would result in lost sales for Illumina, Illumina's ability to raise prices for consumables used with previously purchased short-read NGS instruments (or offer discounts on the same) if a customer purchases an Element short-read NGS instrument means that competitors cannot, and do not, compete on fair footing. Instead, a competitor must not only offer pricing that beats Illumina's price on the next short-read NGS instrument, but pricing that, in aggregate, beats the threatened price hikes (or discounts) on *other* Illumina purchases that the consumer has made.

51. As a result of these information costs, switching costs, and differing demand characteristics, purchasers of Illumina short-read NGS instruments are effectively "locked-in" to purchasing Illumina consumables for the life of the Illumina short-read NGS instrument, and must therefore purchase Illumina short-read NGS consumables in the relevant aftermarket.

## III. Relevant Product Market (or Relevant Aftermarket) #3: Illumina Short-Read NGS Instrument Services

52. Illumina short-read NGS instrument services are services Illumina provides to its NGS instrument owners, including repairs and maintenance on Illumina NGS instruments. Illumina

typically provides these services pursuant to a standard form services contract.[37] Discounts for Illumina NGS instrument services are sometimes contained in a customer's Illumina Supply Agreement.[38] However, Illumina offers NGS instrument services separately from, and prices independently of, NGS instruments and NGS consumables.[39] As with instruments and consumables, Illumina lists services as a separate "Product" on its website and sells those services independently of instrument and consumable sales.[40]

53. Technological and practical limitations restrict who can offer Illumina short-read NGS instrument services. Given the specifics of the technology and instruments involved, Illumina short-read NGS instruments require highly specialized maintenance and repair services tailored to the complex technology and precision requirements of those instruments. These services are therefore specific to Illumina's short-read NGS instruments and technology.

54. Similarly, these services can typically only be provided by Illumina or Illumina-approved service providers. Indeed, using a non-approved service provider will void any Illumina warranty. However, some independent service organizations such as SeqGen exist,[41] and this shows that instrument services are distinct from both instruments and consumables. Consumer demand for independent service organizations likewise shows that Illumina's own pricing for instrument services is high.

55. Although not every short-read NGS instrument purchaser also purchases short-read NGS instrument services, most do. This is because, as noted above, short-read NGS instruments are

---

[37] *See Illumina Service Contract Terms and Limitations*, ILLUMINA, https://www.illumina.com/content/dam/illumina-marketing/documents/terms-conditions/united-states/usa-terms-and-conditions-warranty-services.pdf (last visited June 9, 2026).

[38] *See, e.g.*, Illumina, Inc., Amendment #5 to Supply Agreement, https://www.sec.gov/Archives/edgar/data/1576280/000157628021000031/exhibit1019-illuminaagreem.htm (last visited June 9, 2026).

[39] *See Instrument Service Plans*, ILLUMINA, https://www.illumina.com/services/instrument-services/service-plans.html (last visited June 9, 2026).

[40] *See id.*

[41] *See Does Your MiSeq Need a PM?*, SEQGEN (Dec. 1, 2016), https://blog.seqgen.com/does-your-miseq-need-a-pm (last visited June 9, 2026).

large purchases and a lab or research organization that has invested in a particular NGS instrument cannot easily justify replacing or otherwise disposing of that machine because of the costs of doing so, but also because of considerations around training, data compatibility, and regulatory validation. This means that most short-read NGS instrument users can only maximize the useful life of their instrument by regularly servicing and repairing their instrument. By doing so, short-read NGS instruments typically have an average useful life of 3-5 years, though with proper servicing, the useful life of a machine can extend well beyond this timeframe. That many, but not all, instrument purchasers separately elect to buy service contracts demonstrates separate demand for instruments and for instrument services.

56. General repair services or maintenance for other types of laboratory equipment are not a substitute—let alone a reasonable substitute—for short-read NGS instrument services due to the specialized training, tools, and proprietary knowledge required. A hypothetical monopolist of Illumina short-read NGS instrument services could thus profitably impose a SSNIP above competitive price levels. The absence of substitutes goes to the definition of the relevant services aftermarket; however, the separate demand for the services (discussed above) establishes that services are a distinct product from the instrument.

57. Customers recognize that short-read NGS services constitute a unique type of service for which there are no reasonably interchangeable substitutes. Short-read NGS services are sold and priced separately from short-read NGS instruments, short-read NGS consumables, and other types of scientific instrument services. Because short-read NGS instrument owners typically do not purchase short-read NGS services until expiration of the included warranty, when owners are committed to their purchase of the instrument, demand for short-read NGS services is not highly sensitive to price changes. Furthermore, Illumina itself recognizes that short-read NGS services are a distinct line of business and identifies service revenue as a separate line item in its financial statements from other products and services.[42]

---

[42] Illumina, Inc., Annual Report (Form 10-K) at 34 (Feb. 12, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited June 9, 2026)

58. Although all of these facts indicate that Illumina short-read NGS instrument services are not reasonably interchangeable with other types of scientific instrument services (and thus, if viewed as a category, are a distinct set of relevant products from other types of services), a further facet of this industry is that an Illumina short-read NGS instrument owner can typically only use Illumina or an Illumina-approved independent service organization to service their machine. Again, as with NGS consumables, the specialized, device-specific nature of short-read NGS instrument services reflects Illumina's control over servicing its instruments, not an absence of separate demand.

59. Because securing third party Illumina instrument services is difficult, Illumina short-read NGS instrument services are their own, single-brand market. Thus, if Illumina imposed a SSNIP on services for Illumina short-read NGS instrument services (regardless of whether Illumina itself is the service provider), customers could not switch to other services in sufficient numbers to make that increase unprofitable. Indeed, Illumina charged supracompetitive prices for Illumina short-read NGS instrument services for years, indicating the separateness of the Illumina short-read NGS instrument services market and (as discussed further below) and Illumina's sustained power in that market.

60. As with Illumina short-read NGS consumables, the market for Illumina short-read NGS instrument services is a single-brand aftermarket, over which Illumina maintains substantial lock-in power. Again, that lock-in power encompasses both *ex ante* and *ex post* dimensions.

61. Illumina has *ex ante* lock-in power over Illumina short-read NGS instrument services because, at the time of instrument purchase, Illumina instrument owners generally cannot know the amount of service their instruments will require, nor the price Illumina (the dominant provider in the market) will charge for that service in the future. For instance, it is impossible for even sophisticated purchasers to know how often and how badly Illumina's products will break down or otherwise require maintenance. Thus, high information costs prevent Illumina short-read NGS instrument owners from estimating the lifetime cost of short-read NGS services at the time they purchase an instrument. Additionally, Illumina does not tell short-read NGS instrument purchasers up front that it can, will, and has changed its policies with respect to the pricing, sale, and availability

of Illumina short-read NGS instrument services. Similarly, Illumina can change its policies and products in ways that make it difficult for independent service organizations to operate. Therefore, even sophisticated consumers of short-read NGS instruments can have high information costs about Illumina's short-read NGS instrument services policies and practices.

62. Illumina also has ex post lock-in power over Illumina short-read NGS instrument services because, following the purchase of an Illumina short-read NGS instrument, Illumina short-read NGS instrument purchasers incur high upfront, training, and validation costs to use the technology. Switching between short-read NGS instruments is costly, because those costs will be incurred again. As a result, purchasers are less sensitive to changes in the price of Illumina short-read NGS instrument services.[43] Because service is typically viewed as necessary for short-read NGS instrument operation and the lifetime cost of service is inherently unknowable at the time of instrument purchase, demand for short-read NGS services is not closely related to the price of the original instrument and vice versa.

63. As a result of these information costs, switching costs, and differing demand characteristics, purchasers of Illumina short-read NGS instruments are thus effectively "locked-in" to purchasing Illumina services for the life of the instrument and must therefore purchase Illumina short-read NGS instrument services in the relevant aftermarket, or not at all.

## IV. Relevant Geographic Market

64. A relevant geographic market for short-read NGS instruments, consumables, and instrument services is global, except China.

65. Researchers across the globe rely on short-read NGS instruments, consumables, and instrument services to conduct a wide range of scientific and medical research. To meet this demand, short-read NGS manufacturers produce and sell their instruments, consumables, and services around the world. Illumina and Element, for example, are both companies based in the United States but

[43] "Less sensitive" in economic terms means that these consumers are less likely to switch to a competing product than a consumer not experiencing these lock-in factors. These consumers are, of course, "sensitive" to these price increases in the sense that consumers do not like to pay more for goods than they otherwise have to.

sell their short-read NGS products and services around the world, either on their own or through networks of global distributors.

66. Sellers of short-read NGS instruments, consumables, and instrument services also manufacture their products around the world. U.S.-based Illumina, for example, has manufacturing facilities in the United States, Singapore, and China.

67. There are low barriers to international trade for short-read NGS instruments, consumables, and instrument services. Given the high cost of short-read NGS instruments, the relatively small number of manufacturers, and the importance of short-read NGS technology to global research, any costs associated with the international production or sale of short-read NGS instruments, consumables, and services is easily overcome by global demand.

68. However, Chinese purchasers of NGS instruments, consumables, and instrument services differ in kind from purchasers in other countries. The Chinese government regulates genetic data as a sovereign resource and requires such information to remain within China. As a result, local manufacturers of NGS instruments, consumables, and instrument services, such as BGI Genomics, have a significant advantage over non-Chinese manufacturers. By the same token, data privacy laws in nations other than China make collaboration with Chinese companies more cumbersome. Similarly, geopolitical tension, trade complications, intellectual property differences, and export restrictions make it difficult for Chinese companies to penetrate non-Chinese markets and make non-Chinese companies non-competitive in China. Although Illumina has some presence in China, and BGI has some presence in the U.S., both are quite small.

69. Geographic market definitions of the world, except China, are increasingly common, particularly in high-tech markets such as this one.[44]

70. A hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of short-read NGS instruments, consumables, or services in the world (except China) would profitably impose at least a SSNIP above competitive levels.

---

[44] *See, e.g.*, Jury Verdict at 3, *Epic Games, Inc. v. Google LLC et al.*, No. 3:20-cv-05671-JD (N.D. Cal.) (jury finding relevant geographic market was “Worldwide excluding China”), ECF No. 606.

71. In the alternative, the relevant geographic market for short-read NGS instruments, consumables, and instrument services is no narrower than the United States. Any barriers that restrict the production or sale of short-read NGS technology globally do not exist in interstate commerce. And for the same reasons a hypothetical profit-maximizing monopolist of short-read NGS instruments, consumables, or instrument services could profitably impose at least a SSNIP globally, they could also do so in the United States.

## V. The Parties' Short-Read NGS Products and the Areas of Competition Between Those Products

72. Illumina first entered the three short-read NGS relevant markets by acquiring Solexa in 2007. Illumina's short-read NGS instruments rely on technology it calls "sequencing-by-synthesis" chemistry ("SBS").

73. Illumina currently offers a range of low, mid, and high throughput DNA sequencing machines. Its low throughput sequencers include the "MiniSeq" and "MiSeq" systems. Its mid throughput sequencers include the "NextSeq 1000," the "NextSeq 2000," and "NextSeq 550Dx"[45] systems. And its high throughput sequencers include the "NovaSeq 6000" and "NovaSeq X" systems. All of Illumina's NGS instruments are short-read sequencers.

74. Amidst a large installed base of Illumina instruments, and recognizing an opportunity to innovate, Element was founded in 2017 by three scientists who shared the goal of developing a more accurate and efficient short-read NGS system at lower price points than Illumina. Over the first years of its existence, Element developed its proprietary and innovative "avidite base chemistry" ("ABC"), which enables higher quality DNA sequencing results for a lower cost.

75. Based on its innovative ABC technology, Element launched its AVITI line of short-read NGS instruments in 2022. The AVITI line includes three sequencers, all of which operate in the mid throughput range and all of which are short-read sequencers. The "AVITI" is Element's

---

[45] Similar to the NextSeq 2000 in technological design and capabilities, Illumina launched the NextSeq 550Dx sequencer in November 2017 as an NGS instrument able to conduct *in vitro* diagnostic ("IVD"). Aloingside its NextSeq 550Dx Reagents, sample prep kits, and software as part of its "VeriSeq NIPT Solution v2" bundle, Illumina sells its NextSeq 550Dx instrument to customers for their Noninvasive Prenatal Testing ("NIPT"), a type of sequencing that uses a pregnant women's blood to screen fetuses for chromosomal abnormalities.

standard mid throughput offering. The "AVITI LT" is a lower throughput, lower cost sequencer. And the "AVITI24" offers the same sequencing capabilities as the AVITI alongside multi-omic analysis capabilities, enabling study of multiple types of organic materials like DNA, RNA, and various proteins. The AVITI24 is the only NGS instrument that offers both sequencing and multi-omic capabilities in the same machine.

