United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELEMENT BIOSCIENCES, INC.,
Plaintiff,

v.

ILLUMINA, INC., et al.,
Defendants.

Case No. 25-cv-08026-NW

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: ECF No. 70

This is an antitrust dispute between two manufacturers of DNA sequencing tools. Plaintiff Element Biosciences, Inc. ("Plaintiff" or "Element") alleges that Defendants Illumina, Inc. and Illumina Cambridge Ltd. (together, "Defendants" or "Illumina") have engaged in anticompetitive practices for years by unreasonably restraining trade and monopolizing the market for Illumina's next-generation DNA sequencing systems.

Before the Court is Illumina's motion to dismiss Element's second amended complaint ("SAC"). ECF No. 70. The motion is fully briefed. ECF Nos. 74, 77. The Court held a hearing on November 13, 2026. ECF No. 87. For the following reasons, the Court DENIES the motion to dismiss Plaintiff's antitrust claims under the Sherman Act and the Clayton Act (Counts 1, 2, 3, and 4) as well as Plaintiff's tortious interference with prospective economic relations and Unfair Competition Law ("UCL") claims (Counts 5 and 9). The Court GRANTS the motion to dismiss Plaintiff's secret allowances, defamation, and trade libel claims (Counts 6, 7, and 8) without leave to amend.

## I. BACKGROUND

The Court assumes familiarity with the facts of this case, as outlined in the Court's prior Order on Defendants' motion to dismiss the first amended complaint ("FAC"). ECF No. 65

("Order"). Relevant factual developments from Element's SAC are included below. ECF No. 66.

### A. The Parties' Products

Element and Illumina both develop, manufacture, and sell short-read next generation DNA sequencing ("NGS") tools. SAC ¶¶ 3–4. These sequencing tools operate as "systems" made up of three components: the sequencer, consumables (*e.g.*, chemical reagents and flow cells), and services (*e.g.*, repairs and maintenance). *Id.* ¶¶ 17, 33, 52, 169. Element characterizes consumables and services as "aftermarket" products that need to be regularly repurchased to operate the sequencer; demand for consumables and services depends on the lifespan and usage of the sequencer. *Id.* ¶¶ 33, 42–47, 52–55.

Because the design of each manufacturer's sequencing system is so unique, customers cannot reasonably mix and match sequencers, consumables, and services across brands. *Id.* ¶¶ 33–63. This means that for both companies, once a customer buys a sequencer, that customer is technologically "locked into" buying consumables and services from the same manufacturer for the life of the sequencer (*i.e.*, an owner of an Illumina sequencer must buy Illumina consumables and services, and an owner of an Element sequencer must buy Element consumables and services). *Id.* Element contends that Illumina therefore maintains near-complete control over the supply of its consumables and services for its sequencer customers. *Id.*

According to Element, it competes or otherwise interacts with Illumina in three product markets: (1) short-read NGS sequencers, (2) short-read NGS consumables, and (3) short-read NGS services. *See generally id.* ¶¶ 18–63. But given the lock-in effects, while the parties compete for sales of sequencers or sequencing systems, they do not independently compete for sales of consumables or services. *See id.* ¶¶ 63, 51.

### B. Market Power

Since 2007, Illumina has "dominated" the market for short-read NGS sequencers. *Id.* ¶ 3. In 2022, Element debuted its "AVITI" short-read NGS sequencers, which compete with Illumina's offerings. *Id.* ¶ 4. Since then, Element has "encountered significant—and increasingly severe—headwinds" as it has tried to compete in the NGS market. *Id.* ¶ 5.

Considering "the worldwide market for NGS systems," including the three product

United States District Court
Northern District of California

markets noted above, Element reports that Illumina "has had a market share 'of over 80% since at least 2013, and over 90% since 2015.'" *Id.* ¶ 3. As for each product market, Element alleges that "[b]ecause the markets for short-read NGS instruments, . . . consumables, and . . . instrument services are necessarily narrower than all NGS-related products, Illumina's share of the global market[s] for . . . instruments, consumables, and instrument services . . . must be at least 80%." *Id.* ¶ 91. In short, Element claims that "Illumina is a monopolist" under every formulation of the market or markets. *Id.* ¶¶ 3, 89.

**C. Illumina's Anticompetitive Scheme**

Element alleges that Illumina engaged in a "wide-ranging scheme" to exclude Element as a competitor. *Id.* ¶¶ 6–8. According to Element, Illumina (1) structured its customer sales contracts to exclude competition through both express exclusivity agreements and *de facto* coercion; (2) tied the continued purchase of Illumina's NGS sequencers to the previously-set price of its NGS consumables and services; (3) designed its discount structure for sequencers, consumables, and services to functionally erase the price gap between Element's (cheaper) and Illumina's own (more expensive) sequencing systems for customers who already own Illumina sequencers (what Element calls "leveraging non-contestable demand," *id.* ¶ 148); and (4) disparaged Element's business to customers. *See generally id.* ¶¶ 107–177.

Element claims that "Illumina's conduct harms competition by raising prices, lowering output, stifling innovation, and reducing product quality." *Id.* ¶ 163. It argues that "Illumina's exclusionary contracts mean that Element and other competitors can never gain a foothold in the relevant markets, and therefore cannot exert significant price discipline on Illumina, to the detriment of consumers." *Id.*

The SAC includes nine claims: Restraint of Trade under 15 U.S.C. § 1 (Count 1), Monopolization under 15 U.S.C. § 2 (Count 2), Attempted Monopolization under 15 U.S.C. § 2 (Count 3), Exclusive Dealing and Tying under 15 U.S.C. § 14 (Count 4), Unfair Competition, Cal. Bus. & Prof. Code § 17200, *et seq.* (Count 5), Secret Allowances, Cal. Bus. Prof. Code § 17045 (Count 6), Defamation (Count 7), Trade Libel (Count 8), and Tortious Interference with Prospective Economic Relations (Count 9). Illumina moves to dismiss all claims.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint that does not state a plausible claim upon which relief can be granted may be dismissed. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "can provide the framework of a complaint" but "must be supported by factual allegations." *Id.* at 679. The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). "[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted).