76. Illumina admits that Element is a direct competitor in short-read NGS sequencing. In recent court filings, Illumina acknowledged that "Element's sequencing instruments and consumables compete directly with Illumina's products."[46]

77. Because it is a mid-throughput offering, Element's AVITI sequencer most directly competes with Illumina's NextSeq 2000 sequencer. However, the AVITI offers almost double the throughput as the NextSeq 2000 over the same run time. Third party analyses have also found that the AVITI offers higher quality data, meaning fewer sequencing errors than the NextSeq 2000.[47]

78. Due to cost savings enabled by Element's ABC technology, the AVITI's list price is $289,000, almost 15% lower than the NextSeq 2000's list price of $335,000. Accordingly, the AVITI provides higher throughput and higher quality data than the NextSeq 2000, all at a lower price.

79. Element also offers consumable kits and service packages for a lower cost than Illumina. Element's highest capacity (and bestselling) short-read NGS consumables kit has a list price of $1,680. The competing short-read NGS consumable kit from Illumina costs over $6,000, more than three times the cost of the Element kit. And while Illumina typically charges more than $40,000 for an extended short-read NGS instrument service contract, the comparable contract from

---

[46] *See* Complaint at ¶ 8 , *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602 (D. Del. May 15, 2025), ECF No. 1.

[47] *See, e.g.*, *Investigating Element Data with Google DeepVariant*, ELEMENT BIOSCIENCES, https://www.elementbiosciences.com/resources/videos/all/investigating-element-data-with-google-deepvariant-andrew-carroll-phd (last visited June 9, 2026) (Google Health Genomics presentation comparing Element and Illumina data, noting superiority of Element results at lower sequencing depths).

Element costs between $20,000 and $30,000. As a result, the AVITI has a lower upfront cost than a NextSeq 2000 and is cheaper to operate and maintain in the long run.

80. Element's innovation extends to its newest sequencer, the AVITI24, which combines the AVITI's sequencing capabilities with multi-omics data analysis, a type of biological research that is often performed in parallel with DNA sequencing. Researchers typically use separate multi-omic platforms alongside DNA sequencers, but the AVITI24 is the first and only NGS instrument to combine both functions in a single machine.

81. Although Element's AVITI sequencers all compete in the mid throughput range, their relative price-to-quality ratio versus other short-read NGS instruments creates a unique value proposition for customers considering any type of short-read NGS instrument as an alternative. If customers considering a low throughput short-read sequencer (like an Illumina MiSeq) can afford the higher upfront cost of Element's mid throughput AVITI, Element's instrument power, as well as subsequent purchases of its much lower-priced consumables, can make up the difference in a short period of time. For customers considering a high throughput short-read sequencer (like an Illumina NovaSeq), purchasing multiple Element AVITIs can deliver similar throughput for a comparable upfront cost, all while securing Element's much lower consumables and service pricing in those markets throughout the useful life of the short-read NGS instrument itself.

82. Further adding to this competitive dynamic are the differences between large and small research organizations, how they approach DNA sequencing, and what this means for the value proposition of different types of short-read NGS instruments, consumables, and instrument services for those organizations. Smaller research organizations typically have one or just a small number of labs, meaning they do not need to purchase many short-read NGS instruments and sequence a relatively small volume of DNA on those they do purchase, making low or mid throughput sequencers the most cost-effective option. Short-read NGS consumables and instrument services also cost less overall for such organizations because they have fewer instruments and lower sequencing needs.

83. In contrast to smaller organizations, large research organizations typically have many labs—sometimes, dozens—and accordingly sequence a much higher volume of DNA than their

smaller counterparts. Some large research universities have more than one hundred labs that can utilize sequencing instruments. Historically, the most powerful short-read NGS instruments were higher throughput machines, which means that until recently, large research organizations typically concentrated sequencing in a small number of centralized labs (often called “core labs” or “core facilities”) with a handful of high throughput machines that run sequencing for the entire organization and for multiple labs at once. In this model, labs in the organization need to send their DNA samples to the central lab so they can be run as part of a single batch with multiple other labs’ DNA samples. This can often take weeks and requires reserving a spot in the sequencing run, which unsurprisingly reduces an individual lab’s flexibility and can delay research results. The tradeoff is being part of a large organization that typically has substantial funding and reach, as well as access to other resources that many smaller organizations do not have. Given the high number of sequencing runs and the regular use of short-read NGS instruments at these organizations, large research organizations are typically more sensitive than small organizations to price changes in short-read NGS consumables and instrument services.

84. When it comes to large research organizations, one of Element’s unique value propositions is that it enables those customers to operate more efficiently by decentralizing DNA sequencing. Large organizations can do so by allowing individual or small groups of labs across the organization to purchase Element’s mid throughput NGS instruments. This can lead to increased efficiencies because a decentralized model allows labs to avoid the time and expense of shipping samples to a core sequencing lab, all while obtaining sequencing results and analysis that is better than core labs’ machines because of the higher quality of Element’s NGS instruments. Even where time and expense of shipping is not at issue—for example, if a lab is physically close to a core sequencing lab—the decentralized model avoids processing bottlenecks and delays at core labs. These facilities can become oversubscribed by a high volume of sequencing orders from different labs, and samples often have to wait in line for processing.

85. The decentralized model also offers more accurate results. If a customer has a non-standard sample or unique sequencing specifications, the quality of the sample prep (or the analysis itself) may be worse at core labs that process samples in mass. Where local instruments are shared

by a small number of organizations, customers are far more familiar with the preparation and analysis nuances of their own samples.

86. Furthermore, because the cost of Illumina consumables is so high, it is often more cost-effective for large organizations with Illumina instruments to conduct fewer sequencing runs on centralized high throughput instruments that can sequence more DNA in a single run. But with Element's low cost consumables, large organizations can perform more runs on mid throughput AVITI sequencers across multiple labs for a cost comparable to or lower than operating centralized Illumina high throughput sequencers. This allows large organizations to capture the benefits of decentralization for the same (or lower) all-in cost than a centralized model based on Illumina's NGS instruments.

87. Unsurprisingly, business from large research organizations is incredibly important to Illumina because it drives the majority of Illumina's NGS instrument, consumable, and services revenues, and acts as an anchor for Illumina's monopoly power in each relevant market (discussed further below). Element thus represents a unique competitive threat to Illumina because it offers large researchers flexibility that Illumina and its high throughput machines do not, and because Element offers a better quality short-read NGS instrument with better quality short-read NGS consumables, all at a lower all-in cost. Element's competition with Illumina thus benefits purchasers (large and small) through lower prices, higher quality, greater choice, and enhanced innovation, and by demonstrating to other would-be competitors that they can similarly compete with Illumina on the merits, despite Illumina's anticompetitive history. Customers have already responded positively to Element's entry into the market. For example, the CEO of the New York Genome Center remarked that "[i]t's wonderful to see there's competition" from Element and other NGS startups.[48] This excitement is further evidenced by Element's strong fundraising performance, raising more than $680 million through 2024 from investors who recognize the potential for higher quality, more

---

[48] Brian Gormley, *Startups Take On Illumina in Race For Cheaper DNA Sequencing*, WALL ST. J. (Feb. 16, 2023), https://www.wsj.com/articles/startups-take-on-illumina-in-race-for-cheaper-dna-sequencing-9aaceecb (last visited June 9, 2026).

efficient NGS instruments to bring meaningful choice, competition, and innovation to markets long dominated by Illumina.[49]

88. Element's competition with Illumina and Element's favorable comparisons to Illumina's sequencing results also benefits Element. Despite Illumina's anticompetitive conduct described herein, Element sold 137 AVITI sequencers in 2023 and captured $27 million in revenue, and approximately $60 million in revenue in 2024.

## ILLUMINA'S MONOPOLY POWER

89. Illumina describes itself as "a global leader in DNA sequencing and array-based technologies."[50] "Illumina is a monopolist. It is the self-proclaimed leader in DNA sequencing and dominates DNA sequencing markets in the United States and worldwide. Its name is often considered synonymous with 'next-generation sequencing'…. In the United States, Illumina has complete dominance over the market for these products…. Historically, Illumina has faced little competition for its NGS instruments and consumables…. Illumina has possessed since at least 2009, and continues to possess today, monopoly power in the markets in which it sells its DNA sequencing systems, including in the NGS Market."[51]

90. Illumina's dominance is shown by, among other things, its share of each of the relevant markets identified above and high barriers to entry into each of those markets. Even if the relevant NGS instrument market includes all NGS instruments (*i.e.*, both short-read and long-read), Illumina still has 80-90% share of that market and, according to some sources, has had a share of over 80% of the market since at least 2013.[52] In court filings, Illumina itself has admitted that it "is

[49] *Element Biosciences Raises Over $277 Million to Develop and Commercialize Differentiated Products and Continue Rapid Growth*, ELEMENT BIOSCIENCES (July 11, 2024), https://www.elementbiosciences.com/news/element-biosciences-raises-over-277-million-to-develop-and-commercialize-differentiated-products-and-continue-rapid-growth (last visited June 9, 2026).

[50] Illumina, Inc., Annual Report (Form 10-K) at 5, 31 (Feb. 12, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited June 9, 2026)

[51] *PacBio* Complaint at ¶¶ 1, 36.

[52] *Id.* at ¶¶ 41, 51.

a recognized industry leader in DNA sequencing, and its technology is used to generate over 90% of the world's sequencing data."[53] Industry trade publications report that through at least August 2024, "Illumina has more than 90% market share of clinical genomics testing and its platforms have become deeply embedded in many clinical companies."[54]

91. Because the markets for short-read NGS instruments, Illumina short-read NGS consumables, and Illumina short-read NGS instrument services are necessarily narrower than all NGS-related products, Illumina's share of the global market for short-read NGS instruments, consumables, and instrument services (regardless of whether the consumables and services include those for other manufacturers' short-read NGS instruments) must be at least 80%.

92. As the FTC has also explained, barriers to entry in the NGS industry are high because "any new entrant would need to overcome significant scientific, commercial, and intellectual property barriers to develop and commercialize a new NGS system successfully."[55] "DNA sequencing systems are highly complex systems comprising advanced chemistry, sensitive optics, and powerful semiconductors. Integrating these components into a system that delivers value and performance sufficient to compete with existing systems, is scalable, and is cost effective to manufacture and operate is an immense challenge that requires considerable investment of capital and time."[56]

93. Moreover, Illumina is extremely aggressive in patenting its alleged inventions in the DNA sequencing space and then enforcing the patents it obtains (whether through its own applications or through portfolios it acquires from others) against any real NGS competitor. Indeed, "Illumina's patent enforcement efforts have prevented, and likely will continue to prevent, new

---

[53] Illumina Mot. for Prelim. Inj. at 3, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:19-CV-03770 (N.D. Cal. Feb. 19. 2020), ECF No. 85.

[54] Jeffrey Rosenfeld, *Illumina and the State of the Genomics Market*, GENETIC ENG'G & BIOTECHNOLOGY NEWS (Aug. 29, 2024), https://www.genengnews.com/topics/omics/illumina-and-the-state-of-the-genomics-market/ (last visited June 9, 2026).

[55] *PacBio* Complaint at ¶¶ 42, 52.

[56] *Id.* at ¶ 53.

competitors from emerging in the United States."[57] Relatedly, Illumina recently acquired new short-read sequencing assets from PacBio, which it may further use to stymie competition.[58]

94. Part of Illumina's power also stems from the high switching costs inherent in NGS instrument purchases. As noted above, an NGS instrument typically costs hundreds of thousands of dollars and is not easily replaced once purchased. Further exacerbating these switching costs is the time, energy, and other resources lab personnel would have to undergo by switching to another platform after learning how to use their Illumina NGS instrument. Such switches do in fact happen—which is one of the main reasons Illumina has targeted Element—but the stickiness and lock-in effects of an NGS instrument purchase acts as a barrier to new entry.