## III. DISCUSSION

In the SAC, Plaintiff bolsters the allegations supporting its claims of exclusive dealing and tying, and reframes its theory of predatory pricing into one of anticompetitive "discounting." These theories underpin Plaintiff's Sherman Act and Clayton Act claims, as well as its tortious interference and UCL claims. The Court considers whether Element has cured the deficiencies in the FAC with respect to these claims and theories.

As for its remaining state-law claims (secret allowances, defamation, and trade libel), Element admits that it "has not substantively amended the allegations in [the SAC], from the [FAC]." SAC at n.114–16.

### A. Federal Antitrust Claims

As in its prior Order (ECF No. 65), the Court begins by considering Element's Sherman Act Section 1 and Clayton Act Section 3 claims together. *See Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 n.2 (9th Cir. 1984) ("[T]he elements for establishing a violation under [these] provision[s] are virtually the same."). The Court then turns to Element's claims under Section 2 of the Sherman Act.

### 1. Sherman Act Section 1 (15 U.S.C. § 1) (Count 1) and Clayton Act Section 3 (15 U.S.C. § 14) (Count 4)

Section 1 of the Sherman Act "makes unlawful 'every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States.'" *Parker v. Brown*, 317 U.S. 341, 350 (1943) (quoting 15 U.S.C. § 1). Similarly, Section 3 of the Clayton Act makes it unlawful "to lease or make a sale or contract for sale of goods . . . where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. "Despite the breadth of the statutory language, the Supreme Court 'has long recognized that Congress intended to outlaw only unreasonable restraints.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "[A] Section 1 inquiry has both a threshold component (whether there is a contract, combination, or conspiracy) and a merits component (whether it is unreasonable)." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 981 (9th Cir. 2023).

To state a claim under Section 1, Element must allege (1) the existence of an agreement, and (2) that the agreement was an unreasonable restraint of trade. Element pleads two theories under Section 1: *first*, that Illumina restrained trade by forcing its customers into express or *de facto* exclusive dealing arrangements, and *second*, that Illumina restrained trade by "tying" purchases of Illumina NGS sequencers (the "tied" product) to discounts on Illumina consumables and services (the "tying" product). Under both theories, Element must plausibly allege that it has suffered antitrust injury. The Court addresses the sufficiency of each theory under Section 1 in turn and then considers Element's allegations on injury.

#### a. Exclusive Dealing

"Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "To state an exclusive dealing claim under [Section] 1, a plaintiff must plausibly allege (1) the existence of an exclusive agreement that (2) forecloses competition in a substantial share of the relevant market." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1066 (9th Cir. 2025) (citing *Aerotec*, 836

F.3d at 1180), *cert. denied*, 146 S. Ct. 1836 (2026).

The Court previously rejected Element's exclusive dealing theory for failing to allege the existence of underlying contractual relationships between Illumina and its customers. Order at 11; *see CoStar*, 150 F.4th at 1072–73 (requiring agreements with "specific features" indicating exclusivity). Element has cured that deficiency.

In the SAC, Plaintiff details the "Supply Agreements" and publicly-available standard terms and conditions ("T&Cs") between Illumina and its customers, which contain allegedly exclusionary or coercive terms. SAC ¶¶ 107–126. The Supply Agreements include "exclusivity provisions, explicit tying arrangements, and volume-based pricing structures intended to penalize customers for using short-read NGS instruments from multiple companies."[1] *Id.* ¶ 6. Element further alleges that "all Illumina customers have an ongoing, contractual relationship with Illumina"—meaning that "each time they purchase a product from [Illumina], that purchase is governed by a preexisting or new contractual agreement." *Id.* ¶ 107. And Illumina's T&Cs govern every sale.[2] *Id.* ¶¶ 107, 120. Having identified both specific and universal agreements that govern Illumina's dealings with its customers over time and that act as the foundation for any alleged exclusivity, Element has satisfied the threshold requirement of pleading that Illumina's exclusive dealing arose from contracts.

The Court next considers whether Element's (i) express and (ii) *de facto* exclusive dealing theories are viable. Under these theories, Element must identify "specific features" requiring exclusivity and adequately plead that Illumina has substantially foreclosed competition in the

---

[1] Element identifies the following contracts: Supply Agreement with Freenome Holdings, Inc. ("Freenome"), *id.* ¶¶ 109–110; Supply Agreement with Guardant Health, Inc. ("Guardant"), *id.* ¶¶ 111–112; "Quotation" with Personalis, *id.* ¶ 113; Supply and Servicing Agreement with Foundation Medicine, Inc. ("Foundation"), *id.* ¶¶ 115–116; Supply Agreement with Icahn School of Medicine at Mount Sinai ("Icahn"), *id.* ¶ 114; and Supply Agreement with Natera, *id.* ¶¶ 117–118.

[2] Illumina's T&Cs and "Universal Consumable Discount Schedule" provide for (1) incrementally higher discounts on sequencers based on consumables spend, (2) earned "instrument credits" that can be redeemed for discounts on future instrument purchases, and (3) "discounts for service contracts . . . based on the number of installed Illumina short-read NGS instruments that the purchaser has." *Id.* ¶¶ 120–122.

relevant market through their adoption. *CoStar*, 150 F.4th at 1072–73.