95. In addition to short-read NGS instruments, Illumina also dominates and has monopoly power in both the Illumina short-read NGS consumable and Illumina short-read NGS instrument services markets. For end users wishing to use an Illumina sequencing instrument, dedicated consumables (*e.g.*, reagents and flow cells) from Illumina are effectively required, due to Illumina's intellectual property assertions, its contract requirements, and its product design. *See supra*. Similarly, any end users who want maintenance or repair services for an Illumina short-read NGS instrument must purchase such services from Illumina or an Illumina-approved independent service organization. *See supra*. As noted above, these dedicated consumables and instrument services in fact indicate that there are aftermarkets for Illumina short-read NGS consumables and Illumina short-read NGS instrument services. However, even viewing short-read NGS consumables and instrument services as markets incorporating all other brands as well, Illumina has a dominant share in each, tied (and equivalent) to the dominant share and power it has over short-read NGS instruments themselves.

96. There are substantial barriers to entry in each of the short-read Illumina NGS consumables and Illumina short-read NGS instrument services markets. Each require specialized

---

[57] *Id.* at ¶ 54.

[58] *See PacBio Completes Sale of Short-Read Sequencing Assets*, PACBIO (Feb. 2, 2026), https://www.pacb.com/pressreleases/pacbio-completes-sale-of-short-read-sequencing-assets/ (last visited June 9, 2026).

knowledge and (for consumables) manufacturing capabilities. Similarly, each have certain legal restrictions around them, given consumables and instrument services are specific to an NGS instrument and, largely dictated by requirements from the NGS instrument provider, NGS users may have to obtain new regulatory approvals if the user switches between NGS instruments. Furthermore, Illumina asserts intellectual property ownership over several aspects of the short-read NGS consumables it sells and the short-read NGS instrument technology it services, acting as yet another barrier to would-be entrants into either market. Likewise, Illumina's terms of service preclude consumers from reverse engineering Illumina NGS consumables, which makes it difficult for consumers to avoid paying for Illumina consumables, even if they have the technical know-how to create their own.[59]

97. As a result of its power and dominance, Illumina enjoys the ability to control prices and exclude competition in the markets for short-read NGS instruments, Illumina short-read NGS consumables, and Illumina short-read NGS instrument services. For Illumina short-read NGS consumables and instrument services, this includes but is not limited to lock-in power for the reasons previously discussed. As the FTC previously noted, "[c]ustomers recognize that they have few commercially reasonable alternatives and lack bargaining leverage to obtain lower prices or better contract terms from Illumina. When Illumina has implemented price increases, those increases have been profitable" because they have not driven sufficient sales toward other NGS instruments to render the price increases unprofitable; "Illumina is so dominant that it sees limited sales left to compete for."[60]

## FACTUAL BACKGROUND

### I. Illumina Has Long Demonstrated It Will Not Allow Any Meaningful Competition

98. Illumina entered the markets for short-read NGS instruments, consumables, and instrument services by acquiring Solexa in 2007. Before its acquisition by Illumina, Solexa

---

[59] *See Illumina Terms and Conditions of Sale – IVD Products* at 1 (Section 3), ILLUMINA, https://www.illumina.com/content/dam/illumina-marketing/documents/terms-conditions/united-states/usa-terms-and-conditions-of-sale-ivd.pdf (last visited June 9, 2026).

[60] *PacBio* Complaint at ¶¶ 38, 40.

developed the SBS technology that all Illumina sequencers continue to use to this day. Based on that original acquisition, Illumina acquired more than 80% share of the market for NGS instruments by 2013 at the latest.[61]

99. It is extremely lucrative to dominate such an important and expanding market. Illumina thus demonstrated from early on that it would brook no competition and began a long-running campaign of patent infringement litigation against any would-be competitors. For example, Illumina began a series of lawsuits against the BGI Group (BGI) and its subsidiary Complete Genomics, Inc. (CGI) in 2010, before BGI or CGI even attempted to commercially launch a short-read NGS instrument in the United States.[62] Although the Northern District of California granted a preliminary injunction against BGI and CGI, the court subsequently invalidated several of Illumina's underlying patents and ruled that others had not been infringed, prompting Illumina to drop all of its claims.[63] CGI eventually launched its own short-read NGS instrument in the United States in 2022, but only after another long, drawn out patent infringement battle.

100. Another example is Oxford Nanopore Technologies PLC ("ONT"), which launched its long-read NGS instrument in the United States in or around 2015. Shortly thereafter, Illumina filed complaints with the International Trade Commission and the Southern District of California seeking to block the importation or sale of ONT's long-read NGS systems in the United States based

---

[61] *Id.* at ¶ 41.

[62] *See* Complaint, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. Aug. 3, 2010), ECF No. 1; Complaint, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:12-cv-01465-BEN-BGS (S.D. Cal. June 15, 2012), ECF No. 1.

[63] *See* Stipulation & Order Dismissing Claims Regarding U.S. Patent Nos. 7,232,656 & 7,598,035, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. May 5, 2011), ECF No. 75; *Illumina Inc. v. Complete Genomics Inc.*, No. 3:10-cv-05542-EDL, 2013 WL 1282977, at *2, *4 (N.D. Cal. Mar. 26, 2013); *Illumina Inc. v. Complete Genomics Inc.*, No. C-10-05542 EDL, 2013 WL 1644829, at *1-3 (N.D. Cal. Mar. 27, 2013); Order Granting Stipulation of Dismissal, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. July 19, 2013), ECF No. 256; Order Granting Joint Mot. to Dismiss, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:12-cv-01465-BEN-BGS (S.D. Cal. July 23, 2013), ECF No. 54.

on alleged patent infringement.[64] The parties ultimately reached a settlement permanently enjoining ONT from selling certain products in the United States.[65]

101. Another competitor, QIAGEN, launched a short-read NGS instrument in the United States in or around 2016, but was forced to abandon the market after facing a series of lawsuits from Illumina alleging patent infringement.[66] After QIAGEN's exit from the sequencing market, it entered into a sequencing collaboration agreement with Illumina.[67] QIAGEN currently also partners with Element to offer workflow solutions for AVITI sequencers.

102. But Illumina's campaign to stifle competition at all costs is not limited to aggressive patent litigation. It has also attempted to buy would-be NGS competitors to eliminate threats of meaningful competition. For example, in November 2018, Illumina signed an agreement to acquire another emerging long-read NGS instrument producer, PacBio. Illumina agreed to purchase PacBio for $1.2 billion, representing "a 71% premium over PacBio's share price" at the time the purchase agreement was signed.[68] Shortly thereafter, the FTC filed a complaint to stop the acquisition, noting that PacBio only had 2-3% share of the total NGS instrument market.[69] Illumina and PacBio announced their intent to abandon the transaction a month after the FTC complaint was filed. In a press release accompanying the abandonment, the FTC's Deputy Director of the Bureau of

---

[64] *See* Complaint, *Certain Nanopores & Prods. Containing Same*, Inv. No. 337-TA-991 (Feb. 23, 2016); Complaint, *Illumina, Inc. v. Oxford Nanopore Techs. Ltd.*, No. 3:16-cv-0477-DMS-MDD (S.D. Cal. Feb. 23, 2016), ECF No. 1.

[65] *See* Consent Order, Final Judgment, and Permanent Inj., ECF No. 14, *Illumina, Inc. v. Oxford Nanopore Techs. Ltd.*, Case No. 3:16-cv-0477-DMS-MDD (S.D. Cal. July 12, 2016).

[66] *See, e.g.*, *Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1083 (N.D. Cal. 2016) (granting preliminary injunction).

[67] *Qiagen CEO Quits Amid Genetic Sequencing U-Turn, Shares Tumble*, REUTERS (Oct. 8, 2019), https://www.reuters.com/article/us-qiagen-restructuring/qiagen-ceo-quits-amid-genetic-sequencing-u-turn-shares-tumble-idUSKBN1WN11Q (last visited June 9, 2026).

[68] *PacBio* Complaint at ¶ 8.

[69] *Id.* at ¶ 46.

Competition noted that the "deal threatened to let a monopolist extinguish nascent competition in a growing health care market: next-generation DNA sequencing."[70]

103. In September 2020, Illumina entered into an agreement to acquire Grail, Inc., a company that developed a "multi-cancer early detection test" that required use of NGS instruments to analyze patient DNA.[71] In March 2021, the FTC filed an administrative complaint seeking to block the transaction. While FTC and European Commission regulatory proceedings were ongoing, Illumina consummated its acquisition of Grail. The European Commission fined Illumina and Grail more than €430 million for completing the transaction while regulatory review was pending and ordered Illumina to divest Grail.[72] Illumina completed its divestiture of Grail in June 2024.[73] Although the FTC dismissed its proceedings in light of the divestiture, it did so only after the Fifth Circuit issued an opinion holding that the FTC "carried its initial burden of showing that the Illumina-Grail merger is likely to substantially lessen competition."[74]

104. Element has not escaped Illumina's attempts to stifle new competitors. In May 2025, Illumina sued Element for alleged patent infringement in the District of Delaware.[75] Although litigation is ongoing, Element continues to vigorously contest Illumina's claims. In a press release following the lawsuit, Element stated that "it believe[s] Illumina's claims are unfounded and

---

[70] *Statement of Gail Levine, Deputy Director of FTC Bureau of Competition, Regarding the Announcement that Illumina Inc. has Abandoned Its Proposed Acquisition of Pacific Biosciences of California*, FED. TRADE COMM'N (Jan. 2, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/01/statement-gail-levine-deputy-director-ftc-bureau-competition-regarding-announcement-illumina-inc-has (last visited June 9, 2026).

[71] Administrative Complaint at ¶¶ 1, 23, *In re Illumina, Inc. & GRAIL, Inc.*, FED. TRADE COMM'N (Mar. 30, 2021).

[72] *Commission Approves Illumina's Plan to Unwind Its Completed Acquisition of GRAIL*, EUROPEAN COMM'N (Apr. 11, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_1964 (last visited June 9, 2026).

[73] Illumina, Inc., Annual Report (Form 10-K) at 9 (Feb. 12, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001110803/40bb9893-0143-45cf-adff-78437abde278.pdf (last visited June 9, 2026).

[74] *Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1061-62 (5th Cir. 2023).

[75] *See* Complaint, *Illumina, Inc. et al v. Element Biosciences, Inc.*, No. 25-cv-00602 (D. Del. May 15, 2025), ECF No. 1.

represent an anticompetitive effort to limit choice and stifle innovation in genomic sequencing. The technology described in the asserted patents well predates Illumina, which fundamentally undermines Illumina's hollow public claim that Element lacks a history of innovation. We are confident that Illumina's claims are meritless."[76]

105. As Illumina's acquisition and litigation history shows, it will not accept any meaningful competition in the relevant markets and intends to keep its monopoly power, no matter the cost. Although the acts described in this section are not overt acts on which Element bases its claims, they demonstrate Illumina's specific intent to monopolize and maintain its dominance.

106. Ever since Element entered the market for short-read NGS instruments in March 2022, Illumina recognized it as a new competitive threat and acted in accordance with its long history of trying to stamp out any would-be competitor. Rather than compete with Element by offering better products, reducing its prices, or otherwise trying to convince customers that Illumina was the better choice on the merits, Illumina instead chose to engage in a calculated course of conduct involving interlocking parts, all aimed at forcing or otherwise coercing customers into purchasing its NGS instruments instead of any alternatives. That conduct has sped up in recent years, as Element made further inroads into the next-generation DNA sequencing industry despite Illumina's anticompetitive efforts, and it has hampered competition not only from Element, but from other short-read NGS instrument sellers as well.

## II. Illumina Structures Its Supply Agreements to Exclude Competition

107. Customers purchasing Illumina NGS instruments, consumables, and instrument services have contracts with Illumina governing those purchases. Illumina typically refers to these agreements as a "Supply Agreement." These supply agreements can include a variety of terms, including pricing, discounting, rebating, and exclusivity, among other provisions. Additionally, Illumina Supply Agreements can include a term (*e.g.* a number of years), automatic renewal provisions, and cancelation provisions. Occasionally, customers enter into Amendments to their

---

[76] *Element Biosciences Responds to Illumina Patent Litigation*, ELEMENT BIOSCIENCES, https://www.elementbiosciences.com/element-biosciences-responds-to-illumina-patent-litigation (last visited June 9, 2026).