**i. Express Exclusivity**

Element alleges that Illumina's "Supply Agreement[s] . . . can include express terms that preclude competition on the merits, such as exclusivity provisions," and that "[s]ome Supply Agreements also include express exclusivity provisions." SAC ¶¶ 6, 114. These allegations are not adequately supported, despite Element's inclusion of several example Illumina sales contracts in the SAC. *See id.* ¶¶ 109–119; *supra* at n.1. As Defendants rightly point out, some of the example contracts submitted by Element (*e.g.*, the Freenome, Guardant, Personalis, and Foundation contracts) do not contain explicit agreements by the customer to deal only with Illumina. Opp. at 5–6. For example, the Freenome contract only (1) mentions the existence of loyalty discounts and (2) requires Freenome to use Illumina consumables with Illumina NGS sequencers, which is already mandated as a matter of technological compatibility. SAC ¶¶ 109–110. Similarly, the Guardant agreement only sets out the terms of Illumina's various optional loyalty programs, which confer discounts based on renewals and high-volume purchases. *Id.* ¶¶ 111–112. The Personalis and Foundation contracts are no different. *See id.* ¶¶ 113–116.[3] Examining these agreements, the Court finds no commitments to exclude Illumina's competitors, nor any "requirements terms . . . , volume or market share targets, or long-term contracts that prevent meaningful competition," each of which could have the effect of restraining trade. *Aerotec*, 836 F.3d at 1181 (citations omitted). Rather, these agreements only reiterate what is already an industry feature, *i.e.*, brand lock-in for consumables and services, and provide discount offers that customers can reject without penalty. *See* SAC ¶¶ 42, 53–54.

The two remaining contracts that Element identifies, the Icahn and Natera agreements,

---

[3] The cited "quotation" (or "pricing bid") with Personalis "include[s] the product for purchase . . . , unit pricing, a discount percentage, the customer price, and the number of units being quoted at that price." SAC ¶ 113. The Foundation Agreement includes the following terms: "the redacted list of instruments and consumables are the only hardware and reagents that Foundation is permitted to purchase from Illumina"; "Customer agrees . . . not to use non-Illumina reagents with Illumina Hardware"; "During the Term, Illumina shall offer and Customer shall purchase and maintain a Service Contract for all Illumina Hardware that Customer uses, even if Illumina has determined to discontinue/phase out a given piece of Illumina Hardware." *Id.* ¶¶ 115–116.

contain volume and use-based requirements terms that indicate some level of exclusivity, as the contracts require the customer to purchase only from Illumina when fulfilling certain identified needs. *See id.* ¶¶ 114, 117–118; Mot. at 6; *see also* Ex. A to the Decl. of M. Sullivan at 4, ECF No. 69-3.[4] But those provisions were limited in scope to use in noninvasive prenatal testing (NIPT), and Element does not attempt to explain the prevalence of this use case or the impact of these requirements terms on the broader NGS sequencer market. *See id.* Thus, even assuming the Icahn and Natera contract provisions constitute express agreements to deal exclusively, Element has not alleged that these agreements are unreasonable restraints nor adequately pleaded substantial foreclosure of competition due to the terms. *See Allied Orthopedic*, 592 F.3d at 996 ("[A]n exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" (citation omitted)).[5]

Accordingly, Element has failed to plead an exclusive dealing theory based on express exclusivity provisions.

**ii. *De Facto* Exclusivity**

But the inquiry does not end there. The Ninth Circuit has recognized that exclusive agreements can be *de facto*. *CoStar*, 150 F.4th at 1073 ("To dismiss an exclusive dealing claim just because a contract does not expressly require exclusivity would be the type of overly formalistic rule that the Supreme Court has cautioned against in antitrust cases."); *see also*

---

[4] The Supply Agreement with Icahn states: "Exclusivity. In exchange [*redacted*] under this Agreement, Customer agrees to exclusively use only Illumina [*redacted*] for [*redacted*] performed by Customer during the Term"; "Minimum Purchase Commitment. Beginning in the [*redacted*] Customer launches an [*redacted*], Customer shall purchase and take delivery of no less than [*redacted*] during each calendar quarter of this Agreement during the Term." SAC ¶ 114. The Supply Agreement with Natera provides: "Customer will use only Illumina TG Consumables and Temporary Consumables and Illumina Hardware for all NIPT Uses performed by Customer during the Term." The consequences of non-compliance are: "(i) Customer will not be entitled to the discounts for Products (for any Customer Use) . . . and (ii) . . . Customer shall refund to Illumina an amount equal to [*redacted*]% of the Base Price of all Consumables for which Customer received a [*redacted*] % discount." *Id.* ¶ 117. But Element concedes that "[t]he Illumina-Natera Supply Agreement was later amended to replace this exclusivity provision with a bundled discount structure." *Id.* ¶ 118.

[5] Plaintiff does not seriously contest the limited scope of the Icahn and Natera contracts, nor that the other sample contracts do not expressly require customers to deal only with Illumina. *See* Opp. at 11–15.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."). As the Ninth Circuit explained in *CoStar*, courts in other circuits have recognized *de facto* exclusive agreements where there were "'specific features' that 'effectively coerced' parties to work exclusively with a dominant firm." 150 F.4th at 1073. Despite the flexibility that courts sometimes accord this type of blended theory, the plaintiff must still allege (1) the existence of an agreement with exclusionary effects that (2) substantially forecloses competition. *Id.* at 1066.

<u>First Element: The De Facto Agreement</u>

As a first step, the Court must decide which test to apply in determining whether Element has adequately alleged a *de facto* agreement to deal exclusively: *Brooke Group*'s price-cost test (Defendants' view) or the rule of reason (Plaintiff's view).[6] *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). The price-cost test governs predatory pricing claims; the Court must apply it if predatory pricing is what Element has alleged. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009) (The Supreme Court has "carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low."). If the price-cost test is not appropriate given Plaintiff's allegations, then the Court will apply the rule of reason. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 277 (2012) (applying the rule of reason to *de facto* exclusive dealing claim after finding *Brooke Group* does not apply).