Illumina Supply Agreements. Because these Supply Agreements can include term and renewal provisions, the agreements are ongoing. Even if the initial purchase of an instrument is a one-time event, these Supply Agreements can also govern subsequent purchases of consumables and services. Finally, even if a Supply Agreement does not specifically govern the subsequent purchase of consumables or services, those purchases are governed by Illumina's standard terms and conditions, listed publicly on Illumina's website.[77] Accordingly, all Illumina customers have an ongoing, contractual relationship with Illumina—each time they purchase a product from it, that purchase is governed by a preexisting or new contractual agreement.

108. Not every Supply Agreement contains every combination of instrument, consumables, and services, but they can address all three (and often do). Some Supply Agreements just cover consumable and/or services purchases, in which case they are a term agreement governing the ongoing purchases of those separate products.

109. Numerous examples of Illumina Supply Agreements are available publicly. For instance, Illumina has a long-term Supply Agreement with Freenome Holdings, Inc. ("Freenome").[78] This agreement was effective January 8, 2024, and runs until August 18, 2033 by default.[79] The Supply Agreement concerns Illumina sequencing instruments, specifically "Illumina's NextSeq, NextSeqDx and NovaSeq instruments, and any future sequencing instruments launched by Illumina or its Affiliates,"[80] and Illumina short-read NGS consumables, defined as "those consumables intended by Illumina to be used to perform a sequencing process on Illumina's NextSeq, NextSeqDx and NovaSeq instruments and any future sequencing hardware launched by Illumina or its Affiliates and includes core consumables that are (i) commercialized or otherwise

---

[77] *Terms and Conditions of Sale/Sales Policies*, ILLUMINA, https://www.illumina.com/company/legal/terms-and-conditions.html (last visited June 9, 2026) ("The terms and conditions listed on this page shall govern the purchase and authorized use of products and/or services by you or your company from Illumina, Inc. or its affiliates.").

[78] *See* Illumina, Inc., Supply Agreement, sec.gov/Archives/edgar/data/2017526/000114036126017428/ny20061080x8_ex10-24.htm (last visited June 16, 2026).

[79] *Id.* at 12 (Section 11.1).

[80] *Id.* at 21 (App'x A Section 1).

made available by Illumina to customers or Affiliates of Illumina and (ii) intended by Illumina to be used to perform a sequencing process on any such system."[81] Freenome purchases all instrument, consumable, and instrument services through its Supply Agreement: "This Agreement (together with the applicable Documentation and Specifications) exclusively governs the ordering, purchase, supply, and use of Supplied Product, and its terms shall prevail and override any conflicting, amending and/or additional terms contained in any purchase orders, invoices or similar documents, which are hereby rejected and shall be null and void. In the event Customer begins to purchase Consumables labeled with either Advantage or a prefix "TG" in their catalogue number or product name, the Parties agree to enter into a separate Quality Agreement within [*redacted*] days of the Effective Date. To the extent terms in the Quality Agreement conflict with terms in this Supply Agreement, the terms of this Supply Agreement control."[82] That is, the Illumina-Freenome Supply Agreement is the exclusive means through which Freenome purchases from Illumina.

110. The Illumina-Freenome Supply Agreement includes other provisions that are emblematic of Illumina's conduct, discussed in more detail below as it relates specifically to Element. For instance, this Supply Agreement includes a Volume-Based Net Price, *e.g.*, pricing contingent on purchasing a certain amount of instruments or consumables from Illumina.[83] The same agreement also contractually ties Illumina short-read NGS consumables and instruments: "Consumables; On-Hardware Consumables. Consumables and Hardware were specifically designed and manufactured to operate together. Customer acknowledges and agrees that (i) it will [*redacted*], (ii) it will use [*redacted*] (iii) with respect to [*redacted*], it will only use [*redacted*], and (iv) Customer is not granted any right under this Agreement to [*redacted*], even for use in place of [*redacted*], even for its [*redacted*], and (v) subject to subsection 3.1(e), Customer is not granted any right under this Agreement to [*redacted*]."[84] Although heavily redacted, this provision requires the use of Illumina NGS consumables, when using Illumina NGS instruments. Additionally, Illumina

---

[81] *Id.*

[82] *Id.* at 2 (Section 2.1).

[83] *Id.* at 22 (App'x A Section 4(a)).

[84] *Id*. at 4 (Section 3.2(b)).

reserved the right to terminate the agreement entirely, should Freenome be acquired by another sequencing company.[85] Finally, and notably, the Illumina-Freenome Supply Agreement acknowledges the danger that Illumina might "disadvantage GRAIL's potential competitors after the Transaction by increasing their sequencing prices or by withholding access to Illumina's latest innovations in NGS,"[86] consistent with the FTC's concerns.

111. As another example, Illumina has a Supply Agreement with Guardant Health, Inc. ("Guardant"), which governs the sale, use, and consumable purchasing by Guardant of Illumina sequencing machines (NovaSeq, MiSeq, NextSeq, MiniSeq).[87] Consistent with the product market allegations discussed above, that contract has separate provisions for (1) short-read NGS instruments, (2) short-read NGS instrument services, and (3) short-read NGS consumables, with pricing, terms, and conditions discussed separately.

112. The Guardant-Illumina Supply Agreement includes provisions consistent with the allegations both above and below. First, the contract includes instrument-level volume discounts, which stipulate that the purchase of set numbers of additional short-read NGS instruments will result in discounts on subsequent purchases.[88] Second, the contract also conditions pricing of NGS instrument services on the purchase of additional short-read NGS instruments.[89] Similarly, the Supply Agreement provides for an additional discount with a 2 year service contract renewal and further discounts with (presumably) longer renewals.[90] Third, the Guardant-Illumina Supply Agreement includes consumable discounts.[91] Crucially, and consistent with the allegations below, these consumable discounts are contingent on Guardant having a certain number of Illumina short-

---

[85] *Id.* at 12 (Section 11.2(d)).

[86] *Id.* at 2 (Appendix A, Section 8.b.ix).

[87] *See, e.g.*, Illumina, Inc., Amendment #5 to Supply Agreement, https://www.sec.gov/Archives/edgar/data/1576280/000157628021000031/exhibit1019-illuminaagreem.htm (last visited June 9, 2026). This document is Amendment #5 to the Supply Agreement.

[88] *See id.*

[89] *Id.* at 4-10.

[90] *Id.* at 7. Specific discounts provided, and the specific terms of those discounts, are redacted.

[91] *Id.*

read NGS instruments installed.[92] The Supply Agreement also includes examples for this type of discount, such as: "Customer places a Purchase Order for one NovaSeq 6000 S4 Reagent Kit v1.5 [*consumable*] to be shipped Customer's Facility in the United States. Customer already has ten NovaSeq Systems [*instruments*] which were purchased and installed during the Term, and Customer's NovaSeq 6000 Core Consumables Spend is $21,000,000. Customer shall receive a [*redacted*] discount off NovaSeq 6000 S4 Reagent Kit v1.5 to be shipped to Customer's Facility in the United States."[93] Discounts of this type and structure are common for Illumina: purchase and maintain a certain number of short-read NGS instruments and maintain a certain level of consumable spend, in order to receive discounts.

113. In entering Supply Agreements, Illumina often issues a "Quotation:" essentially a pricing bid that includes pricing information, shipping information, and other terms and conditions. For instance, public materials regarding Illumina's Quotation and Supply Agreement with Personalis exist.[94] These quotes include the product for purchase (in this case, a NovaSeq 6000), unit pricing, a discount percentage, the customer price, and the number of units being quoted at that price.[95] Supply Agreements (and related Quotations) are subject to Illumina's standard terms and conditions, available on Illumina's website.[96]

114. Some Supply Agreements also include express exclusivity provisions. For instance, Illumina's Supply Agreement with Icahn School of Medicine at Mount Sinai states "**Exclusivity**. In exchange [*redacted*] under this Agreement, Customer agrees to exclusively use only Illumina [*redacted*] for [*redacted*] performed by Customer during the Term. For the avoidance of doubt, Customer agrees that [*redacted*] under this Agreement when performing [*redacted*] during the

---

[92] *Id.* at 5, 9, 11.

[93] *Id.* at 5, 9.

[94] *See, e.g.*, *Quotation and Supply Agreement for NovaSeq 6000 Sequencing Systems Between Illumina, Inc. and Personalis*, JUSTIA, https://contracts.justia.com/companies/personalis-inc-8225/contract/62420/ (last visited June 9, 2026).

[95] *Id.*

[96] *Illumina Terms and Conditions of Sale – Research Use Products*, ILLUMINA, https://www.illumina.com/content/dam/illumina-marketing/documents/terms-conditions/united-states/usa-terms-and-conditions-of-sale-general.pdf (last visited June 9, 2026).

Term."[97] Similarly, the same Supply Agreement includes a minimum purchase agreement: "**Minimum Purchase Commitment**. Beginning in the [*redacted*] Customer launches an [*redacted*], Customer shall purchase and take delivery of no less than [*redacted*] during each calendar quarter of this Agreement during the Term. Such amount is based upon the [*redacted*] during such time period."[98] The Illumina-Icahn School of Medicine at Mount Sinai Supply Agreement is heavily redacted, such that it is impossible to determine which Illumina products are included in the exclusivity and minimum purchase agreements. However, the fact that Illumina includes these provisions in any contract is evidence of its general contracting practices.

115. As another example, Illumina has a supply and servicing agreement with Foundation Medicine, Inc. ("Foundation"), which governs the sale and use of Illumina instruments, consumables, and services by Foundation.[99] Under this agreement, the redacted list of instruments and consumables are the only hardware and reagents that Foundation is permitted to purchase from Illumina.[100]

116. Upon purchasing an Illumina sequencer, this agreement requires Foundation to purchase and use Illumina consumables exclusively: "Customer agrees . . . not to use non-Illumina reagents with Illumina Hardware."[101] Supply terms like these leverage Illumina's dominance in the instrument market to contractually prevent competition in the consumables market. Further, Illumina mandates that upon Foundation's purchase of an Illumina instrument, Foundation must also purchase instrument maintenance, repair, and services from Illumina, rather than from a third party service or foregoing service at all: "During the Term, Illumina shall offer and Customer shall purchase and maintain a Service Contract for all Illumina Hardware that Customer uses, even if

---

[97] [sic] *See* Illumina, Inc., Supply Agreement at Section 2.2 (June 20, 2014), https://www.sec.gov/Archives/edgar/data/1818331/000162828021014760/exhibit1027-super8xk.htm (last visited Jne 9, 2026).

[98] *Id.* at Section 2.3. Note that all redactions are in the original document, as filed with the SEC.

[99] *See*, Illumina, Inc., Amended and Restated Supply, Service, and Support Agreement (July 25, 2013), https://www.sec.gov/Archives/edgar/data/1488613/000156459018021082/fmi-ex101_238.htm (last visited June 9, 2026).

[100] *Id.* at Section 2.

[101] *Id.* at Section 5.a.i.

Illumina has determined to discontinue/phase out a given piece of Illumina Hardware. Existing service contracts that Customer has will terminate on the Effective Date[.]"[102] Through contractual provisions such as these, Illumina excludes competition in the services market and contractually locks in customers such as Foundation to Illumina's services.