*<u>Option 1: The Price-Cost Test</u>*

The price-cost test requires the plaintiff to allege that "the prices complained of are below an appropriate measure of its rival's costs." *Brooke Grp.*, 509 U.S. at 222; *see Solyndra Residual Tr. by & through Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1043 (N.D. Cal. 2014). It applies not only to claims explicitly labeled "predatory pricing" but also whenever "price is the clearly predominant mechanism of exclusion." *ZF Meritor*, 696 F.3d at 275. The

[6] The Court makes its finding based on the well-pleaded allegations in the SAC.



United States District Court
Northern District of California

Ninth Circuit has held that the price-cost test applies to claims based on bundled discounts. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 910 (2008) (explaining the bundling attribution test, a variation on the price-cost test). The court explained that the antitrust laws should not "punish economic behavior that benefits consumers and [that] will not cause long-run injury to the competitive process." *Id.* at 903; *see also ZF Meritor*, 696 F.3d at 275 ("the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects"). After all, "[a] bundled discount," for one, "is [just] a price discount on a collection of goods." *Cascade Health*, 515 F.3d at 903. Here, Element does not allege that Illumina's prices are below its costs; Element has conceded that "the marginal price of every [Illumina] product . . . remains comfortably above Illumina's cost of producing it." SAC ¶ 166; *see id.* ¶ 142. Instead, Element argues that Illumina "coerce[s] customers into *de facto* exclusivity" through a two-part strategy: "(1) significant discounting for instruments, to ensure competitors can never gain a foothold in the market, and (2) loyalty and volume-based pricing that leverages existing Illumina instrument, consumable, and service purchases to penalize customers that consider competing instruments." *Id.* ¶¶ 7, 142; *see id.* ¶¶ 136, 145–46. Element offers the following example to illustrate the market dynamics:

> Illumina could offer a 10% consumable discount for consumers who have at least 100 Illumina instruments installed. A consumer with 90 instruments, looking to purchase another 10, may solicit bids from both Illumina and Element. Element's pricing on *both* the instrument *and* the consumables could be lower than Illumina's, and Illumina could still win this business. That is because a loyalty discount applies to consumables used in the previously installed base of 90 Illumina machines, as well as the incremental 10 machines. Element is effectively forced to compete not only on the incremental sale, but also against all the prior sales.

*Id.* ¶ 148. According to Element, Illumina leverages this competitive reality to guarantee wins on incremental sales by "tell[ing] the customer that if it buys the Element instrument, the prices the customer pays on its existing fleet—the consumables and services it has no choice but to buy from Illumina—will go up; or, equivalently, that the discounts the customer currently enjoys on those locked-in purchases will disappear." *Id.* ¶ 165. And because "a single one of [Illumina's] high-throughput instruments generates on the order of $1.35 million in consumable purchases every year[,] [a] customer's installed fleet of such instruments therefore represents an

annual stream of captive spending that dwarfs the one-time price of the single new [Element] instrument." *Id.* ¶ 173. In fact, Element calculates that if a customer owned just three Illumina sequencers, then a "~7.1%" price increase on Illumina consumables, the majority of which would service the existing three machines, would erase any cost savings from purchasing an AVITI sequencer (costing $289,000, compared to the Illumina NextSeq 2000's list price of $335,000). *Id.* ¶¶ 78, 174. Element argues that "Illumina's consumable 'discounts' are not, in reality, lower prices" because Illumina can artificially inflate the list price of consumables to allow for discounts. *Id.* ¶ 149.

Construing these allegations in the light most favorable to Plaintiff, the Court finds that Element has presented a theory of exclusion in which price competition is *not* the primary driver. While discounting is a common method of price competition, Illumina is not using discounts to *undercut* Element's prices here. Rather, it is threatening to *remove* discounts (*i.e.*, increase prices) associated with past purchases—specifically, contractual discounts on consumables and services allocated to servicing already-purchased sequencers. This conduct extends beyond the natural operation of the markets and is punitive in nature. *Cf. Eisai Inc. v. Sanofi-Aventis U.S., LLC*, No. CIV.A. 08-4168 MLC, 2014 WL 1343254, at *26–27 (D.N.J. Mar. 28, 2014), *aff'd*, 821 F.3d 394 (3d Cir. 2016) (finding *ZF Meritor*'s requirement of "something more" than the "market-share or volume rebates" missing where "the incontestable demand relating to the[] [drug's] unique indications [was] attributable to the inherent properties of the product at issue, and thus competition on the merits[;] Eisai was not excluded and could have competed for business by offering a 'superior product at a lower price'" (citation omitted)). There is no procompetitive benefit to Defendants' wielding their monopoly over NGS sequencers and customers' high locked-in demand for consumables and services to compel another sale; that is not competition on the merits. And this conduct is not a form of bundling either. "A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually." *Cascade Health*, 515 F.3d at 894. Here, Illumina has not changed the price of its sequencer, which remains more expensive than Element's offering; it leverages only its discounts on consumables and services. *See* SAC ¶ 165. Element paints a

competitive dynamic whereby customers focus not on the price, performance, or quality of the parties' respective products, but on the threatened loss of planned-for savings associated with past purchases. Under this theory, price competition is not "the clearly predominant mechanism of exclusion." *ZF Meritor*, 696 F.3d at 275.[7] The Court declines to dismiss on the basis that Plaintiff has pleaded an inadequate predatory pricing theory.

*Option 2: The Rule of Reason*

Because Element does not allege that Illumina predominantly restrains competition through *price* manipulation, the Court analyzes Element's *de facto* theory under the rule of reason. Under the rule of reason, the Court asks: "does the challenged conduct have a substantial anticompetitive effect that harms consumers in the relevant market?" *CoStar*, 150 F.4th at 1066 (citation modified); *see also ZF Meritor*, 696 F.3d at 268–69 (analyzing *de facto* scheme under the rule of reason, which provides that "an exclusive dealing arrangement will be unlawful only if its 'probable effect' is to substantially lessen competition in the relevant market" (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–29 (1961))); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 356 (4th Cir. 2024) (generally looking for "anticompetitive conduct"), *cert. denied*, 146 S. Ct. 1485 (2026). Element points to *ZF Meritor* and *Duke Energy* as comparable cases where courts have found anticompetitive effects.