117. As noted, Illumina's Supply Agreements can cover short-read NGS instruments, short-read NGS consumables, and short-read NGS instrument services, or they can cover only one of the three. For instance, one publicly available Illumina Supply Agreement between Illumina and Natera covers only TG Consumables.[103] Similarly, Illumina Supply Agreements may include exclusivity as to some products, but not others. The original Illumina-Natera supply agreement included a specific exclusivity provision for TG Consumables, for some purposes, including non-invasive prenatal testing ("NIPT") uses:

> Exclusivity. In exchange for the discounts on Consumables and Illumina Hardware offered Customer under this Agreement, Customer will use only Illumina TG Consumables and Temporary Consumables and Illumina Hardware for all NIPT Uses performed by Customer during the Term. If Customer, at its discretion, chooses to not use such Products exclusively for all such NIPT Uses (which choice, for clarity, shall not be deemed a breach of this Agreement), then (i) Customer will not be entitled to the discounts for Products (for any Customer Use) set forth on Exhibit B and (ii) if at any time during the period beginning on the First Amendment Date and ending on the date of the [*redacted*] anniversary of the First Amendment Date Customer does not use only Illumina TG Consumables and Temporary Consumables and Illumina Hardware exclusively for all tests for NIPT Use performed by Customer during such period, then Customer shall refund to Illumina an amount equal to [*redacted*]% of the Base Price of all Consumables for which Customer received a [*redacted*] % discount, wherein such refund is payable on the first date that it is not exclusively using Illumina TG Consumables and Temporary Consumables and Illumina Hardware for all NIPT Uses and is due within [*redacted*] business days after Customer's notice as provided in the next sentence. Customer will notify Illumina in writing within [*] days of the first date that it is not exclusively using Illumina TG Consumables and Temporary Consumables and Illumina Hardware for all NIPT Uses and, after such written notice, Customer will not be entitled to the discounts for Products that may be purchased under this Agreement for any Customer Use. In addition, if Customer gives such notice of non-exclusivity during the [*redacted*] period that begins on the Effective Date, then

[102] *Id.* at Section 3.f.

[103] "Illumina Advantage (IA, formerly TG Translational Genomics) large-scale sequencing products feature lot-specific shipments and testing, extended shelf life, and advanced change notifications for greater laboratory efficiency." *See Features of Illumina Advantage (IA Former TG) Product*, ILLUMINA, https://knowledge.illumina.com/instrumentation/general/instrumentation-general-reference_material-list/000005173 (last visited June 9, 2026).

> Customer will promptly refund to Illumina the discount it received on any Illumina Hardware purchased during such period. If Customer has not notified Illumina that it is using Illumina Products non-exclusively for NIPT Uses, then Illumina may request from time to time that an authorized officer of Customer provide Illumina with written certification that Customer is, and has been since the Effective Date or the last such certification, exclusively using Illumina TG Consumables and Temporary Consumables and Illumina Hardware for all NIPT Uses, and Customer will provide such certification. Illumina will waive the requirement for exclusivity in Paragraph 3(a), and will supply in accordance with the discounts offered on Exhibit B, in the event of, and only during the period of, a Supply Failure that pertains to Product for NIPT Use. Notwithstanding the foregoing, development by Customer of assays or tests for NIPT Uses (but provided that Customer is not marketing or commercializing such assays or tests) on non-Illumina sequencing platforms will not, without more, result in loss of the discounts on Exhibit B.[104]

118. The Illumina-Natera Supply Agreement was later amended to replace this exclusivity provision with a bundled discount structure, which was similarly designed to ensure Natera's "[c]ommitment to Illumina's [p]latform."[105] This amendment reflects that Illumina's bundled discount structure is intended to and in fact does serve the same purposes as an express exclusivity clause. In subsequent amendments, the Illumina-Natera Supply Agreement continued to have annual consumable spend requirements in order for Natera to receive discounts.[106]

119. Accordingly, Illumina's Supply Agreements may not always require exclusivity in the sense that non-exclusivity will be considered a breach. Rather, in those instances, failure to remain exclusive to Illumina will forfeit discounts and pricing guarantees, including discounts on consumables that customers must purchase in order to run their installed base of Illumina machines..

120. More generally, Illumina uses standard terms and conditions of sale for its contracts with its customers. These include the standard Terms and Conditions of Sale/Sales Policies,

---

[104] *See* Illumina, Inc., Supply Agreement (TG Consumables) at Ex. A Section 3(a), sec.gov/Archives/edgar/data/1604821/000104746915005707/a2225210zex-10_13.htm (last visited June 9, 2026).

[105] *See* Illumina, Inc., Sixth Amendment to Supply Agreement at Section 1.vi, https://www.sec.gov/Archives/edgar/data/1604821/000155837020009787/ntra-20200630xex10d1.htm (last visited June 9, 2026).

[106] *See* Illumina, Inc., Seventh Amendment to Supply Agreement at Ex. B, sec.gov/Archives/edgar/data/1604821/000155837021014721/ntra-20210930xex10d1.htm (last visited June 9, 2026).

available on Illumina's website.[107] It also includes a standardized set of volume discounts that Illumina offers, which Illumina calls its Universal Consumable Discount Schedule:[108]

**Table 1.** Universal Consumables Discount Schedule:

| **Annual Sequencing Consumables Spend (in USD)** | **NextSeq 550** | **NextSeq 550 (TG)** | **NextSeq 550Dx** | **NovaSeq v1.5** | **NextSeq 1000/2000** |
|---|---|---|---|---|---|
| $0-500,000 | 0% | 10% | 0% | 0% | 0% |
| $500,001-999,999 | 10% | 20% | 10% | 0% | 0% |
| $1,000,000-4,999,999 | 15% | 25% | 15% | 0% | 3% |
| $5,000,000-9,999,999 | 20% | 30% | 20% | 3% | 5% |
| $10,000,000-19,999,999 | 25% | 35% | 25% | 5% | 7% |
| $20,000,000-29,999,999 | 30% | 40% | 30% | 10% | 10% |
| $30,000,000-39,999,999 | 30% | 40% | 30% | 13% | 13% |
| $40,000,000-49,999,999 | 30% | 40% | 30% | 15% | 15% |
| $50,000,000-$74,999,999 | 30% | 40% | 30% | 17% | 15% |
| $75,000,000-$99,999,999 | 30% | 40% | 30% | 20% | 15% |
| $100,000,000+ | 30% | 40% | 30% | 22% | 15% |

Discounts for new versions of Supplied Products (e.g., future consumables for NovaSeq, NextSeq 500/550, or future platforms) shall be added to the Supply Agreement in compliance with the terms and conditions of the Supply Agreement, including without limitation Section 5.

121. The same, standardized, contractual discount schedule also includes volume-based discounts based on instrument purchases. Specifically, purchasing instruments grants purchasers "instrument credits," which can then be redeemed for discounts on future instrument purchases:[109]

---

[107] *See Terms and Conditions of Sale/Sales Policies*, ILLUMINA, https://www.illumina.com/company/legal/terms-and-conditions.html (last visited June 9, 2026) ("The terms and conditions listed on this page shall govern the purchase and authorized use of products and/or services by you or your company from Illumina, Inc. or its affiliates.").

[108] *See, e.g.*, *Universal Consumables and Instruments Discount Schedules and List Price Catalogue* at 1, ILLUMINA (Jan. 6, 2022), https://www.illumina.com/content/dam/illumina-marketing/documents/applications/cancer/01_6_2022revision-Appendix1_.pdf (last visited June 9, 2026) (highlighting in original).

[109] *Id.* at 3 (highlighting in original).

**Table 2**: Universal Hardware Discount Schedule:

| Tier | Instrument Credits | Discount off NextSeq 500/550(including Dx)/1000/2000 Instrument | Discount off NovaSeq 6000 Instrument |
|---|---|---|---|
| **1** | **1-30** | 5% | 5% |
| **2** | **31-50** | 10% | 10% |
| **3** | **51-100** | 13% | 13% |
| **4** | **101-200** | 15% | 15% |
| **5** | **201-300** | 17% | 17% |
| **6** | **300-600** | 20% | 20% |
| **7** | **601-900** | 20% | 22% |
| **8** | **900+** | 20% | 24% |

**Table 3**: Allocation of Instrument Credits:

| Installed Instrument | Instrument Credits |
|---|---|
| NovaSeq 6000 | 10 |
| NextSeq 500/550 (including Dx)/1000/2000 | 3 |
| MiSeq (including Dx) | 1 |

122. Finally, the same standardized, contractual discount schedule includes separate discounts for service contracts, this time based on the number of installed Illumina short-read NGS instruments that the purchaser has:[110]

[110] *Id.* at 4-5 (highlighting in original).

**Table 4:** Universal Service Contract Discount Schedule:

| Tier | Number of Installed Instruments | Service Contract Discount |
|---|---|---|
| 1 | 1 | 0% |
| 2 | 2-4 | 5% |
| 3 | 5-10 | 8% |
| 4 | 11-30 | 10% |
| 5 | 31-50 | 12% |
| 6 | 51-75 | 15% |
| 7 | 76-100 | 17% |
| 8 | 100+ | 20% |

123. The foregoing examples of Illumina Supply Agreements, the terms and conditions, and the standardized, contractual discount schedules, are not intended to be an exhaustive catalogue of all Illumina contracts with customers. Instead, they provide examples of contracts whose terms, structure, and key features create either explicit or *de facto* exclusivity requirements for Illumina's customers.

124. For some customers, the contracts include explicit exclusivity and tying arrangements. These contractual provisions, on top of technical limitations, make clear that these customers cannot realistically purchase short-read NGS instruments, consumables, or instrument services from companies other than Illumina, once they have purchased an instrument from Illumina.

125. For other customers, the contracts do not include explicit exclusivity or tying requirements. Crucially, however, Illumina does not need express exclusivity and tying provisions to coerce customers into exclusivity. Virtually all of these contracts include discount/rebate

programs with volume targets, which effectively foreclose non-Illumina competitors from competing, even absent express exclusivity or tying provisions. Notably, though Element (or another Illumina competitor) can often provide better pricing on any given short-read NGS instrument, Illumina's Supply Agreements and the related discounting schedule—as well as Illumina's demands relating to those agreement (discussed further below)—means customers must forego purchasing from Element even at a lower price, in order to maintain discounts on other Illumina products; namely, Illumina short-read NGS consumables.

126. As discussed in detail below, beyond the specific contractual terms set in Illumina's Supply Agreements, Illumina also uses threats to maintain *de facto* exclusivity, essentially imposing exclusivity terms into ongoing contracts even if they do not explicitly include such terms.

**III. Illumina Threatens to Raise Illumina Short-Read NGS Consumable and Instrument Service Prices to Coerce Customers Into Purchasing Only Illumina Short-Read NGS Instruments for Any New NGS Instrument Purchase**

127. One way Illumina leverages its dominance to crowd out competition in the market for short-read NGS instruments is by threatening to raise price or remove discounts or rebates on Illumina short-read NGS consumables and instrument services for preexisting customers that are considering purchasing anything but an additional Illumina short-read NGS sequencer. These threats are effective due to the need to maximize an NGS instrument's useful life and the lock-in power Illumina exercises over Illumina short-read NGS instrument purchasers after their purchase. Once customers purchase an Illumina short-read NGS instrument, they are effectively locked in to purchasing Illumina consumables and instrument services in order to use that instrument, often at a much higher price than Element charges for comparable consumables and services for its own short-read NGS instruments. Although a research organization could use Illumina and Element (or other) short-read NGS instruments in parallel, Illumina's conduct prevents that result.

128. Element first learned of this Illumina tactic from its very earliest days selling AVITI sequencers to customers in 2022. On multiple occasions, customers reported that Illumina threatened to increase the cost of its NGS consumables or instrument services if the customer considered purchasing an Element AVITI. Large customers that already owned multiple Illumina NGS instruments were (and remain) particularly vulnerable to these threats, as they must purchase

a large amount of consumables and instrument services from Illumina to continue operating their NGS instruments and because their ability to continue DNA sequencing is critical to their research efforts.

129. By tying the previously negotiated (and agreed upon) price of its short-read NGS consumables and instrument services to the continued purchase of its short-read NGS instruments, Illumina effectively coerces its customers into purchasing Illumina short-read NGS instruments when the customer otherwise would have purchased a short-read NGS instrument from Element or another seller.

130. This anticompetitive result is not just theoretical. On at least two occasions of which Element is specifically aware, these threats have directly caused Element to lose committed sales. In or around September 2024, Element was close to finalizing the sale of an AVITI sequencer to Customer A, a prominent medical school,[111] which had verbally committed to the purchase. But Customer A backed away from the deal at the last minute after Illumina threatened to increase the price of instrument services for Customer A's existing Illumina NGS instruments if Customer A purchased an AVITI. Illumina either threatened to eliminate discounts provided under a standardized, contractual discount schedule, threatened to raise prices under Customer A's existing contracts, or threatened to raise the prices on Customer A's contracts once they were renewed.