In *ZF Meritor*, the Third Circuit considered whether a suite of exclusionary conduct by Eaton, a maker of truck transmissions, "foreclose[d] rival suppliers from a large enough portion of the market to deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete." 696 F.3d at 271. On a full record, the court determined that the following conduct amounted to *de facto* exclusive dealing: conditioning rebates on a customer's purchase of a specified percentage of its requirements from Eaton; requiring customers to market Eaton as

---

[7] *See also id.* at 281 ("Although prices are unlikely to exclude equally efficient rivals unless they are below-cost, exclusive dealing arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition, irrespective of below-cost pricing. Where, as here, a dominant supplier enters into *de facto* exclusive dealing arrangements with every customer in the market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand." (citations omitted)).

their standard offering; and requiring customers to preferentially price Eaton's transmissions to downstream buyers. *Id.* at 265–66. Similarly, in *Duke Energy*, the plaintiff prevailed on its Section 1 claim by proving a dual-tactic scheme: a "blend-and-extend" strategy, in which the defendant conditioned discounts on previously-won (*i.e.*, locked-in) contracts on entering long-term renewal agreements; and raising technological barriers to the plaintiff's connection to necessary transmission lines. 111 F.4th at 347–48, 357–59, 362.

The Court is persuaded that Element has alleged a cognizable theory of discount-based coercion. As seen in *ZF Meritor*, Element has described a coercive scheme in which customers, afraid of losing significant discounts, have rejected its offer of a superior and better-priced product. *See* SAC ¶¶ 130–32 (alleging that Customers A and B backed out of verbal commitments to buy AVITI sequencers because of Illumina's threats); *id.* at 134 ("Element . . . offer[s] AVITI sequencers with higher throughput, better quality, and lower cost relative to Illumina sequencers. It separately offers NGS consumables at a fraction of the price Illumina offers, and similarly prices its NGS instrument services far below where Illumina prices its Illumina NGS instrument services."); *id.* at 78–79 (AVITI's list price is $289,000, compared to NextSeq 2000's list price of $335,000; Element's consumables kit costs $1,680, while Illumina's kit costs over $6,000); *ZF Meritor*, 696 F.3d at 281. And as in *Duke Energy*, Defendants here used non-contestable demand to force future contracts—the equivalent of "discount[s] on pre-2024 prices" in *Duke*. *See* SAC ¶¶ 173–74 (demonstrating how Illumina's discounts on consumables can erase savings from choosing Element); *Duke Energy*, 111 F.4th at 358. Because Element "would have to give away its AVITI instruments for free—or at an unworkably low price—to make the deal worthwhile for the locked-in customers subject to Illumina's tactics," Illumina's alleged conduct, taken as true, rises to the level of coercion. Opp. at 1 (citing SAC ¶¶ 173–75); *compare Allied Orthopedic*, 592 F.3d at 997 (finding no coercion where "[the plaintiff's expert] never explained why price-sensitive hospitals would adhere to Tyco's market-share agreements when they could purchase less expensive generic sensors instead") *with* SAC ¶ 134 ("Notwithstanding better pricing and higher quality on *incremental* sales of NGS instruments, consumables, and instrument services, Element cannot compete for those *incremental* sales because Illumina's contracts leverage a customer's *existing*

Illumina instruments and related demand for consumables to foreclose that *incremental* competition."). Element has therefore alleged "something more than the discount itself." *Allied Orthopedic*, 592 F.3d at 997.

Further, as in both *ZF Meritor* and *Duke Energy*, Element pleads actions that may not individually restrain competition, but that result in a plausible anticompetitive scheme when taken together. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (anticompetitive schemes should be judged "as a whole"). Illumina's multifaceted strategy, as Element alleges, includes entering requirements contracts (*e.g.*, the Icahn and Natera exclusivity clauses, *see supra* at n.4), conditioning discounts on customers' agreement to trade in non-Illumina sequencers so that Element's sales are undone, and engaging in aggressive (but above cost) price-cutting. SAC ¶¶ 140, 142–50. The Court finds that these allegations, taken as true, bolster Element's theory of coercion.

<u>Second Element: Substantial Foreclosure</u>

Next, the Court considers whether Element has sufficiently alleged that Illumina foreclosed competition in a substantial part of the sequencer market. *Aerotec*, 836 F.3d at 1180–81. As the Ninth Circuit explained in *CoStar*, "[b]ecause monopoly power 'is the substantial ability "to control prices or exclude competition,"' if a monopolist enters into exclusive agreements with its customers, those agreements can substantially foreclose competition. Thus, even though monopoly power is not a necessary element of a [Section] 1 claim, when a plaintiff plausibly alleges that exclusive agreements cover a market in which the defendant allegedly holds monopoly power, that is sufficient to allege the substantial foreclosure element of exclusive dealing too." 150 F.4th at 1067. Element has satisfied this test by adequately pleading (1) Illumina's monopoly power, and (2) Illumina's widespread conduct.

First, Element alleges, and Illumina does not contest, that Illumina holds an 80 to 90 percent share of worldwide short-read NGS sequencer sales, that it has held that power since 2013, and that it holds a corresponding share of sales in consumables and services. SAC ¶¶ 90–91, 173. This is monopoly power. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924–25 (9th Cir. 1980) ("[M]arket shares on the order of 60 percent to 70 percent have supported

findings of monopoly power."); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (explaining that "[c]ourts generally require a 65% market share to establish a prima facie case of market power").