131. Similarly, in or around January 2025, Customer B, a large healthcare provider and research institution, walked away from its previous verbal commitment to purchase an Element AVITI sequencer after Illumina threatened to raise the cost of instrument service on Customer B's existing Illumina sequencers if it purchased an AVITI. As with Customer A, Illumina either threatened to eliminate discounts provided under a standardized, contractual discount schedule, threatened to raise prices under Customer B's existing contracts, or threatened to raise the prices on Customer A's contracts once they were renewed.

132. Customers A and B are large research organizations that sequence substantial amounts of DNA each year, and they are particularly sensitive to Illumina's threats because NGS

[111] Element uses pseudonyms to refer to existing and prospective customers to protect Element's competitively sensitive business information and to protect the privacy of nonparties.

instrument service costs represent a material portion of their operating budgets. And these are not the only instances where Illumina has engaged in this sort of conduct, both with Element and other short-read NGS instrument sellers. Element has lost sales to Illumina in several other instances with large organizations where Element was the better-priced option, yet nevertheless lost the sale to Illumina under circumstances highly similar to the Customer A and B examples.

133. The anticompetitive impact of Illumina's threats to raise consumable and instrument service prices for preexisting customers that considering an Element short-read NGS instrument for a new purchase is heightened by competitive dynamics surrounding short-read NGS systems. As noted above, because large customers like Customers A and B purchase high quantities of consumables and instrument services each year, they account for a disproportionate share of any short-read NGS provider's revenue and are uniquely sensitive to threats, like Illumina's, to raise prices on critical short-read NGS consumable and instruments services. These large organizations are thus more likely to choose Illumina over Element or any other short-read NGS competitor in the face of Illumina's threats and to have an outsized impact on Illumina's competitors' bottom line as a result. Indeed, for Element, the inability to obtain such customers dramatically reduces its competitive options, as well as its long-term viability.

134. These threats also harm Illumina's customers and stifle competition. Element, for example, competes by offering AVITI sequencers with higher throughput, better quality, and lower cost relative to Illumina sequencers. It separately offers NGS consumables at a fraction of the price Illumina offers, and similarly prices its NGS instrument services far below where Illumina prices its Illumina NGS instrument services. Notwithstanding better pricing and higher quality on *incremental* sales of NGS instruments, consumables, and instrument services, Element cannot compete for those *incremental* sales because Illumina's contracts leverage a customer's *existing* Illumina instruments and related demand for consumables to foreclose that *incremental* competition. For large research organizations, the AVITI's individual advantages are magnified by the ability to decentralize DNA sequencing workflows, which can save the time and expense of shipping samples to centralized sequencing labs that rely on high throughput sequencers. But through its threats to raise aftermarket

consumable and instrument service prices, Illumina prevents its customers from considering these benefits when purchasing a new short-read NGS instrument.

135. Illumina has similarly conditioned the price of its NGS consumables and instrument services on the purchase of additional Illumina NGS instruments for numerous other customers. Though the specifics may vary between customers, Illumina's threats all leverage its monopoly power in Illumina short-read NGS consumables and instrument services for the same anticompetitive goal: coercing customers into purchasing additional Illumina instruments, and thereby crowding Element and other competitors out of the market for short-read NGS instruments.

136. Illumina also leverages its market power to effectively force customers to exclusively purchase short-read NGS instruments from Illumina. Illumina achieves this exclusivity in at least three ways. First, and as discussed above, its threats to raise contractual Illumina short-read NGS consumable and instrument service prices on customers that consider purchasing a competing short-read NGS instrument when making an additional short-read NGS instrument purchase *de facto* require those customers to exclusively purchase Illumina NGS instruments. Second, Illumina expressly conditions Illumina short-read NGS consumable and instrument service discounts in its supply contracts on exclusivity, which it has obtained and which foreclose access to a substantial portion of the short-read NGS instrument market. Third, Illumina conditions discounts on its short-read NGS instruments, consumables, and instrument services on a customer's agreement not to trade in a non-Illumina short-read NGS instrument.

137. As alleged above, Illumina's threats to raise contractual prices for Illumina short-read NGS consumable and instrument services have substantially foreclosed competition for short-read NGS instruments due to the *de facto* (and, in many instances, explicit) exclusivity it requires. Element identifies two such examples (Customers A and B) above, as well as its information and belief based on other lost competitive sales opportunities that this is a widespread practice for Illumina.

138. Confirming that this is a widespread practice that, in most instances forecloses competition, Illumina attempted to coerce an Element customer into explicit exclusivity through a combination of discounts and implied threats. Specifically, Illumina offered Customer C, an

agricultural genetic sequencing provider, substantial discounts on Illumina NGS instruments and consumables conditioned on exclusivity to Illumina. Moreover, Customer C reported to Element that Illumina threatened to raise prices on consumables for its existing Illumina instruments if it did not agree to Illumina's exclusivity proposal. In a November 2022 email to Customer C, an Illumina representative wrote that in exchange for these current and future discounts, "we are asking for your commitment to use only Illumina products for your genotyping and production/development. . . . With your continued commitment to Illumina, I will have more leverage with the executive leadership team to develop a pricing strategy that better aligns with your projects and expansion goals" (emphasis in original). In a subsequent conversation with Element, a Customer C representative expressed frustration with Illumina's "anti-competitive BS." Although Customer C ultimately declined Illumina's exclusivity offer, Illumina's communications with Customer C offer a clear example of how it exercises this practice across the industry.

139. Although Customer C ultimately resisted Illumina's exclusivity demand due its unique circumstances, Illumina's communications with Customer C illustrate the mechanism Illumina uses across the industry: conditioning discounts and pricing on a customer's commitment to use only Illumina products. Customer C was able to resist largely because Customer C is a smaller research organization with fewer DNA sequencing needs than larger organizations, meaning Illumina's tactics did not have as much relative effect on Customer C's bottom line. Larger organizations, with greater locked-in consumable and service spend, incur far greater costs when faced with the same threat, however, and do not have similar flexibility or ability to withstand Illumina's tactics, and, on information and belief, have succumbed to these tactics despite the desire to use competitive offerings like Element's. Element bases this allegation on competitive sales offerings at large research organizations where it was the lowest-priced offer but nevertheless lost to Illumina. By precluding access to these large organizations due to the unique pressure it can bring to bear on them, Illumina substantially foreclosed access to the lion's share of the addressable market for short-read NGS instruments.

140. And in still other cases, Illumina has attempted to achieve exclusivity through trade in offers, whereby it will only offer discounts on Illumina NGS consumables and instrument services

for preexisting Illumina NGS instruments if the customer in question trades in a newly purchased competitive short-read NGS instrument (like the AVITI). If accepted, this quite literally forces the customers to only—*i.e.*, exclusively—use Illumina short-read NGS instruments.

141. Whether explicit or implied, these exclusivity requirements are intended to (and do) foreclose Element and other competitors from a substantial portion of the market for short-read NGS instruments. As discussed below, upwards of 80% of labs already have at least one Illumina sequencer and their conduct therefore prevents Element from accessing any meaningful number of labs beyond the margins. That constitutes substantial foreclosure because it keeps Element out of the vast majority of labs in the U.S. This exclusive dealing also harms Illumina's customers. By foreclosing Element and other competitors from the market, Illumina deprives research organizations of choice and entrenches its own power to artificially raise prices for all of Illumina NGS instruments, consumables, and instrument services.

## IV. Illumina Structures Its Pricing to Exclude Competition

142. In addition to coercing customers directly, Illumina structures its pricing to exclude competition by starving entrants of much-needed cash flow in the short-term so that Illumina can enjoy long-term supracompetitive prices. This practice works in conjunction with Illumina's other anticompetitive practices described above. Illumina's pricing strategy has two components: (1) significant discounting for instruments, to ensure competitors can never gain a foothold in the market, and (2) loyalty and volume-based pricing that leverages existing Illumina instrument, consumable, and service purchases to penalize customers that consider competing instruments. Critically, taken together and alongside Illumina's exclusionary contracts and coercive tactics, this pricing strategy allows Illumina to exclude competition on bases other than efficiency even if Illumina's pricing is not below its marginal cost. This practice also allows Illumina to charge supracompetitive prices for consumables and instrument services, to the detriment of customers.

143. First, Illumina frequently offers steep discounts off the list prices of its NGS instrument, sometimes in excess of 50%. Although Element (and other competitors) can at times compete by offering their own instruments at or near their own marginal costs, Illumina's instrument pricing strategy still has important exclusionary effects in the long-run. Illumina well knows the list

prices for its competitors' products, including Element's AVITI NGS instruments. It uses this knowledge to undercut them in ways separate from efficiency.

144. Short-read NGS equipment manufacturers generate the bulk of their revenue from consumables. Demand for consumables and services, however, is entirely derivative of the initial demand for instruments; a company engaged in NGS equipment sales cannot make consumable sales unless it first makes one or more instrument sales. It is therefore important for nascent short-read NGS instrument manufacturers to gain an initial foothold in the market by placing NGS instruments. Illumina's heavy discounting on instruments makes gaining that foothold much more challenging by starving entrants of capital in the short term so that they run out of operating cash before they can make up the difference through longer-term consumable and services sales (which typically take years to recoup initial instrument losses, if an entrant tries to compete with Illumina's heavy instrument discounts).

145. Examples of this strategy are common. In one case, Illumina offered Customer D, a large regional healthcare provider, a 55% discount off the list price of a NextSeq 2000 sequencer ($335,000), meaning the instrument cost only $150,000. In another, Illumina offered Customer E, a nonprofit genetic research institution, more than 50% off the list price of a NextSeq 2000 sequencer, again taking the price of the sequencer under $167,500. In comparison, Element's AVITI Standard instrument has a list price of $289,000.

146. Second, Illumina offers volume-based and loyalty discounts on consumables, which maintain its dominance. For example, Illumina offered Customer F, a prominent research university, a nearly 40% discount on a NextSeq 2000 sequencer in addition to between $50,000 and $70,000 in free consumables. Because Customer F would have purchased those consumables from Illumina anyway, the consumables discount functioned as an added discount to the sequencer itself. Illumina thus offered Customer F as much as a 64% discount off the price of its sequencer. This essentially means that, for Customer F, Illumina offered them a NextSeq 2000 sequencer for $131,000 because the customer had no consumable costs for an extended amount of time after purchasing the machine.

147. Discounts of this type are not only common, but publicly advertised and included in Illumina's Supply Agreements. As discussed above, Illumina broadly offers five types of discounts:

(1) discounts on instruments based on a certain level of consumable spend; (2) discounts on instruments based on a certain number of prior instrument purchases; (3) discounts on instrument services based on the number of installed instruments; (4) discounts on instrument services for signing longer service agreements; and (5) discounts on consumables based on having a certain number of installed instruments. Each is a type of loyalty or volume-based discount, which excludes competition on the merits.

148. Discounts of this type harm competition. For instance, Illumina could offer a 10% consumable discount for consumers who have at least 100 Illumina instruments installed. A consumer with 90 instruments, looking to purchase another 10, may solicit bids from both Illumina and Element. Element's pricing on *both* the instrument *and* the consumables could be lower than Illumina's, and Illumina could still win this business. That is because a loyalty discount applies to consumables used in the previously installed base of 90 Illumina machines, as well as the incremental 10 machines. Element is effectively forced to compete not only on the incremental sale, but also against all the prior sales. Economists refer to this as leveraging non-contestable demand.[112]

149. Crucially, Illumina's consumable "discounts" are not, in reality, lower prices. Instead, Illumina simply raises the list price, then offers loyalty discounts down to the supracompetitive price. In this way, Illumina continues to extract a supracompetitive profit on consumables, but also ensures Element and other competitors cannot reasonably compete either.

150. Illumina's two-fold pricing strategy is both general and targeted. Although Illumina broadly uses loyalty discounting to maintain its stranglehold on the market, it also specifically targets Element. Element has received multiple reports from existing and prospective customers in the past several months that Illumina representatives have promised to "undercut Element pricing, whatever it is." These statements directly illustrate that Illumina's pricing strategy is driven by a desire to put Element out of business rather than compete on the merits.

---

[112] *See also infra*, "Harm To Competition."

### V. Illumina Creates Market Wide Fear, Uncertainty, and Doubt About Element's Financial Sustainability

151. If there were any doubt that the conduct described above is specifically intended to be anticompetitive, Illumina put such questions to rest with its widespread, pernicious, defamatory, and libelous efforts to make Element's current and prospective customers believe that Element would go out of business within a few months or years.