Second, a combination of market factors support Element's argument of pervasive conduct. For one, Element asserts that "Illumina uses standard terms and conditions of sale for its contracts with its customers," which includes "a standardized set of volume discounts." SAC ¶¶ 6, 107, 120–22. These universal schedules make plausible Element's allegation that Illumina's coercive discounting tactics are standard practice. *Id.* ¶¶ 125, 134–136, 142–150. Moreover, Element alleges (and emphasized at the hearing) that (1) "business from large research organizations" drives most of Illumina's sales; (2) "upwards of 80% of labs already have at least one Illumina sequencer," and (3) that "[l]arger organizations" are more susceptible to "succumb[ing]" to Illumina's "tactics" because these customers have "greater locked-in consumable and service spend" and thus "incur far greater costs when faced with the same [price or discount-related] threat." *Id.* ¶¶ 87, 139, 141. In other words, Element argues that large organizations are *both* Illumina's biggest buyers *and* the most likely victims of Illumina's coercion. Given this, it appears plausible that Illumina's anticompetitive agreements—or, its coercion—cover a substantial portion of the market. While there remains some uncertainty regarding the precise pervasiveness and the extent of the coercive effects, Element need not plead more at this stage. On balance, Plaintiff's allegations of substantial foreclosure are sufficient under *CoStar*.

The Court finds Element has adequately alleged a theory of *de facto* exclusive dealing.

**b. Tying**

"In a tying arrangement, a 'seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product).'" *Aerotec*, 836 F.3d at 1178 (quoting *Cascade Health*, 515 F.3d at 912). To state a tying claim, Element must allege that (1) Illumina tied together the sale of two distinct products or services, (2) that Illumina possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product, and (3) that the tying arrangement affects a not insubstantial volume of commerce in the

United States District Court
Northern District of California

tied product market. *Id.* Courts "readily acknowledge that tying conditions need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions." *Id.* at 1179; *see Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015) (recognizing "non-explicit tying" when a seller "adopts a policy that makes it unreasonably difficult or costly to buy the tying product . . . without buying the tied product").

Element alleges that Illumina conditioned consumables and services discounts on sequencer sales. *See* Opp. at 18 ("The tying products are the consumables and instrument services that the[] customers cannot abandon, lest their instrument be unusable; the tied product is the contestable instrument sale."); SAC ¶ 129. Specifically, Element argues that "[b]y tying the previously negotiated (and agreed upon) price" of its consumables and services to "the continued purchase of its . . . instruments," Illumina effectively coerced its customers into buying Illumina instruments when the customer otherwise would have preferred Element. *Id.* Element identifies "two occasions" where "these threats have directly caused Element to lose committed sales": loss of a close-to-final sale of an AVITI sequencer to "Customer A," a prominent medical school; and retraction of a verbal commitment to purchase an AVITI sequencer from "Customer B," a large healthcare provider and research institution. *Id.* ¶¶ 130–132. In both cases, "Illumina either threatened to eliminate discounts provided under a standardized, contractual discount schedule, threatened to raise prices under [the Customer]'s existing contracts, or threatened to raise the prices on [the Customer]'s contracts once they were renewed." *Id.* ¶ 130. This is alleged to be problematic because Illumina's "leverage[ing]" of "a customer's *existing* Illumina instruments and related demand for consumables" "foreclose[s] . . . *incremental* competition" by Element on "NGS instruments, consumables, and instrument services." *Id.* ¶ 134. Notably, the "tie" that Element pleads under this theory is no different from the coercive mechanism that Elements pleads under its *de facto* exclusive dealing theory.

This Court previously dismissed Element's tying theory for failing to allege two distinct product markets. *See* Order at 12–13. The Court found that "Element's allegations [we]re internally inconsistent as to whether the short-read NGS instruments are separate products from the consumables and services." *Id.* at 12.

Element tries to square this inconsistency by alleging that Illumina's consumables and services are their own "single-brand" aftermarkets. *See* SAC ¶¶ 43, 59–60. The Supreme Court has instructed that "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984); *see also Eastman Kodak*, 504 U.S. at 462 ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."). The "character of the demand" refers to the practicalities of how the products or services are requested, sold, and used, like whether the products or services are billed separately and whether customers request the products or services individually or together. *See Jefferson Parish*, 466 U.S. at 18–23.

In Element's view, that "an Illumina short-read NGS instrument owner can only use Illumina consumables [and services] to operate their Illumina instrument" does not negate or conflict with the fact that the aftermarket products have their own demand. SAC ¶ 42. This demand is allegedly borne out by evidence that: (1) Illumina markets "Instruments," "Kits & Reagents," and "Services" as separate products on its website; (2) customers can order each product separately or in bundles; (3) customers treat sequencers as capital expenditures and consumables and services as operating expenses for accounting purposes; (4) federal grants qualify sequencers as "equipment" but consumables and services as "supplies"; and (5) Illumina's Supply Agreements uniquely treat each product and forbid "purchasers [from] us[ing] non-Illumina NGS consumables as a work-around to purchasing Illumina NGS consumables." *Id.* ¶¶ 35–38, 40, 42. Finally, Illumina argues that the existence of "homebrew" reagents and independent service providers like SeqGen demonstrates that there is "distinct demand." Opp. at 19.