152. Illumina representatives have expressly raised fears about Element's near term viability to at least Customer G, a prominent medical school; Customer H, a pharmaceutical manufacturer; and Customer I, a nonprofit medical research institution. Illumina told each of these customers that they should be concerned about Element's long-term ability to sell consumables or services for its short-read NGS instruments because Element "might not exist in another year or two."

153. At the time Illumina made these disparaging comments, it had no basis to make claims about the sustainability of Element's business. Element is a privately held company and does not report performance metrics publicly. Any comments Illumina made about Element's business prospects to prospective customers were necessarily baseless and intended to harm Element's business prospects with these entities.

154. Lacking any basis to speculate on Element's financial sustainability, Illumina's clear intent in making these disparaging statements (as well as their effect) was to stoke fear in the minds of Element's existing or prospective customers. In light of the substantial upfront cost of purchasing a short-read NGS instrument, customers need assurance that sellers will be able to produce consumables and provide instrument maintenance and repair services for years to come. Illumina's rumormongering was intended to and did suggest that Element would not be able to sell necessary consumables or instrument services in the near future, thereby attempting to induce customers to purchase from Illumina instead.

155. In a particularly stark example, Illumina representatives told Customer J, a large teaching hospital, in late 2024 that "Element won't be in business for long; if Illumina needs to we can just buy them and shut them down." This disparaging statement goes a step beyond fostering

doubt about Element's ability to service its NGS instruments: it belies Illumina's anticompetitive and tortious intent. Illumina essentially informed the Hospital that if other anticompetitive tactics fail to put Element out of business, Illumina will simply acquire its competitor to maintain monopoly power. As noted above, it tried a similar tactic with PacBio and Grail but was forced to either abandon or divest those acquisitions due to their anticompetitive nature and effects. Here, the clear suggestion behind Illumina's comments is that customers like Customer J should buy short-read NGS instruments from Illumina now because Element will either succumb to Illumina's conduct and cease selling consumables and instrument services, or it will simply disappear because Illumina will prevent a competitive offering like Element's to exist and result in Illumina charging whatever it wants for short-read NGS instruments.

156. The effects of Illumina's disparaging statements are directly tied to Illumina's market power. Stoking baseless fears that Element may not be able sell NGS consumables and instrument services is only an effective strategy because of Illumina's nearly two-decade long dominance of the market for short-read NGS instruments, implying that customers can have confidence in Illumina. And by telling customers that it can acquire Element if all else fails, Illumina underscores that it is willing to use its monopoly power to stomp out new competitors.

157. On information and belief, Illumina has made similar disparaging statements to numerous other Element customers or prospective customers, with the intent of inducing those customers to purchase Illumina NGS instruments out of fear that Element might not be able to service its cheaper, higher quality short-read instruments in the near term.

## VI. Illumina's Conduct Lacks Any Legitimate Business or Otherwise Procompetitive Justification

158. As the facts alleged herein show, Illumina's specific intent is to obtain and/or maintain monopoly power in short-read NGS instruments by driving out Element and all other competitors from that relevant market. That goal is blatantly anticompetitive, tortious, and, if successful, would result in higher prices, less choice, and less innovation for short-read NGS instrument consumers.

159. Illumina's conduct cannot be justified as a mere attempt to compete against Element on price or the merits. Indeed, much of Illumina's conduct would be economically irrational but for its anticompetitive effects. Threatening customers is typically bad for business. But for Illumina, such threats will not result in clients switching to competitors. Because clients are locked-in to Illumina's ecosystem, these customers are forced to acquiesce to exclusionary Supply Agreements.

160. Similarly, there are no legitimate justifications to forcing research organizations to only purchase short-read NGS instruments from Illumina and to suffer price increases on Illumina short-read NGS consumables and/or Illumina NGS instrument services just because they want to or do buy a short-read NGS instrument from a different manufacturer.

161. Furthermore, and in any event, there are substantially less restrictive alternatives that Illumina could use to compete against Element on the merits. These include offering discounts not tied to volume or loyalty on short-read NGS instruments, consumables, and instrument services, or offering discounts that are not conditioned on exclusivity or the purchase of any other product or service. Moreover, Illumina could invest more of its substantial financial resources into developing new and better short-read NGS instruments and consumables that offer the same cost, quality, and efficiency advantages as Element's and other competitors' products.

162. To the extent Illumina can provide any procompetitive explanations for its conduct, such explanations are far outweighed by anticompetitive effects.

## HARM TO COMPETITION

163. Illumina's conduct harms competition by raising prices, lowering output, stifling innovation, and reducing product quality. Illumina's exclusionary contracts mean that Element and other competitors can never gain a foothold in the relevant markets, and therefore cannot exert significant price discipline on Illumina, to the detriment of consumers.

164. Illumina's conduct excludes competition through a mechanism that does not depend on Illumina ever lowering the price of a sequencer below what it costs Illumina to make one. The mechanism instead exploits a simple structural feature of this market: a meaningful portion of any customer's demand is not actually open to competition at all. Once a customer has purchased an Illumina instrument, that customer must buy Illumina-specific consumables to run it and Illumina-

specific services to maintain it, for the multi-year useful life of the machine. That installed-base demand is therefore locked in to Illumina by the technology itself, and it is locked in regardless of how the underlying contracts are written. Element competes only for the portion of demand that remains genuinely contestable: the customer's decision, at the moment of a new instrument purchase, about which manufacturer's sequencer to buy next.

165. A stylized example illustrates how Illumina turns the locked-in portion of demand into a weapon against competition for the contestable portion. Imagine a large research institution that already operates a number of Illumina sequencers and spends heavily each year on the consumables. Element approaches that institution with a better mid-throughput instrument at a lower price than what Illumina offers. It is attractive to the institution as a new purchase because it provides (for example) more flexibility for a lab in a certain location or allows a lab to assemble a lower number of DNA samples for a sequencing run, thus reducing the amount of time researchers have to wait for their DNA sequencing results. On the merits of that single purchase, Element wins. But Illumina does not compete for that purchase on the merits. Instead, Illumina tells the customer that if it buys the Element instrument, the prices the customer pays on its existing fleet—the consumables and services it has no choice but to buy from Illumina—will go up; or, equivalently, that the discounts the customer currently enjoys on those locked-in purchases will disappear. The customer now faces a choice that has nothing to do with whether Element's short-read NGS instrument is the better option for this new purchase. Instead, the customer must weigh the modest benefit of one superior new instrument against a penalty imposed across its entire installed base of Illumina short-read NGS instruments. Because the locked-in spend dwarfs the value of the single contestable purchase, the rational customer abandons Element and stays with Illumina. Competition for the new instrument is foreclosed, even though Element offered the superior product at the lower price.

166. The critical point is that Illumina need not "discount" anything in a way that costs Illumina money. Illumina can fund the entire scheme out of the supracompetitive margins it already earns on demand that no rival can touch. A small price movement spread across a large base of captive consumable and service purchases generates a large pool of dollars, and Illumina can redeploy those dollars to make the customer's all-in cost of staying loyal lower than the all-in cost

of diversifying to Element—while the marginal price of every product, including the new instrument, remains comfortably above Illumina's cost of producing it. The customer experiences a powerful financial incentive to reject the entrant; Illumina sacrifices nothing meaningful to create it. This is why the harm here cannot be detected by asking whether Illumina priced any instrument below cost. The exclusion operates through the leverage of non-contestable demand, not through below-cost pricing.

167. Illumina's actual discount practices confirm that its pricing architecture is built to exploit, and to deepen, this lock-in. Illumina conditions discounts on an instrument upon the customer's level of consumable spending, and upon the number of instruments the customer has previously purchased. It conditions discounts on instrument services upon the number of Illumina instruments the customer already has installed, and upon the customer's agreement to longer-term service commitments. And it conditions discounts on consumables upon the size of the customer's installed base. The unifying logic of these schedules is unmistakable: the more deeply a customer is already committed to the Illumina ecosystem, the cheaper Illumina becomes. Discounts that reward an existing installed base and existing consumable volume are not rewards for winning new, contested business; they are inducements calibrated to the very lock-in that makes the customer captive in the first place, and they raise the effective penalty a customer suffers if it dares to diversify even a single instrument purchase to Element.

168. The competitive consequences follow directly, and they fall on consumers as well as on Element. In the short run, customers who would prefer Element's higher-quality, lower-priced instruments are forced to buy Illumina instead, so the market is denied the lower prices and better products that competition on the merits would deliver. In the longer run, the effect compounds: an entrant that cannot win new instrument sales cannot build the installed base that would, in turn, generate its own stream of consumable and service revenue and fund continued innovation and expansion. Element and other would-be competitors are thus prevented not because they cannot build a better sequencer at a better price—they have—but because they are never permitted to compete for the sale on those terms. With rivals foreclosed, Illumina preserves its ability to charge supracompetitive prices across NGS consumables and services alike, and the customers who depend

on next-generation sequencing pay more, choose from less, and benefit from slower innovation than a competitive market would provide.

169. In the alternative, this mechanism also does not depend on isolating consumables and services into their own Illumina-specific aftermarkets. The same dynamic operates, and the same harm results, if the relevant market is instead defined as a single "systems" market—one encompassing the instrument together with the complementary consumables and instrument services that the instrument requires over its useful life, sold and consumed as an integrated whole. Under that view, the locked-in consumable and service demand is simply the follow-on purchase for the very same products it has already purchase; Illumina's leverage over those follow-on purchases allows it to foreclose competition for instruments—the new-system sale—for which Element can actually compete. Whether that leverage is described as power over distinct aftermarkets or as power over the lifecycle of an integrated system, it is the technological tie between a customer's existing instruments and its future consumable and service purchases, not the label affixed to the market, that supplies Illumina with its captive base and its means of exclusion.

## ACTUAL AND ANTITRUST INJURY

170. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

171. Illumina's anticompetitive conduct directly harms competition. Through the acts alleged herein, Illumina has substantially hindered competition from Element and any other potentially significant entrant in the relevant markets for short-read NGS instruments, consumables, and instrument services. In doing so, Illumina has raised market wide prices, lowered market wide quality, limited market wide choice, and stifled market wide innovation for short-read next-generation DNA sequencing.

172. Illumina's exclusionary contracts foreclose Element from competing for a substantial volume of potential sales. Using public figures, the nature and extent of that foreclosure is calculable and palpable.

173. Consumers do not purchase a sequencer in a vacuum. With a market share upwards of 80%, Illumina short-read NGS instruments are ubiquitous. Every large research organization that

already owns Illumina instruments—*i.e.*, almost all of them—must keep buying Illumina consumables to operate them, because Illumina consumables work only on Illumina instruments and the instruments themselves cannot economically be replaced before the end of their useful lives. That recurring consumable spend is not contestable: no rival can supply it, and the customer cannot avoid it without abandoning equipment it has already paid for. The scale of that locked-in spend is what gives Illumina its leverage. By Illumina's own reporting, a single one of its high-throughput instruments generates on the order of $1.35 million in consumable purchases every year.[113] A customer's installed fleet of such instruments therefore represents an annual stream of captive spending that dwarfs the one-time price of the single new instrument—roughly $289,000 for an Element AVITI—that Element and Illumina are actually competing to sell.