To determine the sufficiency of these allegations, the Court looks generally to comparable cases, recognizing that the assessment of demand is a highly fact-dependent inquiry and no element-by-element test exists. The parties cite *Kodak*, *Malheur*, and *Kentmaster*, but no case is on all fours. For one, while *Kodak* supports the existence of separate aftermarkets that are

"functionally linked" to foremarkets, the single-brand service and parts markets in *Kodak* included "ISO's" (independent service organizations) that competed in those aftermarkets with the defendant. 504 U.S. at 457–58, 463. This competition is a strong indicator of separate demand that Element does not adequately allege, notwithstanding its passing mentions of "homebrews" and one independent services provider. SAC ¶¶ 42, 54; *cf. Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 187 F.4th 1092, 1100–01 (9th Cir. 2026) (involving an aftermarket where the plaintiff competed and offered substitute services, unlike here); *Aerotec*, 836 F.3d at 1176 (single-brand aftermarket included independent providers offering "substitute repair methods"). On the flipside, while *Malheur* supports Illumina's contention that "necessarily linked" offerings are not distinct products, in *Malheur*, the customers did not demand and could not purchase separately the services that produced the sawlogs and the sawlogs themselves, and the defendant did not market them as distinct. *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 736 (9th Cir. 2026); *cf.* SAC ¶¶ 35–38. And while *Kentmaster* suggests that equipment and spares are a unit when "A will not work for long without B, and . . . no one else but [the maker of A] makes B," there, the customer could predict how much it would spend on B at the time that it bought A and the plaintiff "allege[d] no special market imperfections, such as imperfect information, that would prevent consumers from accurately determining the total cost of A and B." *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 694–95 (9th Cir. 1998). Here, Element pleads uncertain pricing for Illumina's consumables and services, with Illumina having significant power to change contractual prices. SAC ¶¶ 45–47, 60–61, 120–22, 146–47, 130–31, 163–68.[8]

On balance, given Element's factual allegations regarding market participants' practical

[8] The parties' other cases are also not clearly instructive to the facts at hand: *Teradata Corp. v. SAP SE*, 124 F.4th 555 (9th Cir. 2024) analyzed market definitions on a full record, involving industry-specific definitions with no analogous application here; *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1046 (9th Cir. 2008) asked whether "the boundaries of [the alleged] markets impermissibly depended on a contractually-created group of consumers," an inquiry not relevant here; *10X Genomics, Inc. v. Vizgen, Inc.*, No. 22-CV-595, 2025 WL 26734 (D. Del. Jan. 3, 2025) did not involve a tying claim; and in *Synopsys Inc. v. ATopTech, Inc.*, No. 13-cv-2965, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) and *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-cv-3587, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019), the courts did not examine aftermarkets, and the dismissals stemmed from the plaintiffs' failures to plausibly allege the coercion mechanism.

treatment of consumables and services as separate offerings, the Court finds that Element has plausibly alleged distinct product markets among instruments, consumables, and services. For example, that Illumina markets and customers buy sequencers, consumables, and services separately indicates distinct needs and uses for each. Moreover, that a customer cannot *a priori* predict its consumables and services spending at the time that it invests in a sequencer suggests that the demand for the aftermarkets products change and develop over time, without reference to the cost of the initial sequencer.[9] As such, customers are not truly buying complete systems when they make an initial sequencer purchase. Taking these and other well-pleaded allegations as true, "[e]nough doubt is cast on [Illumina]'s claim of a unified market that it should be resolved by the trier of fact" after the benefit of discovery. *Eastman Kodak*, 504 U.S. at 463; *see also Hosp. Bldg.*, 425 U.S. at 746 (In antitrust cases, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (citations omitted)). Because Illumina's arguments primarily "hinge on factual disagreements rather than legal deficiencies, such . . . arguments do not support affirmance of the Rule 12(b)(6) dismissal." *Newcal Indus.*, 513 F.3d at 1051; *see* Mot. at 10 (questioning the nature of demand).

As explained above, Element has plausibly alleged that Illumina unreasonably lessened competition by conditioning the price of its NGS consumables and services on the purchase of additional Illumina sequencers and foreclosed a substantial portion of the sequencers market. Because the facts underlying Element's *de facto* exclusive dealing and tying claims are the same, the Court also finds that Illumina possessed enough power in the tying market to coerce its

[9] On reply, Illumina introduced the argument that Element failed to plead the four factors of a "*Kodak* lock-in market." Reply at 8–9, ECF No. 77. But as Defendants acknowledge, Element pleads an "inverted" tie in which the tying product is the aftermarket product. *See* Illumina's Demonstrative Slides at 18, ECF No. 86-1. The Court is not persuaded at this stage that *Kodak* supplies the correct framework, given that Plaintiff has alleged conduct by Illumina that is more than merely "'normal' market forces . . . at work." *Universal Avionics Sys. Corp. v. Rockwell Int'l Corp.*, 184 F. Supp. 2d 947, 955 (D. Ariz. 2001), *aff'd*, 52 F. App'x 897 (9th Cir. 2002); *cf. Apple Inc v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1201 (N.D. Cal. 2008) (requiring the plaintiff to plead *Kodak* factors where it alleged "Apple asks its customers to purchase Mac OS knowing that it is to be used only with Apple computers," a classic foremarket-aftermarket tie). The Court considers informational asymmetry to the extent that it informs the character of the demand for the several alleged products and services.



United States District Court
Northern District of California

United States District Court
Northern District of California

customers into purchasing the tied product, thereby affecting a not insubstantial volume of commerce in the tied market. *See Eastman v. Quest Diag. Inc.*, 724 F. App'x 556, 558 n.1 (9th Cir. 2018) (importing analysis under exclusive dealing where allegations of tying and exclusive dealing were the same).

Element has cured its definitions for the tying and tied products, and the tying theory survives.

**c. Antitrust Injury**

In addition to alleging unreasonable restraints of trade, Element must allege that it suffered harm. An antitrust plaintiff seeking monetary or injunctive relief must show that it has suffered antitrust injury, *i.e.*, an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat Inc.*, 429 U.S. 477, 489 (1977); *see Epic Games*, 67 F.4th at 983 (examples include "reduced output, increased prices, or decreased quality in the relevant market"). This requirement is common to every antitrust theory.

Here, by "hinder[ing] competition," "Illumina has raised market wide prices, lowered market wide quality, limited market wide choice, and stifled market wide innovation for short-read next-generation DNA sequencing." SAC ¶ 171. The Court finds these allegations sufficient at this stage, as Plaintiff has presented enough to support a plausible theory of market-wide exclusion based on a collection of practices. *See, e.g.*, *id.* ¶¶ 148–50, 163–177; *see In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) ("[W]e are required to take a holistic look at how the interlocking agreements actually impact competition. . . . [T]he law requires that the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" (quoting *Cont'l Ore*, 370 U.S. at 698–99)); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (holding that "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect").