174. Because the captive stream is so large relative to the contestable instrument sale, Illumina need only adjust consumable pricing on the customer's existing fleet by a small fraction to erase the entire economic case for buying a competing instrument. The mechanism is the same whether Illumina frames it as a threatened price increase on consumables for the customer's installed machines or as a discount on those consumables that the customer forgoes by buying outside Illumina. In either direction, the customer compares its total cost and finds that the penalty on its locked-in spend swallows whatever it would save on the new instrument. The table below illustrates the point using representative high-throughput installed-base sizes for large customers. For each, it shows the annual captive consumable spend, how many times that spend exceeds the price of a single competing AVITI, and the percentage move in consumable pricing that would fully offset the customer's benefit from switching:

| Number of Installed Illumina Instruments | Annual Captive Consumable Spend (~$1.35 million) | Multiple Of One AVITI ($289k) | Consumable Price Move Needed To Offset A Switch |
|---|---|---|---|
| 3 | $4.05 million | ~14x | ~7.1% |
| 10 | $13.5 million | ~47x | ~2.1% |

[113] *See Illumina Q4 2025 Earnings Presentation,* ILLUMINA (Feb. 5, 2026), https://s24.q4cdn.com/526396163/files/doc_financials/2025/q4/v2/ILMN-Q4-25-Earnings-Presentation-02-05-2026-1.pdf (last visited June 9, 2026).

| | | | |
|---|---|---|---|
| 25 | $33.75 million | ~117x | ~0.9% |
| 100 | $135 million | ~467x | ~0.2% |

175. These figures are conservative in several respects. They use Illumina's own reported average annual consumable pull-through for its high-throughput instruments, and they measure a single year of that captive spend against the full price of the new instrument—even though the instrument will operate for roughly five years and the customer's locked-in spend recurs the entire time. Measured over the life of the instrument, the captive stream is several times larger, and the percentage move Illumina needs to make on consumable pricing to defeat a competing sale shrinks to a fraction of the figures shown above. For the largest customers, a change of far less than one percent on consumables they are already buying is sufficient to take a competing instrument off the table—without Illumina ever lowering the price of its own instrument below cost, and before accounting for the parallel pricing leverage Illumina holds over instrument service, which compounds the same effect.

176. Given Illumina's massive market share already, its threats of price hikes (or loyalty discounts), combined with its low or no cost instrument price, Element has very little ability to compete on equal footing. The foreclosure of potential business is staggering. That harm includes both past and future lost profits due to the loss of current and prospective customers, as well as the diminution in Element's business value due to the same.

177. Element's lost market share and profits are directly caused by Illumina's unfair and unlawful conduct, as described herein.

## CAUSES OF ACTION

### COUNT 1: UNREASONABLE RESTRAINT OF TRADE (15 U.S.C. § 1)

178. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

179. Illumina's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits contracts, combinations, and conspiracies in restraint of interstate trade or commerce.

180. Sale of short-read NGS instruments around the world is a relevant antitrust market.

Sale of consumables and instrument services for Illumina short-read NGS instruments globally are relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and instrument services globally are relevant antitrust markets, regardless of seller. Further in the alternative, short-read NGS systems around the world are a relevant antitrust market.

181. Illumina has monopoly power in all relevant markets and aftermarkets.

182. As alleged herein, Illumina entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, exclude competition, and to willfully acquire and maintain monopoly power in the relevant markets for short-read NGS instruments, consumables, and instrument services.

183. These contracts, combinations, or conspiracies include but are not limited to tying arrangements and exclusive dealing arrangements.

184. These contracts, combinations, or conspiracies are harmful to competition and foreclose a substantial share of competition in the markets for short-read NGS instruments, consumables, and instrument services (or, in the alternative, the market for short-read NGS systems) from Element and other competitors.

185. Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

186. Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

187. Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

**COUNT 2: MONOPOLIZATION (15 U.S.C. § 2)**

188. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

189. Illumina's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of interstate trade or commerce.

190. Sale of short-read NGS instruments around the world is a relevant antitrust market. Sale of consumables and instrument services for Illumina short-read NGS instruments globally are

relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and instrument services globally are relevant antitrust markets, regardless of seller. Further in the alternative, short-read NGS systems around the world are a relevant antitrust market.

191. Illumina has monopoly power in all relevant markets and aftermarkets.

192. Illumina has maintained or acquired monopoly power in the markets for short-read NGS instruments, consumables, and instrument services by means of the exclusionary and anticompetitive conduct alleged herein. This conduct includes, but is not limited to, tying arrangements, exclusive dealing arrangements, and structuring new NGS-related contracts in a way to prevent competition based on efficiency.

193. Illumina's conduct as alleged herein is harmful to competition and forecloses a substantial portion of the markets for short-read NGS instruments, consumables, and instrument services (or, in the alternative, the market for short-read NGS systems) from Element and other competitors.

194. Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

195. Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

196. Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

**COUNT 3: ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2)**

197. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

198. Illumina's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits attempted monopolization of interstate trade or commerce.

199. Sale of short-read NGS instruments around the world is a relevant antitrust market. Sale of consumables and instrument services for Illumina short-read NGS instruments globally are relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and short-

read NGS instrument services globally are relevant antitrust markets, regardless of seller. Further in the alternative, short-read NGS systems around the world are a relevant antitrust market.

200. Illumina specifically intended to monopolize the market for short-read NGS instruments globally by means of the exclusionary and anticompetitive conduct alleged herein. This conduct includes, but is not limited to, tying arrangements, exclusive dealing arrangements, and structuring new NGS-related contracts in a way to prevent competition based on efficiency.

201. Illumina attempted to monopolize the market for short-read NGS instruments in the United States by means of the exclusionary and anticompetitive conduct alleged herein.

202. There is a dangerous probability that Illumina will achieve monopoly power in the markets for short-read NGS instruments, consumables, and instrument services (or, in the alternative, the market for short-read NGS systems) as a result of its anticompetitive conduct.

203. Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

204. Illumina's attempts to monopolize the markets for NGS instruments, consumables, and instrument services in the United States are harmful to competition and, if successful, will foreclose a substantial portion of the relevant markets from Element and other competitors.

205. Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

206. Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

## COUNT 4: EXCLUSIVE DEALING AND TYING IN VIOLATION OF THE CLAYTON ACT SECTION 3 (15 U.S.C. § 14)

207. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

208. Illumina's conduct violates Section 3 of the Clayton Act, 15 U.S.C. § 14, which prohibits exclusive dealing and tying agreements that may substantially lessen competition or tend to create a monopoly.

209. Sale of short-read NGS instruments around the world is a relevant antitrust market. Sale of consumables and instrument services for Illumina short-read NGS instruments globally are relevant antitrust aftermarkets. In the alternative, sale of short-read NGS consumables and instrument services globally are relevant antitrust markets, regardless of seller.

210. Illumina has monopoly power in all relevant markets and aftermarkets.

211. As alleged herein, Illumina has entered into one or more contracts or agreements that may substantially lessen competition by conditioning the sale or price of Illumina short-read NGS instruments, consumables, and instrument services on the exclusive purchase of short-read NGS products from Illumina.

212. As alleged herein, Illumina has entered into one or more contracts or agreements that may substantially lessen competition by conditioning the sale or price of Illumina short-read NGS instruments, consumables, or instrument services on the purchase of other short-read NGS products from Illumina.

213. These contracts or agreements, as alleged herein, have and will continue to substantially lessen competition in the market for short-read NGS instruments in the United States.

214. Illumina's conduct has no legitimate business purpose or procompetitive effect, or any such effects are substantially outweighed by anticompetitive injury.

215. Illumina's conduct occurs in interstate commerce or affects a substantial volume of interstate commerce.

216. Element has suffered, and will continue to suffer, antitrust injury as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

**COUNT 5: UNLAWFUL AND UNFAIR COMPETITION (CAL. BUS. & PROF. CODE §17200, *et seq*.)**

217. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

218. Illumina's conduct violates California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., which prohibits unlawful, unfair, or fraudulent business acts or practices.

219. Illumina's conduct is unlawful under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the California Secret Rebate Law, Cal. Bus. & Prof. Code § 17045, and constitutes defamation, trade libel, and tortious interference with prospective economic relations under California common law.

220. For these reasons, Illumina's conduct is also unfair under the UCL. Illumina's conduct is additionally unfair because it is designed to harm Element's ability to compete, thereby restraining competition.

221. As a direct result of Illumina's unlawful and unfair conduct, Element has suffered significant harm, including lost market share, lost profits, reputational harm, and litigation costs.

**COUNT 6: SECRET ALLOWANCES (CAL. BUS. & PROF. CODE § 17045)[114]**

222. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

223. Illumina's conduct violates California's Secret Payments or Allowances law, Cal. Bus. & Prof. Code § 17045, which prohibits secret rebates, refunds, commissions, or unearned discounts that are "not extended to all purchasers purchasing upon like terms and conditions."

224. As alleged herein, Illumina has offered non-public rebates, refunds, or unearned discounts to some purchasers of short-read NGS instruments, consumables, or instrument services that it has not offered to other purchasers on like terms and conditions.

225. Illumina's use of these secret rebates and discounts is designed to put Element out of business, thereby destroying competition. Illumina has specifically targeted Element customers or prospective customers for its secret discounts and rebates.

226. Element has suffered, and will continue to suffer, significant harm as a result of Illumina's conduct, including in the form of past and future lost customers and revenue.

[114] With respect to Count 6, Element has not substantively amended the allegations in this Second Amended Complaint, from the First Amended Complaint. Element preserves this Count for appeal.

## COUNT 7: DEFAMATION[115]

227. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

228. As alleged herein, Illumina has intentionally made false and misleading statements to Element's customers and prospective customers.

229. As alleged herein, Element customers and prospective customers reasonably understand Illumina's false and misleading statements to disparage Element's continued ability to sell short-read NGS consumables and provide services for its short-read NGS instruments.

230. Because of the facts and circumstances known to Element's customers and prospective customers about the importance of short-read NGS consumables and instrument services, Illumina's false and misleading statements about Element's financial viability tended to injure Element by discouraging customers and prospective customers from association or dealing with Element.

231. Illumina failed to use reasonable care to determine the truth or falsity of its statements, including because it had no basis to believe that Element will go out of business.

232. Element has and will continue to suffer harm to its property, business, and reputation as a result of Illumina's false and misleading statements. Element's specific economic damages include past and future lost customers and revenue.

## COUNT 8: TRADE LIBEL[116]

233. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

---

[115] With respect to Count 7, Element has not substantively amended the allegations in this Second Amended Complaint, from the First Amended Complaint. Element preserves this Count for appeal.

[116] With respect to Count 8, Element has not substantively amended the allegations in this Second Amended Complaint, from the First Amended Complaint. Element preserves this Count for appeal.

234. Illumina has intentionally made false and misleading statements to Element's customers and prospective customers disparaging Element's continued ability to sell short-read NGS consumables and service its short-read NGS instruments.

235. Illumina made these statements with knowledge of their falsity or misleading nature because it had and continues to have no basis to believe that Element will go out of business.

236. Illumina's disparaging statements were made maliciously because they were designed to create fear, uncertainty, and doubt about Element's ability to sell the consumables and services necessary to operate Element NGS instruments.

237. Element has sustained, and will continue to sustain, significant economic and reputational harm as a result of Illumina's disparaging statements. Element's specific economic damages include past and future lost customers and revenue.

## COUNT 9: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

238. Element hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

239. Illumina knowingly interfered with Element's prospective business relationships with existing or prospective customers. These customers include, but are not limited to Customers A, B, C, G, H, I, and J.

240. Element has existing contracts with or was in advanced negotiations with these existing or prospective customers for the sale of AVITI sequencers, creating a strong probability of future economic benefit.

241. Illumina was aware of Element's relationships with these existing and prospective customers at all relevant times.

242. As alleged herein, Illumina's independently wrongful and anticompetitive acts were intended to and actually did disrupt Element's relationship with these existing and prospective customers.

243. The loss or significant deterioration of Element's business relationships with these existing or prospective customers would not have occurred but for Illumina's interference.

244. Illumina's wrongful acts proximately caused substantial economic harm and reputational damage to Element. Element's specific economic damages include past and future lost customers and revenue.

**PRAYER FOR RELIEF**

245. WHEREFORE, Element respectfully prays for the following relief:

a. a judgment finding that Illumina violated Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and Sections 17200 *et seq.* and 17045 of the California Business and Professions Code;

b. a judgment finding that Illumina committed the torts of defamation, trade libel and tortious interference with prospective economic relations;

c. a permanent injunction prohibiting Illumina from engaging in the anticompetitive, unfair, and tortious conduct alleged herein;

d. equitable relief as may be required to restore competition and to prevent the recurrence of future statutory and state common law violations alleged herein;

e. a judgment and order requiring Illumina to pay Element's actual and treble damages in an amount adequate to compensate it for Illumina's violations for the federal statutes, state statutes, and state common law cited herein;

f. pre-judgment and post-judgment interest on such monetary relief;

g. the costs of bringing this suit, including reasonable attorneys' fees;

h. any further relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

246. Element hereby demands a jury trial on all claims.

DATED: June 18, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By /s/ *Adam B. Wolfson*
Adam B. Wolfson (Bar No. 262125)
Attorney for Plaintiff Element Biosciences, Inc.