**2. Sherman Act Section 2 (15 U.S.C. § 2) (Counts 2 and 3)**

Section 2 of the Sherman Act makes it illegal to "monopolize . . . any part of the trade or

commerce among the several States." 15 U.S.C. § 2. A plaintiff must show that the defendant (1) possesses monopoly power in the relevant market and (2) uses that power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak*, 504 U.S. at 482–83 (citing *United States v. Griffith*, 334 U.S. 100, 107 (1948)); *see also Epic Games*, 67 F.4th at 998. For an attempted monopolization claim, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

Element bases its Section 2 claim on three theories: "tying arrangements, exclusive dealing arrangements, and structuring new NGS-related contracts in a way to prevent competition based on efficiency." SAC ¶¶ 192, 200. Because "the rule of reason . . . analysis is 'essentially the same' as the anticompetitive-conduct inquiry for a monopolization claim under Section 2," the Court finds that Element has adequately alleged anticompetitive conduct under Section 2 in support of its monopolization and attempted monopolization claims. *Malheur Forest*, 164 F.4th at 737 (citing *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)); *see also CoStar*, 150 F.4th at 1068. The Court therefore limits its discussion to market power and intent. The Court also briefly addresses Plaintiff's new contract-structuring theory.

**a. Market Power and Intent**

"[I]f [a plaintiff] plausibly alleges that [the defendant] has monopoly power and willfully acquired that power through anticompetitive conduct, it will have stated both a monopolization and attempted monopolization claim under § 2." *CoStar*, 150 F.4th at 1067. Illumina does not contest its monopolist label, and as discussed *supra* at 14–15, the Court determined that Element has sufficiently alleged monopoly power. *See* SAC ¶¶ 3, 89–91 (at least 80% market share in instruments, consumables, and services); *CoStar*, 141 F.4th at 1070–71 (finding market shares of 60–90% in varying geographic regions sufficient at the pleading stage). Next, by pointing to Illumina's history of exclusionary conduct, SAC ¶¶ 98–106, disparaging comments about Element, *id.* ¶¶ 151–157, and coercive discounting practices, *id.* ¶¶ 127–136, Element has alleged sufficient facts to support that Illumina willfully acquired its monopoly power. *See Hunt-Wesson*,

United States District Court
Northern District of California

627 F.2d at 926 ("Specific intent to monopolize will normally be proved by inference from conduct," and "the existence of market power is relevant to drawing the inference of specific intent from conduct").

Accordingly, Plaintiff's exclusive dealing and tying theories survive under both of its Section 2 claims.

**b. Loyalty Discounts**

Element carves out a separate "structuring new NGS-related contracts in a way to prevent competition based on efficiency" theory under Section 2 in the SAC—called "loyalty discounting" or "loyalty rebating" in its Opposition—but this theory appears no different from Element's *de facto* exclusive dealing theory. *See* SAC ¶¶ 192, 200; Opp. at 9–11; *supra* at 8–15. At the hearing, Plaintiff clarified that unlike its exclusive dealing claim, its discounting claim challenges a "negative tie"—preventing customers from buying from Plaintiff without necessarily forcing them to buy from Defendant. *See Aerotec*, 836 F.3d at 1178 ("A negative tie 'occur[s] when the customer promises not to take the tied product from the defendant's competitor, but courts "rarely encounter[]" such a situation.'" (citation omitted)). This appears to be a distinction without a difference, as the practical effect of Illumina's "negative tie" is to drive the customer to buy from Illumina. While this theory appears duplicative, the Court declines to dismiss it at this stage as discovery may reveal meaningful differences between Plaintiffs' theories. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("duplicative" or "superfluous" claims are "not grounds for dismissal" given Federal Rule of Civil Procedure 8(d)(2)).

**B. State Law Claims**

**1. Secret Allowances, Defamation, and Trade Libel (Counts 6, 7, and 8)**

Plaintiff states in footnotes 114, 115, and 116 of the SAC that "Element has not substantively amended the allegations in this Second Amended Complaint, from the First Amended Complaint" with respect to these claims, and that "Element preserves [these] Count[s] for appeal." SAC at pp. 69–70. Because Plaintiff has intentionally not addressed the insufficiencies the Court identified in the FAC, *see* Order at 15–18, granting further leave to amend would be futile. *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018)

("Leave to amend may be denied if the proposed amendment is futile or would be subject to dismissal."). The Court therefore grants Defendants' motion to dismiss Counts 6, 7, and 8 without leave to amend.

**2. Unlawful and Unfair Competition Under the UCL (Cal. Bus. & Prof. Code §17200, *et seq*.) (Count 5)**

Element's UCL unlawful-prong and unfair-prong claims are entirely derivative of Plaintiff's antitrust claims. *See* Order at 17–18. Both claims survive because Plaintiff's antitrust claims survive.

**3. Tortious Interference with Prospective Economic Relations (Count 9)**

The Court previously found that Element had alleged sufficient facts to support all the factors of its claim for tortious interference for Customers A and B, except for the element of an independent wrongful act. *See id.* at 18–19. Because Element's Sherman and Clayton Act violations are actions "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard," they satisfy tortious interference's independent-wrongfulness requirement. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). Element's tortious interference with prospective economic relations claim therefore survives.

## IV. CONCLUSION

For the foregoing reasons, Illumina's motion to dismiss is DENIED in part and GRANTED in part. Defendants shall answer the SAC with respect to the surviving claims (Counts 1, 2, 3, 4, 5, and 9) within 21 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: November 20, 2026

Noël Wise
United States District Judge